**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ESSILOR INTERNATIONAL SAS and
ESSILOR MANUFACTURING (THAILAND)
CO., LTD.,

                           Plaintiffs,

     v.

J.P. MORGAN CHASE BANK, N.A.,

                       Defendant.

Case No. 1:22-cv-03361
**ORAL ARGUMENT REQUESTED**


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................3

    A.    The Parties' Banking Relationship ........................................................ 3

    B.    Events Giving Rise To This Litigation ................................................. 5

LEGAL STANDARD...........................................................................................................6

ARGUMENT .......................................................................................................................7

I.     EMTC'S CLAIMS ARE TIME-BARRED BY A CONTRACTUAL LIMITATIONS PERIOD ........................................................................................ 7

II.    PLAINTIFFS' N.Y. U.C.C. § 4A-204(1)(A) CLAIM FAILS........................... 9

    A.    Statutory Framework ............................................................................ 9

    B.    Essilor's U.C.C. Claim Fails Because It Is Not A "Sender" Within The Meaning Of The Statute, And Hence, Cannot Obtain A "Refund" ................................... 11

    C.    The U.C.C. Claim Fails Because The Payment Orders Were "Authorized"........ 12

III.   PLAINTIFFS' COMMON-LAW CLAIMS SHOULD BE DISMISSED...................... 17

    A.    EMTC's Common-Law Claims Are Preempted................................................. 17

    B.    Plaintiffs' Contract Claim Should Be Dismissed As Inadequately Pled .............. 18

    C.    Plaintiffs' Negligence Claim Should Be Dismissed For Failure To Plausibly Allege A Duty, Breach, Or Compensable Damages............................................ 20

CONCLUSION ..................................................................................................................24

Case 1:22-cv-03361-LJL   Document 19   Filed 07/15/22   Page 3 of 31

# TABLE OF AUTHORITIES

Page(s)

## CASES

*2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*,
    816 F. Supp. 2d 222 (S.D.N.Y. 2011), *aff'd*, 503 F. App'x 51 (2d Cir. 2012) .......... *passim*

*Alvarez Rodriguez v. Branch Banking & Trust Co.*,
    529 F. Supp. 3d 1309 (S.D. Fla. 2021) ........................................................................11

*Andre Romanelli, Inc. v. Citibank, N.A.*,
    875 N.Y.S.2d 14 (1st Dep't 2009) ...............................................................................24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................................6, 15

*Banco del Austro, S.A. v. Wells Fargo Bank, N.A.*,
    215 F. Supp. 3d 302 (S.D.N.Y. 2016) ..........................................................................18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................................6

*Blum v. Citibank, NA*,
    81 N.Y.S.3d 51 (2d Dep't 2018) ...................................................................................23

*BNP Paribas Mortgage Corp. v. Bank of America, N.A.*,
    949 F. Supp. 2d 486 (S.D.N.Y. 2013) ..........................................................................22

*Cartier Saada S.A. v. Bank of America, N.A.*,
    2022 WL 195598 (S.D.N.Y. Jan. 21, 2022) .................................................................19

*Centre-Point Merchant Bank Ltd. v. American Express Bank Ltd.*,
    913 F. Supp. 202 (S.D.N.Y. 1996) ...............................................................................18

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ...........................................................................................7

*Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*,
    516 N.E.2d 190 (N.Y. 1987) .........................................................................................23

*Cohen v. Avanade, Inc.*,
    874 F. Supp. 2d 315 (S.D.N.Y. 2012) .............................................................20, 21, 23

*Daniels v. City of New York*,
    2019 WL 1437586 (S.D.N.Y. Mar. 31, 2019), *aff'd sub nom. Smalls v.
    Collins*, 2021 WL 3700194 (2d Cir. Aug. 20, 2021) .....................................................9

ii

*Deswal v. U.S. National Ass'n,*
    603 F. App'x 22 (2d Cir. 2015) ...........................................................7

*Deutsche Bank Trust Co. Americas v. Rado L.P.,*
    819 F. App'x 66 (2d Cir. 2020) .........................................................22

*EQT Infrastructure Ltd. v. Smith,*
    861 F. Supp. 2d 220 (S.D.N.Y. 2012)..................................................4

*Feinberg v. Katz,*
    2002 WL 1751135 (S.D.N.Y. July 26, 2002) .......................................9

*Frankel-Ross v. Congregation OHR Hatalmud,*
    2016 WL 4939074 (S.D.N.Y. Sept. 12, 2016)...................................19

*Fried v. Lehman Brothers Real Estate Associates III, L.P.,*
    67 N.Y.S.2d 145 (1st Dep't 2017) ......................................................19

*Global Network Communications, Inc. v. City of New York,*
    458 F.3d 150 (2d Cir. 2006)..................................................................3

*Grain Traders, Inc. v. Citibank, N.A.,*
    160 F.3d 97 (2d Cir. 1998).............................................................11, 17

*Griffin v. Garratt-Callahan Co.,*
    1995 WL 151824 (E.D.N.Y. Mar. 28, 1995), *aff'd*, 74 F.3d 66 (2d Cir. 1996) .................9

*Harris v. Mills,*
    572 F.3d 66 (2d Cir. 2009)....................................................................7

*Hertz Global Holdings, Inc. v. Nat'l Union Fire Insurance Co.,*
    530 F. Supp. 3d 447 (S.D.N.Y. 2021)...................................................4

*In re Optionable Securities Litigation,*
    577 F. Supp. 2d 681 (S.D.N.Y. 2008)...................................................8

*International Audiotext Network, Inc. v. American Telephone & Telegraph Co.,*
    62 F.3d 69 (2d Cir. 1995).......................................................................7

*J Construction Co., LLC v. Westchester Fire Insurance Co.,*
    87 N.Y.S.3d 585 (2d Dep't 2018)..........................................................8

*John v. State Farm Mutual Automobile Insurance Co.,*
    983 N.Y.S.2d 883 (2d Dep't 2014)........................................................8

*JPMorgan Chase Bank, N.A. v. Freyberg,*
    171 F. Supp. 3d 178 (S.D.N.Y. 2016)..................................................21

*Kevin Kerveng Tung, P.C. v. JP Morgan Chase & Co.*,
    943 N.Y.S.2d 792 (Sup. Ct. Oct. 28, 2011), *aff'd*, 963 N.Y.S.2d 145 (2d
    Dep't 2013) ................................................................................................................21, 23

*Lewis Tree Service, Inc. v. Lucent Technologies, Inc.*,
    2000 WL 1277303 (S.D.N.Y. Sept. 8, 2000) ...................................................................19

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    597 F.3d 84 (2d Cir. 2010) ...............................................................................................17

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007) ..............................................................................................20

*Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*,
    261 F.R.D. 13 (S.D.N.Y. 2009), *aff'd*, 382 F. App'x 107 (2d Cir. 2010) ........................21

*New South Federal Savings Bank v. Flatbush Federal Savings & Loan Ass'n of Brooklyn*,
    2002 WL 31413680 (S.D.N.Y. Oct. 25, 2002) ................................................................13

*Prakhin v. JPMorgan Chase Bank*,
    No. 1:19-cv-06737, Mem. & Order (E.D.N.Y. July 23, 2021)...........................................8

*Shah v. Wilco Systems, Inc.*,
    126 F. Supp. 2d 641 (S.D.N.Y. 2000) ...............................................................................19

*Socci v. JPMorgan Chase & Co.*,
    2018 WL 4388454 (E.D.N.Y. Sept. 14, 2018) ..................................................................22

*Traditional Chile Agentes de Valores Ltda v. ICAP Sec. USA LLC*,
    2010 WL 4739938 (S.D.N.Y. Nov. 5, 2010).................................................................9, 20

*TVT Records v. Island Def Jam Music Group*,
    412 F.3d 82 (2d Cir. 2005)................................................................................................21

*Veliz v. Collins Building Services, Inc.*,
    2011 WL 4444498 (S.D.N.Y. Sept. 26, 2011) ....................................................................4

*Village on Canon v. Bankers Trust Co.*,
    920 F. Supp. 520 (S.D.N.Y. 1996) ...................................................................................21

*Westchester County Correction Officers Benevolent Ass'n, Inc. v. County of Westchester*,
    953 N.Y.S.2d 623 (2d Dep't 2012)...................................................................................19

*Wolff v. Rare Medium, Inc.*,
    171 F. Supp. 2d 354 (S.D.N.Y. 2001)...............................................................................18

*Zaidi v. JP Morgan Chase Bank, N.A.*,
    2021 WL 848864 (E.D.N.Y. Mar. 5, 2021) ........................................................................9

## STATUTES, RULES, AND REGULATIONS

CPLR § 201 ...................................................................................................................8

N.Y. U.C.C.
§ 4A-102 .........................................................................................................11
§ 4A-102 (cmt.) ...............................................................................9, 10, 12, 17
§ 4A-103 .........................................................................................................10
§ 4A-103(1)(a) ................................................................................................10
§ 4A-103(1)(b) ................................................................................................10
§ 4A-103(1)(d) ................................................................................................10
§ 4A-103(1)(e) ...........................................................................................10, 11
§ 4A-104 .........................................................................................................10
§ 4A-104 (cmt. 1) ...........................................................................................10
§ 4A-105 .........................................................................................................10
§ 4A-202 .........................................................................................................13
§ 4A-202 (cmt.) ..............................................................................................13
§ 4A-202(1) ...............................................................................................13, 14
§ 4A-202(2) .....................................................................................................13
§ 4A-203 ...................................................................................................13, 15
§ 4A-203 (cmt. 1) .....................................................................................13, 14, 15
§ 4A-203 (cmt. 3) ..........................................................................................2, 16
§ 4A-203 (cmt. 4) ...........................................................................................16
§ 4A-203(1)(b) ................................................................................................16
§ 4A-204(1)(a) ......................................................................................... *passim*

## OTHER AUTHORITIES

EssilorLuxottica, 2019 Universal Registration Document,
https://www.essilorluxottica.com/sites/default/files/documents/2020-
05/ESSI_DEU_2019_UK_29052020_MEL.pdf (last visited July 12, 2022) ....................6

EssilorLuxottica, *Fraudulent Financial Activities at an Essilor Plant in Thailand* (Dec.
30, 2019) https://www.essilorluxottica.com/sites/default/files/documents/2019-
12/Press_Release_EssilorLuxottica_December_30_2019_EN.pdf ....................................8

*Oxford English Dictionary* (4th ed. 1993) ...................................................................11

**INTRODUCTION**

In 2019, a high-level employee of Essilor Manufacturing (Thailand) Co., Ltd. ("EMTC") stole $272 million from the company by initiating fraudulent wire transfers from EMTC's bank account at JPMorgan Chase Bank, N.A. ("JPMC").  To carry out her fraud, the employee used security credentials that had been entrusted to her by EMTC, along with security credentials she apparently misappropriated from another authorized employee.  EMTC failed to detect the fraud over the four months it was being committed—failing to account along the way for more than a quarter billion dollars.  After the fraud was detected in December 2019, EMTC's ultimate parent company EssilorLuxottica squarely placed the blame for the fraud on EMTC's deficient internal controls.  As EssilorLuxottica admitted in its annual financial report, the fraud took place because "[i]nternal controls [were] circumvented by colluding employees at the plant (including its finance manager)."  In response, the company undertook "a wide range of corrective measures" to its internal controls, and it "reorganized its Treasury and local management in Thailand."  In addition, the board of EssilorLuxottica docked the pay of the chairman of Essilor International SAS ("Essilor")—EMTC's direct parent company—"[i]n view of the fraud that took place at an Essilor plant in Thailand."

With JPMC's help, EMTC recovered nearly $172 million of the misappropriated funds.  Nevertheless, EMTC and Essilor now seek to shift the blame for their own internal controls failure, and their failure to supervise EMTC's employee, onto JPMC.  Their complaint contends that JPMC is responsible for failing to detect and intercept the criminal conduct of EMTC's faithless employee and should be responsible for the remaining $100 million loss.

All of Plaintiffs' claims are time-barred, legally deficient, or defeated by Plaintiffs' own allegations.  Accordingly, the complaint should be dismissed.

1

*First*, EMTC—the entity that initiated the fraudulent wire transfers—agreed in its contract with JPMC that it would bring any claims against the bank within two years.  But it filed this suit in April 2022, more than two years after the last fraudulent wire transfer in December 2019.  All claims based on funds transferred from the EMTC account are accordingly time-barred.

*Second*, EMTC's and Essilor's claims under New York U.C.C. Article 4A fail for multiple reasons.  Essilor was not the "sender" of any of the wire transfers at issue here (i.e., EMTC was the "sender"), so Essilor has no rights under the statute to assert.  EMTC's (time-barred) U.C.C. claim also fails because the transactions were "authorized" by EMTC within the meaning of the statute.  As the factual allegations in the complaint establish, the wire transfers were initiated consistent with the contractually agreed-upon dual-user certification process.  EMTC's U.C.C. claim thus falters on one of the most basic principles of wire-transfer law:  "The burden on the customer is to supervise its employees to assure compliance with the security procedure and to safeguard confidential security information and access to transmitting facilities so that the security procedure cannot be breached."  N.Y. U.C.C. § 4A-203 (cmt. 3).

*Third*, EMTC's and Essilor's common-law claims should be dismissed for multiple reasons.  To the extent they are not time-barred, EMTC's common-law claims are preempted by the New York U.C.C.  Plaintiffs' contract claims also should be dismissed because they fail to give JPMC notice of the contract provisions Plaintiffs contend were breached.  To the extent JPMC can decipher the claims at all, Plaintiffs do not plead any plausible contractual obligation that was breached when EMTC's employee defrauded EMTC.  And, finally, Plaintiffs' negligence claim fails under well-settled case law holding that banks owe no noncontractual duty

to their customers to monitor account activity for potential fraud, as well as under the parties'

contract provisions exculpating JPMC for negligent conduct.

EMTC regrettably fell victim to a fraud by its own trusted employee who circumvented

the company's internal controls.  JPMC has done everything reasonably in its power to assist the

company in recovering misappropriated funds, and the bank and EMTC have had extraordinary

success in their cooperative efforts.  To the extent EMTC cannot recover the remainder, the loss

falls to them—not to JPMC.  JPMC is not obligated by statute, contract, or common law to act as

its customer's insurer.  The complaint should be dismissed.

## BACKGROUND

### A.    The Parties' Banking Relationship

EMTC is a Thailand-based eyewear manufacturer.  Compl. ¶ 12.  Essilor is its France-

based parent company.  *Id.* ¶ 11.  EssilorLuxottica, the ultimate parent of both EMTC and

Essilor, is a sophisticated multinational company and the world's largest eyewear conglomerate,

with total assets of more than €52 billion; it is listed on the CAC 40 share index, which includes

the 40 largest and most actively traded shares listed on Euronext Paris.

"Essilor, EMTC, and JPM[C] have a long-standing banking relationship."  Compl. ¶ 16.

Specifically, EMTC and Essilor each have separate accounts with JPMC, each governed by a

separate set of contractual account terms.  *See id*. ¶¶ 2, 12, 15, 24-25.  Plaintiffs bring this

lawsuit seeking to recover funds that were transferred from EMTC's bank account at JPMC in

New York (the "EMTC Account").  *See id*. ¶¶ 1, 2 n.1.  The contract that governs the EMTC

Account (the "EMTC Account Terms") includes explicit provisions concerning security

procedures for initiation of wire transfers.[1]  The Terms provide that "[w]hen issuing

---

[1] Plaintiffs assert a claim for breach of contract but do not attach the contracts themselves to the complaint.
The Court can consider the contracts on this motion to dismiss.  *See, e.g.*, *Glob. Network Commc'ns, Inc. v. City of*

Instructions" to initiate wire transfers, the customer (EMTC) is "required to follow the Bank's security procedures … and shall be bound by such security procedures for use of the Service." *See* Declaration of Siriwan Premplumjit ("Premplumjit Decl.") Ex. 2, § 2.1.  In other words, once the parties agree upon a security procedure, EMTC is bound by transactions initiated pursuant to that procedure, and JPMC is required only to ensure that the instructions comply with the security procedure.  The Terms make this understanding explicitly clear:  "It is understood that the purpose of the security procedure is to verify the authenticity of, and not to detect errors in, Instructions."  *Id*.

The agreement places further obligations on EMTC.  It is EMTC's responsibility to "safeguard the security procedure and make it available only to persons that it has authorized," Premplumjit Decl. Ex. 2, § 2.1, and to "promptly examine[] each Account Statement and any accompanying Items that are made available to it by the Bank, and report[] any irregularities to the Bank in writing, including any claim of unauthorized funds transfer activity," *id*. § 7.  By contrast, the Terms explicitly state that "[t]he Bank shall not be required to inquire into the circumstances of any transaction."  *Id*. § 5.1.

The EMTC Account Terms also include a contractual limitations period requiring that all claims be brought against JPMC within two years.  *See* Premplumjit Decl. Ex. 2, § 16.2 ("Any claim in connection with any … Service … must be brought against the Bank within two (2)

---

*New York*, 458 F.3d 150, 157 (2d Cir. 2006) (court may consider on motion to dismiss a "contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint"); *Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co.*, 530 F. Supp. 3d 447, 451 (S.D.N.Y. 2021) (considering insurance policy even though "Plaintiff did not attach a copy of the insurance policy to its Second Amended Complaint," because "Plaintiff relie[d] on the terms of the written policy throughout the Second Amended Complaint"); *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 224 n.2 (S.D.N.Y. 2012) (court could consider letter of intent on motion to dismiss because complaint "refer[red] to and quote[d] from the Letter of Intent, thus incorporating it"); *Veliz v. Collins Bldg. Servs., Inc.*, 2011 WL 4444498, at *1 n.2 (S.D.N.Y. Sept. 26, 2011) (considering collective bargaining agreement on motion to dismiss because complaint was "based entirely on [plaintiff's] employment relationship … of which the CBA is an integral part").

years of the occurrence of the event giving rise to the claim"); *id*. at Preamble ("'Services' shall mean services offered by the Bank and subject to the Account Terms and any applicable Service Terms."); *id*. § 5 (discussing JPMC's wire transfer services).  The EMTC Account Terms—as well as the terms of the separate contract between JPMC and Essilor—likewise limit any potential liability of JPMC to any direct damages incurred as a result of the bank's gross negligence or willful misconduct.  *Id*. § 11.1 ("The Bank … shall not be liable for any damage, loss, expense or liability of any nature which the Customer may suffer or incur, except to the extent of direct losses or expenses resulting from the gross negligence or willful misconduct of the Bank[.]"); *see also* Declaration of Dragana Kosanovic ("Kosanovic Decl.") Ex. 1, § 11.1.

B.      **Events Giving Rise To This Litigation**

EMTC and Essilor allege they "are the victims of a complex fraud orchestrated by international cybercriminals" who "enlisted a then-current employee of EMTC," Chamanun Phetporee, "to make approximately 243 fraudulent" wire transfers from the EMTC Account. Compl. ¶¶ 1, 17-18 (describing the fraudulent scheme), ¶ 2 n.1 (indicating that the "unauthorized transfers" were made "from the EMTC account").  The fraudulent wire transfers occurred from September through December 2019, and totaled roughly $272 million.  *Id*. ¶¶ 1, 17.  Plaintiffs, with JPMC's assistance, have been able to recover approximately $172 million, though roughly $100 million remains to be recovered.  *See id*. ¶¶ 2, 49-50.

As Plaintiffs explain in their complaint, Phetporee's scheme was possible because EMTC gave her electronic credentials to act on EMTC's behalf, as well as access to EMTC's facilities. JPMC and EMTC agreed to a specific security procedure:  any electronic wire transfer from the EMTC Account required a two-step process—that is, "[t]wo separate approvals at EMTC were required to process a payment order" electronically.  Compl. ¶ 19.  "Phetporee was able to provide the first approval."  *Id*.  She then "misappropriated the credentials of the designated

second approver," and issued the 243 fraudulent wire transfers from the EMTC Account. *Id.*[2]
The stolen funds "were deposited to a multitude of straw man accounts located throughout the
world." *Id.* ¶ 17.  Notably, the complaint does not include a single allegation that the wire
transfers were executed in any way inconsistently with the parties' agreed-upon user-certification
process.  Phetporee was arrested by Thai law enforcement authorities and charged with multiple
crimes. *Id.* ¶ 18.  Following detection of the fraud, "[a]dditional internal controls have been put
in place at Essilor International worldwide in order to strengthen existing security processes."[3]
In addition, the board of EssilorLuxottica docked the pay of Esslior's chairman "[i]n view of the
fraud that took place at an Essilor plant in Thailand."[4]

      On April 25, 2022, Essilor and EMTC filed this lawsuit to recover the fraudulent wire
transfers they were not previously able to recover.  Seeking "costs and expenses incurred in this
action" and "compensatory damages" plus interest (Compl. 18), EMTC and Essilor each bring
three claims in connection with the at-issue wires that JPMC processed between September and
December 2019—a claim pursuant to Article 4A of the N.Y. U.C.C, a breach of contract claim,
and a negligence claim.

## LEGAL STANDARD

      Under Rule 12(b)(6), a complaint should be dismissed when a plaintiff's allegations fail
to set forth a set of facts that, if true, would entitle the plaintiff to relief.  *See Ashcroft v. Iqbal*,
556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court

---

[2] Section 1.2 of the EMTC Account Terms permits EMTC to designate "authorized persons" to, among
other things, initiate wire transfers on behalf of the company.  Section 1.1 in turn authorizes JPMC to rely on the
client's authorization to "identif[y] a person authorized to act on behalf" of EMTC.  As the complaint acknowledges,
Phetporee was such an authorized person.  Compl. ¶¶ 18-19.

[3] EssilorLuxottica, 2019 Universal Registration Document at 41,
https://www.essilorluxottica.com/sites/default/files/documents/2020-05/ESSI_DEU_2019_UK_29052020_MEL.pdf
(last visited July 12, 2022).

[4] *Id.* at 114.

accepts the complaint's well-pleaded factual allegations as true, but not legal conclusions

couched as factual allegations, and makes any factual inferences in favor of the plaintiff.  *See*

*Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009).  Relevant here, "a statute of limitations

defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the

complaint."  *Deswal v. U.S. Nat'l Ass'n*, 603 F. App'x 22, 23-24 (2d Cir. 2015) (internal

quotation marks omitted).  And, in resolving a 12(b)(6) motion to dismiss, the court may

consider the facts alleged in the complaint, and documents attached or referenced in the

complaint.  *Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l*

*Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

## ARGUMENT

### I.    EMTC'S CLAIMS ARE TIME-BARRED BY A CONTRACTUAL LIMITATIONS PERIOD

All of the wire transfers Plaintiffs seek to recover were made from the EMTC Account.

*See* Compl. ¶¶ 1, 2 n.1.  As EMTC alleges, that account relationship is governed by written

account terms.  *See, e.g.*, *id.* ¶ 15 (referring to a forum selection clause in the Account Terms),

¶¶ 24-25 (quoting provisions in the Account Terms that relate to JPMC's anti-money laundering

procedures).  Those account terms include a contractual limitations period requiring that all

claims—including those relating to wire transfers—be brought against JPMC within two years.

*See* Premplumjit Decl. Ex. 2, § 16.2 ("Any claim in connection with any … Service … must be

brought against the Bank within two (2) years of the occurrence of the event giving rise to the

claim"); *id.* at Preamble ("'Services' shall mean services offered by the Bank and subject to the

Account Terms and any applicable Service Terms."); *id.* § 5 (discussing JPMC's wire transfer

services).

Under CPLR § 201, parties may contractually agree to specific limitations periods. CPLR § 201 ("An action … must be commenced within the time specified in this article *unless* a different time is prescribed by law or *a shorter time is prescribed by written agreement*." (emphasis added)).  Consistent with the statute, New York courts enforce contractually agreed limitations periods.  *See, e.g.*, *J Constr. Co., LLC v. Westchester Fire Ins. Co.*, 87 N.Y.S.3d 585, 587 (2d Dep't 2018) (enforcing two-year contractual period of limitations in bond agreement because "[t]he parties to a contract may agree to limit the period of time within which an action must be commenced to a period shorter than that provided by the applicable statute of limitations."); *John v. State Farm Mut. Auto. Ins. Co.*, 983 N.Y.S.2d 883, 884 (2d Dep't 2014) (applying one-year limitation period provided in insurance policy to bring claim or commence action).

EMTC brings three claims relating to wires that JPMC processed in between September and December 2019.[5]  EMTC did not file its complaint until April 2022—at least four months after the contractual limitations period for each wire had passed.  As a result, all claims brought by EMTC are time barred and should be dismissed.  *See, e.g.*, *Prakhin v. JPMorgan Chase Bank*, No. 1:19-cv-06737, Mem. & Order (E.D.N.Y. July 23, 2021), ECF No. 16 (dismissing with prejudice U.C.C Article 4 (and other) claims barred by two-year limitations period in JPMC's

---

[5] The contractual limitations period requires that any claim be brought within two years "of the occurrence of the event giving rise to the claim."  Premplumjit Decl. Ex. 2, § 16.2.  EMTC was thus required to bring its claim no later than two years after each of the alleged fraudulent transfers took place.  To the extent EMTC might argue that it was only required to bring its claim within two years of *discovery* of the fraud, it makes no difference here because EMTC knew of the fraud by December 2019, as EssilorLuxottica's December 30, 2019 press release makes clear.  EssilorLuxottica, *Fraudulent Financial Activities at an Essilor Plant in Thailand*, (Dec. 30, 2019) https://www.essilorluxottica.com/sites/default/files/documents/2019-12/Press_Release_EssilorLuxottica_December_30_2019_EN.pdf.  The Court can consider the press release on this motion to dismiss for the purpose of showing that Plaintiffs were on notice of the events giving rise to this litigation because they are not reasonably susceptible to dispute.  *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 688 (S.D.N.Y. 2008) (on motion to dismiss, considering "SEC filings and press releases referred to in the Complaint," because those documents were "incorporate[d] by reference or [were] amenable to judicial notice").

deposit agreement); *Zaidi v. JP Morgan Chase Bank, N.A.*, 2021 WL 848864, at *6 (E.D.N.Y.

Mar. 5, 2021) (enforcing limitations period in JPMC's deposit agreement in breach of contract

claim relating to electronic transfers).[6]

## II.      PLAINTIFFS' N.Y. U.C.C. § 4A-204(1)(A) CLAIM FAILS

Plaintiffs' first claim is brought under New York U.C.C. § 4A-204(1)(a), which concerns

banks' limited refund obligations in connection with certain electronic payment orders.  This

claim fails for two straightforward reasons:  First, because Essilor did not send any of the wire

transfers—they all were paid out of the EMTC Account—it has no rights under § 4A-204(1)(a).

And, second, to the extent EMTC, the sender of the wire transfers, has not forfeited rights under

Article 4A by its belated complaint, its claim nonetheless fails because the complaint

affirmatively alleges that the two-step approval process was complied with.  Essilor's and

EMTC's U.C.C. claims fail on the face of the statute and the complaint.

### A.      Statutory Framework

Article 4A "governs a specialized method of payment referred to … as a funds transfer

but also commonly referred to in the commercial community as a wholesale wire transfer."  N.Y.

U.C.C. § 4A-102 (cmt.).  Article 4A deliberately treats wire transfers "as a unique method of

payment to be governed by unique rules that address the particular issues raised by this method

---

[6] As the complaint itself alleges, all of the fraudulent wire transfers were made from the EMTC Account.
*See* Compl. ¶¶ 1, 2 n.1.  Essilor, of course, has no standing to sue for any injury to EMTC from the transfer of funds
from EMTC's account.  *See, e.g.*, *Traditional Chile Agentes de Valores Ltda v. ICAP Sec. USA LLC*, 2010 WL
4739938, at *9 (S.D.N.Y. Nov. 5, 2010) ("[A] corporation usually does not have standing to enforce the rights of its
subsidiaries."); *Feinberg v. Katz*, 2002 WL 1751135, at *6 (S.D.N.Y. July 26, 2002) ("Numerous courts have
dismissed claims brought by corporations when the claims actually belong to a subsidiary or an affiliated
corporation." (collecting cases)).  To the extent it presses any claim based on the transfer of funds out of the EMTC
Account, its claims are likewise barred by the two-year statute of limitations in the EMTC Account Terms.  *See
Griffin v. Garratt-Callahan Co.*, 1995 WL 151824, at *7 (E.D.N.Y. Mar. 28, 1995) ("[T]he derivative claim is
governed by the same statute of limitations which applies to the original claim."), *aff'd*, 74 F.3d 66 (2d Cir. 1996);
*Daniels v. City of New York*, 2019 WL 1437586, at *3 (S.D.N.Y. Mar. 31, 2019) ("These claims are derivative in
nature and are therefore dismissed to the extent that they are predicated on Plaintiff's time-barred claims."), *aff'd sub
nom. Smalls v. Collins*, 2021 WL 3700194 (2d Cir. Aug. 20, 2021).

of payment." *Id*.  To that end, the drafters "use[d] precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability." *Id*.

The scope of these "precise and detailed rules" is governed by carefully drafted definitions.  *See* N.Y. U.C.C. §§ 4A-103-105.  A "payment order" is defined as "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary."  *Id*. § 4A-103(1)(a).  The "sender" is "the person giving the instruction to the receiving bank." *Id*. § 4A-103(1)(e).  "'Receiving bank' means the bank to which the sender's instruction is addressed." *Id*. § 4A-103(1)(d).  The "beneficiary" is "the person to be paid." *See id*. § 4A-103(1)(b).

The payment orders at issue here are those in which EMTC instructed JPMC to pay specific recipients.  With respect to these, EMTC is the "sender," JPMC is the "receiving bank," and the intended recipients are the "beneficiaries."  *See* N.Y. U.C.C. § 4A-104 (cmt. 1).

Plaintiffs bring a statutory claim based on N.Y. U.C.C. § 4A-204(1)(a), which concerns a "sender's" right to a "refund" from a "receiving bank" if the "receiving bank" executes certain payment orders.  It provides:

> If a receiving bank [JPMC] *accepts a payment order issued in the name of its customer as sender* [EMTC] which is (a) *not authorized and not effective* as the order of the customer under Section 4-A-202 … the bank [JPMC] shall refund any payment of the payment order received from the customer [EMTC] to the extent the bank [JPMC] is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank [JPMC] received payment to the date of the refund.

N.Y. U.C.C. § 4A-204(1)(a) (emphasis added).

Two provisions of this section are relevant to this motion to dismiss.  *First*, a "refund" pursuant to § 4A-204(1)(a) is available only to "senders" of the payment orders, not to third parties.  *Second*, a § 4A-204(1)(a) refund is available only if the disputed payment orders were

"not authorized *and* not effective"—*i.e.*, a § 4A-204(1)(a) claim is unavailable where the at-issue

wire transfers are either "authorized" or "effective."  (Emphasis added.)

### B.      Essilor's U.C.C. Claim Fails Because It Is Not A "Sender" Within The Meaning Of The Statute, And Hence, Cannot Obtain A "Refund"

A claim for a "refund" under § 4A-204(1)(a) is available where "a receiving bank accepts

a payment order issued in the name of its customer as sender."  Section 4A-103(1)(e) defines

"sender" as "the person giving the instruction to the receiving bank."  Further, a "refund," by

definition, requires that the funds be returned to the entity that made the payment—i.e., the

"sender."  *See Oxford English Dictionary* 2525 (4th ed. 1993) (defining "refund" as "Return or

repay (a sum of money); hand back.").  Here, the "receiving bank"—JPMC—did not accept any

"instruction" to issue a wire transfer "in the name of" Essilor as the "sender."  *See* N.Y. U.C.C.

§§ 4A-204(1), 4A-103(1)(e).  Essilor has no § 4A-204(1)(a) claim because it was never a

"sender" and therefore cannot obtain a "refund."

The complaint is devoid of allegations that the wire transfer "instruction[s]" were made

"in the name of" Essilor.  To the contrary, the complaint alleges that EMTC was the customer

that instructed JPMC to effect the wires.  *See, e.g.*, Compl. ¶ 2 n.1 (transfers "from the EMTC

account"), ¶ 8 (discussing approval process "at EMTC"), ¶ 17 (noting that fraudsters "caused

EMTC" to transfer money).  Because Essilor was not the entity "giving the instruction" to JPMC

to issue the allegedly fraudulent wires, Essilor is not a "sender" within the meaning of the statute,

N.Y. U.C.C. § 4A-103(1)(e), and it is not among the "affected parties" whose rights are

governed by Article 4A, *see id.* § 4A-102; *see also, e.g.*, *Grain Traders, Inc. v. Citibank, N.A.*,

160 F.3d 97, 101 (2d Cir. 1998) (Article 4A "applies only between the parties to a particular

payment order"); *Alvarez Rodriguez v. Branch Banking & Tr. Co.*, 529 F. Supp. 3d 1309, 1322

(S.D. Fla. 2021) (dismissing Section 204 refund claim under Florida U.C.C. Article 4A brought

by affiliates of sender; concluding that only direct parties to a wire transfer "can maintain a claim under Article 4A"); *see also* N.Y. U.C.C. § 4A-102 (cmt.) ("In the drafting of these rules, a critical consideration was that *the various parties to funds transfers* need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately." (emphasis added)).

Nonsensically, Essilor's § 4A-204 claim would require JPMC to make a payment to a third party (i.e., to Essilor) instead of the statute's contemplated "refund" to the "sender" (i.e., EMTC). The claim should be dismissed.

### C.    The U.C.C. Claim Fails Because The Payment Orders Were "Authorized"

Because Essilor has no rights under Article 4A, only EMTC can press the complaint's U.C.C. claim. And were EMTC's U.C.C. claim not time-barred, that claim also would fail because the complaint affirmatively alleges that the transfers were "authorized" within the meaning of the statute. To prevail on a "refund" claim under § 4A-204(1)(a), a "sender" must prove that the disputed payment orders were both (1) "not authorized" *and* (2) "not effective." N.Y. U.C.C. § 4A-204(1)(a). The complaint's U.C.C. claim fails under the first requirement because the facts pled more than adequately suffice to establish authorization under the New York U.C.C. Accordingly, the Court need not analyze on this motion whether the payment orders were also "effective." *See, e.g.*, *2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*, 816 F. Supp. 2d 222, 235 n.24 (S.D.N.Y. 2011) (finding that plaintiffs' § 4A-204 failed because payment orders were "authorized," and "refrain[ing] from addressing whether Plaintiffs can establish that the wire transfers at issue were 'not effective,' because it is unnecessary to do so"), *aff'd*, 503 F. App'x 51 (2d Cir. 2012).[7]

---

[7] Plaintiffs allege that JPMC is liable under § 4A-204 unless it can demonstrate that (1) it executed the wire transfers following an agreed-upon and commercially reasonable security procedure, and (2) it acted in good faith.

Under New York's U.C.C. § 4A-202(1), authority from a payment order can arise in two ways: (1) "the person identified as sender … authorized the order," or (2) the person "is otherwise bound by it under the law of agency." This motion proceeds on the first ground.[8]

Section 4A-202(1) and accompanying commentary unambiguously provide the reasons why authority is established by the complaint here. *See New S. Fed. Sav. Bank v. Flatbush Fed. Sav. & Loan Ass'n of Brooklyn*, 2002 WL 31413680, at *1 (S.D.N.Y. Oct. 25, 2002) ("The official comments to Article 4A … may be useful in interpreting Article 4A."). Comment 1 to § 4A-203 speaks specifically to electronic wire transfers.[9] Noting that "Section 4A-202 reflects the reality of the wire transfer business," Comment 1 explains that in the "very large percentage of cases covered by Article 4A" in which "transmission of the payment order is made electronically, … [t]he receiving bank may be required to act on the basis of a message that appears on a computer screen." N.Y. U.C.C. § 4A-203 (cmt. 1). In these instances, because "[t]here is no way of determining the identity or the authority of the person who caused the message to be sent[, …] the receiving bank relies on a security procedure pursuant to which the authenticity of the message can be 'tested' by various devices which are designed to provide certainty that the message is that of the sender identified in the payment order." *Id.* Said

---

Compl. ¶ 20. But those elements relate to whether the payment orders were "effective" under § 4A-202(2)—which is not at issue on this motion to dismiss. As explained, Plaintiffs' § 4A-204 claim fails because the payment orders were "authorized" under § 4A-202(1), which is a distinct inquiry from whether the payment orders were "effective." *See* N.Y. U.C.C. § 4A-204(1)(a) (noting that a "refund" is available if a payment order is "not authorized *and* not effective" (emphasis added)). Plaintiffs point to "red flags" that JPMC allegedly ignored when honoring the fraudulent wire transfers (*see* Compl. ¶¶ 32-43) as supposed evidence of the bank's lack of "good faith." But even if these supposedly missed red flags were relevant to JPMC's good faith—they are not—they are still irrelevant for purposes of this motion because they have nothing to do with whether the transfers were "authorized" under § 4A-202(1).

[8] Should the complaint survive this motion, the evidence will show that EMTC is bound by the alleged fraudulent wire transfers under the law of agency and that the security procedures at issue in this litigation are "effective" under § 4A-202(2) and were complied with in good faith.

[9] As explained in the U.C.C., the drafters placed the commentary to §§ 4A-202 and 4A-203 together after § 4A-203. *See* N.Y. U.C.C. § 4A-202 (cmt.) ("This section is discussed in the Comment following Section 4A-203.").

13

differently, electronic security procedures, in the form of "algorithms or other codes," allow banks to certify users as a way of testing that wire transfers are initiated from a customer's devices as opposed to the result of a cyber hack, unauthorized outsider access, or a phishing scam. *See* Premplumjit Decl. Ex. 2, § 2.1.  Testing through this method provides authority. Comment 1 puts it plainly and directly: "In the wire transfer business the concept of 'authorized' is different from that found in agency law.  In that business a payment order is treated as the order of the person in whose name it is issued if it is properly tested pursuant to a security procedure and the order passes the test."  N.Y. U.C.C. § 4A-203 (cmt. 1).  In sum, the commentary makes clear that "electronic[]" wire transfers are "authorized" within the meaning of § 4A-202(1) if bank customers issue them in compliance with "security procedure[s]" that certify users, which banks can then "test[]" "on the basis of … a computer screen."  *Id.*

EMTC authorized the wire transfers precisely as contemplated by Article 4A.  The complaint specifies the security procedure in place:  "Two separate approvals at EMTC were required to process a payment order"—i.e., a two-step user-certification process.  Compl. ¶ 19. The complaint then details how that process "passe[d] the test" (N.Y. U.C.C. § 4A-203 (cmt. 1)): JPMC received the first approval when Phetporee provided it using her credentials.  Compl. ¶ 19. JPMC received the second approval when Phetporee, unbeknownst to JPMC, used "the credentials of the designated second approver"—"a specifically designated EMTC employee"— to confirm the wire was authorized.  *Id.*

To be sure, Plaintiffs allege that Phetporee misappropriated the credentials of the second approver, but there is no dispute that receipt by JPMC of the two approvals fully satisfied the dual-approver procedure agreed to by EMTC and JPMC—thereby confirming that the wires were in fact initiated and authorized by EMTC.  Indeed, while the complaint acknowledges that

EMTC breached the EMTC Account Terms by failing to safeguard the security credentials (*see* Premplumjit Decl. Ex. 2, § 2.1), it does not allege that JPMC failed to follow any aspect of the dual-certification procedure to which EMTC and JPMC agreed.  By the complaint's own admission then, the allegedly fraudulent wire transfers were "authorized" within the meaning of Article 4A, *see* N.Y. U.C.C. § 4A-203 (cmt. 1), which defeats the § 4A-204 claim.

The complaint alleges that the wire transfers were "not authorized" (Compl. ¶ 46), but that is precisely the type of legal conclusion that the court may not accept as true.  *See Iqbal*, 556 U.S. at 678 (court is not "bound to accept as true a legal conclusion couched as a factual allegation").  It is also irrelevant.  Authorization under Article 4A of the U.C.C., as just explained, is based on receipt of specified electronic confirmation, not on a customer's subjective view.  The complaint also makes the obvious point that Phetporee was not authorized to make "fraudulent transfers."  Compl. ¶ 19.  Of course she was not.  But that does not affect whether the wire transfers were "authorized" within the meaning of Article 4A.  Again, receipt by JPMC of the approvals necessary to satisfy the parties' agreed procedure establishes authorization for purposes of the statute.  That is the end of the inquiry.

EMTC's theory is that although it was defrauded by its own faithless employee, JPMC should nonetheless be responsible for EMTC's losses because JPMC allegedly ignored red flags in EMTC's payment activity.  *See* Compl. ¶¶ 32-43.  But the U.C.C. expressly contemplates this scenario and allocates the risk of loss in precisely the opposite way.  Section 4A-203—which addresses the unenforceability of certain payment orders—explains that the risk of loss is on the customer if the payment order "was caused … by a person [] entrusted … to act for the customer" or "who obtained, from a source controlled by the customer … information facilitating the breach of the security procedure, regardless of how the information was obtained

or whether the customer was at fault." N.Y. U.C.C. § 4A-203(1)(b).[10]  The official commentary

underscores the point that the burden falls on the customer (EMTC), not the receiving bank

(JPMC): "The burden on the customer is to supervise its employees to assure compliance with

the security procedure and to safeguard confidential security information and access to

transmitting facilities so that the security procedure cannot be breached." *Id.* § 4A-203 (cmt. 3).

As the commentary continues, the purpose of the U.C.C. is "not to make [banks] insurers against

fraud." *Id.* (cmt. 4).  Consistent with this commentary, the EMTC Account Terms squarely place

the burden on EMTC—not JPMC—to safeguard security credentials from misappropriation by

EMTC's own employees,[11] and mandate that EMTC—not JPMC—regularly inspect the EMTC

Account for irregular activities.[12]  Nothing in the U.C.C. text or commentary excuses EMTC's

lack of internal controls in protecting approver credentials, its obvious failure to review or

reconcile its account records as required by its agreement with JPMC, or the subsequent four-

month delay in reporting unauthorized wire transfers to JPMC.  *See* Premplumjit Decl. Ex. 2,

§§ 2.1, 7.

 While Phetporee's fraud is regrettable, it does not give Plaintiffs recourse to the New

York U.C.C. to recover wire transfers that were concededly authorized by EMTC's own

employee consistent with the parties' agreed-upon approval procedure.  Plaintiffs' U.C.C.

---

  [10] Section 4A-203(1)(b) states: "The receiving bank is not entitled to enforce or retain payment of the payment order if the customer proves that the order was not caused, directly or indirectly, by a person (i) entrusted at any time with duties to act for the customer with respect to payment orders or the security procedure, or (ii) who obtained access to transmitting facilities of the customer or who obtained, from a source controlled by the customer and without authority of the receiving bank, information facilitating breach of the security procedure, regardless of how the information was obtained or whether the customer was at fault. Information includes any access device, computer software, or the like."

  [11] *See* Premplumjit Decl. Ex. 2, § 2.1 ("The Customer shall safeguard the security procedure and make it available only to persons that it has authorized.").

  [12] *See id.* § 7 ("The Customer is responsible for ensuring that an Authorized Person promptly examines each Account Statement and any accompanying Items that are made available to it by the Bank, and reporting any irregularities to the Bank in writing, including any claim of unauthorized funds transfer activity.").

claim—which Essilor cannot in any event bring, and which EMTC is in any event time-barred from bringing—should be dismissed.

## III.   PLAINTIFFS' COMMON-LAW CLAIMS SHOULD BE DISMISSED

### A.   EMTC's Common-Law Claims Are Preempted

EMTC's (time-barred) common-law claims for breach of contract and negligence are likewise subject to dismissal because they are preempted by the U.C.C.

The U.C.C. recognizes that Article 4A was the result of a "deliberate decision … to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment." N.Y. U.C.C. § 4A-102 (cmt).  The rules of Article 4A, therefore, "are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article." *Id*.  Relying on the standards set out in Article 4A, courts in this Circuit have held that Article 4A preempts state law causes of action premised on conduct falling within the scope of the New York U.C.C., regardless of whether the state law conflicts with or is duplicative of Article 4A. *See Grain Traders*, 160 F.3d at 103; *2006 Frank Calandra*, 816 F. Supp. 2d at 236.

In determining whether a common law claim is preempted, "the critical inquiry is whether its provisions protect against the type of underlying injury or misconduct alleged in a claim." *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89-90 (2d Cir. 2010). As relevant here, "[a]ny common law claims about the existence of unauthorized wire transfers … and the mechanics of how those transactions were conducted, fall within the regime of Articles 4-A," and are therefore preempted. *2006 Frank Calandra*, 816 F. Supp. 2d at 236. Consistent with this principle, courts in this District routinely dismiss breach of contract and negligence claims relating to allegedly fraudulent payment orders because the parties' rights, duties and obligations are exclusively governed by Sections 4A-202 through 4A-204. *See, e.g.*,

*Banco del Austro, S.A. v. Wells Fargo Bank, N.A.*, 215 F. Supp. 3d 302, 306-07 (S.D.N.Y. 2016)

(dismissing negligence claim—which alleged that the bank "violated its duty of care by

negligently honoring the" wires—because the "claim falls entirely within the coverage of Section

4A-202, which creates a comprehensive system of risk allocation for unauthorized funds

transfers"); *Ctr.-Point Merch. Bank Ltd. v. Am. Express Bank Ltd.*, 913 F. Supp. 202, 208

(S.D.N.Y. 1996) (dismissing negligence and good faith claims relating to "fraudulent payment

orders," reasoning that "§§ 4-A-201 to -204 … determine the rights, duties and obligations of the

parties," and thus, the common law claims are "precluded"); *cf. 2006 Frank Calandra*, 816 F.

Supp. 2d at 236 (in case involving § 4A-204 claim, holding, on summary judgment, that the

N.Y. U.C.C. preempted "at a minimum," "the breach of contract and gross negligence claims"

relating to unauthorized wires and the mechanics about those transactions).

EMTC's claims for breach of contract and negligence relate exclusively to allegedly

unauthorized wire transfers and the mechanics of how those transactions were conducted. *See,*

*e.g.*, Compl. ¶¶ 17-21. Both claims therefore are preempted by the New York U.C.C., and

should be dismissed. *See, e.g.*, *Banco del Austro*, 215 F. Supp. 3d at 306-07; *Ctr.-Point Merch.*

*Bank Ltd.*, 913 F. Supp. at 208; *cf. 2006 Frank Calandra*, 816 F. Supp. 2d at 236.[13]

### B.    Plaintiffs' Contract Claim Should Be Dismissed As Inadequately Pled

Plaintiffs' breach of contract claim alleges that they "entered into a valid and binding

agreement governing the NY Account and the broader cash management system that was put in

place in 2017," and that "JPM breached its obligations under the contract." Compl. ¶¶ 53-54.

That is manifestly insufficient to put JPMC on notice of what contract, much less what contract

provision, Plaintiffs contend was breached or how. *See Wolff v. Rare Medium, Inc.*, 171 F. Supp.

---

[13] If the Court concludes, contrary to JPMC's argument above, that Essilor does in fact have rights under the New York U.C.C. with respect to the wire transfers, then Essilor's common-law claims are likewise preempted.

2d 354, 357-58 (S.D.N.Y. 2001) ("[A] plaintiff must identify what provisions of the contract were breached as a result of the acts at issue … to give the adverse party fair notice of the claim asserted so as to enable that party to answer and prepare for trial" (cleaned up)).[14]

Plaintiffs' factual allegations are focused on provisions that relate to JPMC's anti-money laundering controls.  *See* Compl. ¶¶ 24-25.  The complaint does not plausibly allege a breach of any of those controls—or that the employee fraud even constituted money laundering—but in any event, to the extent Plaintiffs seek to predicate their breach of contract claim on those terms, the claim fails because a bank's AML obligations do not give rise to a private cause of action. *See, e.g.*, *Cartier Saada S.A. v. Bank of Am., N.A.*, 2022 WL 195598, at *2 (S.D.N.Y. Jan. 21, 2022) ("As many courts have held, the Bank Secrecy Act does not provide a private right of action.");[15] *Frankel-Ross v. Congregation OHR Hatalmud*, 2016 WL 4939074, at *4 (S.D.N.Y. Sept. 12, 2016) (rejecting plaintiff's claim that bank was required "to maintain an effective AML system" because "it is now well settled that the anti-money-laundering obligations of banks … obligate banks to report certain customer activity to the government but do not create a private cause of action permitting third parties to sue for violations of the statute").

Dressing up a claim to enforce those statutory obligations as one for breach of contract does nothing for Plaintiffs, because the EMTC Account Terms expressly provide that, as a matter

---

[14] *See also Shah v. Wilco Sys., Inc.*, 126 F. Supp. 2d 641, 653 (S.D.N.Y. 2000) ("[T]he Complaint fails to provide [defendant] notice of the contractual provision allegedly breached, or the nature of the breach; it merely states that '[d]efendant breached the terms of these employment contracts.'"); *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.*, 2000 WL 1277303, at *5 (S.D.N.Y. Sept. 8, 2000) (dismissing breach of contract claim because "plaintiffs fail to identify any particular contractual provision that the defendants have allegedly breached"); *Fried v. Lehman Bros. Real Est. Assocs. III, L.P.*, 67 N.Y.S.2d 145, 146 (1st Dep't 2017) ("[B]reach of contract claim was deficiently pleaded" because plaintiffs "never pleaded, in those claims or the breach of contract claim, the breach of any specific contractual provisions"); *Westchester Cnty. Corr. Officers Benevolent Ass'n, Inc. v. Cnty. of Westchester*, 953 N.Y.S.2d 623, 625 (2d Dep't 2012) ("A breach of contract cause of action fails as a matter of law in the absence of any showing that a specific provision of the contract was breached.").

[15] The Bank Secrecy Act imposes anti-money-laundering obligations on banks, requiring them to report certain customer activity to the government.  *See Frankel-Ross v. Congregation OHR Hatalmud*, 2016 WL 4939074, at *4 (S.D.N.Y. Sept. 12, 2016).

of contract, JPMC "shall not be required to inquire into the circumstances of any transaction," when honoring a customer's wire transfer instructions.  *See* Premplumjit Decl. Ex. 2, § 5.1. More to the point, the complaint readily admits that EMTC breached the Account Terms by failing to safeguard the user credentials.[16]  Aside from acknowledging their own material breaches—which precludes their recovery in contract altogether, *see Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007)—Plaintiffs' complaint does nothing to clarify the basis for their contract claim.  It should be dismissed for failure to give JPMC notice under Rule 8; to the extent it rests on these AML provisions, it should be dismissed for failure to allege a plausible legal theory; and, in any event, it should be dismissed due to Plaintiffs' own material breaches.

Essilor's contract claim also fails for an independent reason.  Again, as the complaint points out, the EMTC Account is governed by the EMTC Account Terms.  *See* Compl. ¶ 24. The only signatories to the EMTC Account Terms are JPMC and EMTC.  While Essilor is a party to separate account terms that govern *Essilor's* account at JPMC, Essilor cannot sue for alleged breach of its subsidiary's agreement with JPMC.  *See, e.g.*, *Traditional Chile Agentes de Valores Ltda*, 2010 WL 4739938, at *9.

### C.  Plaintiffs' Negligence Claim Should Be Dismissed For Failure To Plausibly Allege A Duty, Breach, Or Compensable Damages

To prevail on a negligence claim, a plaintiff must make "a showing that the defendant breached a duty of care owed to the plaintiff."  *2006 Frank Calandra*, 503 F. App'x at 54. Because New York "does not recognize a cause of action for the negligent performance of a contract," a plaintiff "must demonstrate that [d]efendants breached a duty independent from their

---

[16] *See* Premplumjit Decl. Ex. 2, § 2.1; Compl. ¶¶ 18-19.

obligations under the contract." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 326 (S.D.N.Y. 2012); *see also TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005) (under New York law, claims sounding in negligence must be "sufficiently distinct from the breach of contract claim to be viable").  Thus, when a customer sues a bank, the complaint must make sufficient allegations evidencing an extracontractual duty of care.  *See, e.g.*, *Cohen*, 874 F. Supp. 2d at 326; *Kevin Kerveng Tung, P.C. v. JP Morgan Chase & Co.*, 943 N.Y.S.2d 792 (Sup. Ct. Oct. 28, 2011), *aff'd*, 963 N.Y.S.2d 145 (2d Dep't 2013).

Plaintiffs' complaint does not allege any legally cognizable duty independent of the contracts between Plaintiffs and JPMC.  While Plaintiffs allege that they had a "long-standing banking relationship" with JPMC (Compl. ¶ 16), New York law makes clear that such a relationship does not give rise to an extracontractual duty of care: "the relationship between a bank and its depositor is that of debtor and creditor, which, without more, is not a fiduciary or special relationship … even if there is a long-standing relationship between the customer and a particular bank employee." *JPMorgan Chase Bank, N.A. v. Freyberg*, 171 F. Supp. 3d 178, 191 (S.D.N.Y. 2016) (citations omitted); *see also Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 26 (S.D.N.Y. 2009) ("'[U]nder New York law no fiduciary relationship arises from a long-standing debtor-creditor or creditor-guarantor relationship.'" (quoting *Vill. on Canon v. Bankers Tr. Co.*, 920 F. Supp. 520, 532 (S.D.N.Y. 1996), *aff'd*, 382 F. App'x 107 (2d Cir. 2010)); *Kevin Kerveng Tung*, 943 N.Y.S.2d at 792 (same).

Similarly, the complaint's suggestion that JPMC had a duty to monitor the EMTC Account to prevent EMTC's own employees from misappropriating funds (*see, e.g.*, Compl. ¶¶ 22, 28) is contrary to the EMTC Account Terms, which, again, place the burden on EMTC to safeguard security credentials from misappropriation and to regularly inspect its account for

21

irregular activities.  *See supra* Background, Section A.  Plaintiffs' negligence claims not only improperly seek to impose extracontractual duties on JPMC that directly conflict with the EMTC Account Terms, but also seek to excuse EMTC's failure to properly monitor its account and four-month delay in reporting unauthorized wire transfers to JPMC.  *See* Premplumjit Decl. Ex. 2, §§ 2.1, 7.  Moreover, it is well-settled that banks do not have an extracontractual duty to monitor their customers' accounts for mismanagement or misappropriation.  *See, e.g.*, *Deutsche Bank Tr. Co. Americas v. Rado L.P.*, 819 F. App'x 66, 67-68 (2d Cir. 2020) (affirming dismissal of counterclaims alleging bank had failed to adequately guard trust account from mismanagement because depository bank had no duty to monitor fiduciary account); *2006 Frank Calandra*, 503 F. App'x at 54 (noting that a bank does not have a "duty to monitor [] accounts maintained at its branches in order to safeguard funds in those accounts from [] misappropriation," and further noting that "[i]t was up to the Trustees, not [the] Bank, to make sure that Trust funds were being used appropriately").

The complaint's suggestion that JPMC owed a duty to Essilor in these circumstances (*see* Compl. ¶ 28) is even more strained:  JPMC had no duty to monitor Essilor's account, much less to prevent wrongdoing by Essilor's own subsidiary.  *See, e.g.*, *Deutsche Bank Tr. Co. Am.*, 819 F. App'x at 67-68; *2006 Frank Calandra*, 503 F. App'x at 54.

Because the complaint fails to state an extracontractual duty of care, the negligence claims therefore must be dismissed.  *See, e.g.*, *Socci v. JPMorgan Chase & Co.*, 2018 WL 4388454, at *3 (E.D.N.Y. Sept. 14, 2018) (dismissing negligence claim against bank because "[p]laintiff has not asserted any relationship with Defendant, or duty therefrom, beyond a standard banker-depositor contract"); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F.

Supp. 2d 486, 506-08 (S.D.N.Y. 2013) (dismissing negligence claims against bank because plaintiff "failed to establish any independent duty allowing their tort claims to proceed").[17]

Even assuming EMTC has adequately alleged a duty of care (it has not), the complaint does not allege a breach.  The complaint alleges that "[t]wo separate approvals at EMTC were required to process a payment order," that Phetporee "was able to provide the first approval," that she in fact provided the first approval for the at-issue wire transfers, and that the requisite second approval was provided using the secured credentials of EMTC's authorized second approver.  Compl. ¶¶ 18-19.  In light of these admissions, JPMC had "the right to presume" that the at-issue wires—all issued using EMTC's secured credentials—were not fraudulent.  *See 2006 Frank Calandra*, 503 F. App'x at 54 (affirming summary judgment on negligence and gross negligence claims because bank had the "the right to presume" that employee who was authorized to effect wire transfers on the company's behalf was not misappropriating the company's funds).

EMTC was in the best position to protect itself from Phetporee's fraudulent scheme, and cannot shift the losses it incurred onto JPMC.  *See, e.g.*, *Kevin Kerveng Tung*, 2011 WL 6989895, at *5 (dismissing concealment claim because the customer "was in the best position to protect itself from a fraudulent check cashing scheme, by knowing its 'client', and exercising caution before wiring funds … [and] may not shift the losses it incurred as a result of said scheme onto the [banks]"); *Blum v. Citibank, NA*, 81 N.Y.S.3d 51, 52 (2d Dep't 2018) (affirming

---

[17] The complaint's formulaic recitation that "JPM owed Plaintiffs a duty of care, independent of their contractual agreement, to act in a manner consistent with commercially reasonable standards" (Compl. ¶ 58), is, again, the type of recitation of the elements of a claim entitled to no weight here.  Moreover, it fails, as is required, to specify what duty of care JPMC allegedly owed.  *See Cohen*, 874 F. Supp. 2d at 326-27 (dismissing negligence claim because "conclusory assertions of a duty aside, the complaint does not state what duty of care Defendants owed, let alone how they breached that duty"); *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987) ("Merely charging a breach of a 'duty of care,' employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim.").

dismissal of "action to recover damages for negligence," holding customer not entitled to "recoup the monies that he transferred from his account" because the plaintiff himself "made the subject payments by wire transfers"); *cf. Andre Romanelli, Inc. v. Citibank, N.A.*, 875 N.Y.S.2d 14, 16 (1st Dep't 2009) ("The risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent.").

Finally, in addition to failing to plausibly allege duty or breach, Plaintiffs cannot plead compensable damages.  Both the EMTC Account Terms and the terms governing Essilor's own account limit JPMC's liability to "direct losses or expenses resulting from the gross negligence or willful misconduct of" JPMC.  *See* Premplumjit Decl. Ex. 2, § 11.1; Kosanovic Decl. Ex. 2, § 11.1.  The complaint does not even attempt to state a claim for gross negligence or willful misconduct—nor could it, as it alleges that JPMC honored wires transfers that complied with the parties' agreed-upon security procedures (*see* Compl. ¶¶ 18-19), and JPMC had a contractual right to presume the authenticity of such wires (*see* Premplumjit Decl. Ex. 2, § 2.1).

## CONCLUSION

For all the foregoing reasons, the Court should dismiss the complaint.

Dated:  July 15, 2022                              Respectfully submitted,


                                                   */s/* Alan E. Schoenfeld
                                                   Alan E. Schoenfeld
                                                   WILMER CUTLER PICKERING
                                                      HALE AND DORR LLP
                                                   7 World Center
                                                   250 Greenwich Street
                                                   New York, NY 10007
                                                   (212) 937-7294 (t)
                                                   (212) 230-8888 (f)
                                                   alan.schoenfeld@wilmerhale.com

                                                   Margarita M. Botero
                                                   WILMER CUTLER PICKERING

HALE AND DORR LLP
1225 Seventeenth St.
Suite 2600
Denver, CO 80202
(720) 274-3130 (t)
(720) 274-3133 (f)
margarita.botero@wilmerhale.com