**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- x

ESSILOR INTERNATIONAL SAS and
ESSILOR MANUFACTURING (THAILAND)
CO., LTD.,

         Plaintiffs,

    -against-

J.P. MORGAN CHASE BANK, N.A.,

         Defendant.

-------------------------------------------------- x

Index No. 22-cv-03361-LJL
**ORAL ARGUMENT REQUESTED**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT**
**J.P. MORGAN CHASE BANK, N.A.'s MOTION TO DISMISS**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND.................................................................................................4

ARGUMENT.........................................................................................................................6

   I.   EMTC's claims are timely ........................................................................................6

      A.   EMTC's claims are subject to a three-year limitations period and, regardless, it
         would be premature to rule on JPMC's statute of limitations defense.......................7

      B.   EMTC's claims are subject to tolling under Executive Order No. 202.8....................9

      C.   JPMC cannot contractually modify its obligation to refund....................................10

   II.   Plaintiffs' U.C.C. claims are well pled .........................................................................11

      A.   JPMC failed to follow commercially reasonable procedures and act in good faith...12

      B.   The fraudulent transfers were not "authorized" under applicable agency law ..........15

      C.   Essilor is a "customer" as that term is defined in the U.C.C. ...................................19

   III.   The Complaint adequately alleges claims for breach of contract and negligence ............20

      A.  Plaintiffs' common law claims are not preempted ....................................................20

      B.  JPMC breached its agreement to implement a daily overdraft limit ...........................21

      C.  JPMC is alternatively liable in tort for failing to prevent overdrafts..........................23

      CONCLUSION....................................................................................................................25

i

## TABLE OF AUTHORITIES

**Case**                                                                                                         **Page**(s)

*2006 Frank Calandra, Jr. Irrevocable Trust v. Signature Bank Corp.*,
    816 F. Supp. 2d 222 (S.D.N.Y. 2011)...............................................................16

*2006 Frank Calandra, Jr. Irrevocable Trust v. Signature Bank Corp.*,
    503 F. App'x 51 (2d Cir. 2012).............................................................. 11, 24

*Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*,
    18 N.Y.3d 675 (2012) ...........................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................6

*Banco del Austro, S.A. v. Wells Fargo Bank, N.A.*,
    215 F. Supp. 3d 302 (S.D.N.Y. 2016)..................................................... 13, 14

*Barnes v. Uzu*,
    2022 U.S. Dist. LEXIS 46014 (S.D.N.Y. Mar. 15, 2022) ...................................10

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
    692 F.3d 42 (2d Cir. 2012 .......................................................................25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 570 (2007)..........................................................................6

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
    949 F. Supp. 2d 486 (S.D.N.Y. 2013).............................................................24

*Boutsis v. Home Depot*,
    371 F. App'x 142 (2d Cir. 2010) ...............................................................25

*Brash v. Richards*,
    195 A.D.3d 582 (2d Dep't 2021)..................................................................9

*C.M v. Estate of Archibald*,
    2022 U.S. Dist. LEXIS 64328 (S.D.N.Y. Apr. 6, 2022)......................................25

*Cain v. Cnty. of Niagara*,
    2022 U.S. Dist. LEXIS 38140 (W.D.N.Y. Mar. 2, 2022)......................................10

*CMGRP, Inc. v. Agency for the Performing Arts, Inc.*,
    689 F. App'x 40 (2d Cir. 2017)..................................................................21

*Cmty. Ass'n Underwriters of Am. v. Main Line Fire Prot. Corp.*,
    2020 U.S. Dist. LEXIS 156882 (S.D.N.Y. Aug. 28, 2020) ...................................8

*Colo. Capital v. Owens*,
    227 F.R.D. 181 (E.D.N.Y. 2005).................................................................23

*Crabowski v. Bank of Boston*,
    997 F. Supp. 111 (D. Mass. 1997) ...................................................................16

*Deutsche Bank Trust Co. Ams. v. Rado Ltd. P'ship*,
    819 F. App'x 66 (2d Cir. 2020).....................................................................24

*Dubai Islamic Bank v. Citibank, N.A.*,
    126 F. Supp. 2d 659 (S.D.N.Y. 2000)............................................................23

*Edinburg Volunteer Fire Co., Inc. v. Danko Emergency Equip. Co.*,
    55 A.D.3d 1108 (3d Dep't 2008)...................................................................17

*Experi-Metal, Inc. v. Comerica Bank*,
    2011 U.S. Dist. LEXIS 62677 (E.D. Mich. June 13, 2011)....................................14

*Fischer & Mandell LLP v. Citibank, N.A.*,
    632 F.3d 793 (2d Cir. 2011) ........................................................................20

*Ford v. Unity Hosp.*,
    32 N.Y.2d 464 (1973) ..........................................................................16, 17

*Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*,
    156 A.D.3d 464 (1st Dep't 2017) ..................................................................21

*Gallagher's NYC Steakhouse Franchising, Inc. v. NY Steakhouse of Tampa, Inc.*,
    2011 U.S. Dist. LEXIS 139175 (S.D.N.Y. Dec. 5, 2011).....................................22

*Grain Traders v. Citibank, N.A.*,
    160 F.3d 97 (2d Cir. 1998) ..........................................................................19

*Green Door Realty Corp. v. TIG Ins. Co.*,
    329 F.3d 282 (2d Cir. 2003) .........................................................................17

*Hallock v. State*,
    64 N.Y.2d 224 (1984) .................................................................................17

*Highland Capital Mgmt. LP v. Schneider*,
    2010 U.S. App. LEXIS 12735 (2d Cir. June 22, 2010) .......................................16

*Hirsch v. Citibank, N.A.*,
    542 F. App'x 35 (2d Cir. 2013) ......................................................................8

*Klockner Stadler Hurter, Ltd. v. Ins. Co. of Pa.*,
    785 F. Supp. 1130 (S.D.N.Y. 1990)................................................................8

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
    10 F. Supp. 3d 504 (S.D.N.Y. 2014)...............................................................21

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
    179 F. Supp. 2d 118 (S.D.N.Y. 2000).............................................................17

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ................................................................ 24

*Lewis Tree Serv. v. Lucent Techs., Inc.*,
    2000 U.S. Dist. LEXIS 12922 (S.D.N.Y. Sep. 4, 2000) ...................... 21

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    597 F.3d 84 (2d Cir. 2010) ....................................................... 11, 20, 21

*Mary Jo C. v. N.Y. State & Local Ret. Sys.*,
    707 F.3d 144 (2d Cir. 2013) ................................................................ 15

*Matter of Lipper Holdings v. Trident Holdings*,
    1 A.D.3d 170 (1st Dep't 2003) ............................................................... 9

*Melwani v. Lipton*,
    2019 U.S. Dist. LEXIS 161121 (S.D.N.Y. Sept. 20, 2019) .................. 23

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007) ................................................................ 22

*New Props., Inc. v. George D. Newpower, Jr., Inc.*,
    2006 Mich. App. LEXIS 2668 (Mich. Ct. App. Sept. 14, 2006) .......... 16

*Nusbaum v. E-Lo Sportswear LLC*,
    2017 U.S. Dist. LEXIS 198032 (S.D.N.Y. Dec. 1, 2017) .................... 23

*Patane v. Clark*,
    508 F.3d 106 (2d Cir. 2007) .................................................................. 6

*Patco Constr. Co. v. People's United Bank*,
    684 F.3d 197 (1st Cir. 2012) ....................................................... 11, 12, 13

*Powell v. United States*,
    2022 U.S. Dist. LEXIS 93314 (S.D.N.Y. May 24, 2022) .................... 10

*Regatos v. N. Fork Bank*,
    5 N.Y.3d 395 (2005) ................................................................. 10, 11, 19

*Roach v. Cornell Univ.*,
    2022 NY Slip Op 04601 (3d Dep't July 14, 2022) .............................. 10

*Rodriguez v. Branch Banking & Trust Co.*,
    529 F. Supp. 3d 1309 (S.D. Fla. 2021 ........................................... 19, 20

*Russell v. Crossland Sav. Bank*,
    111 F.3d 251 (2d Cir. 1997) ................................................................ 23

*SEC v. Fiore*,
    416 F. Supp. 3d 306 (S.D.N.Y. 2019) .................................................... 6

*Shah v. Wilco Sys.*,
   126 F. Supp. 2d 641 (S.D.N.Y. 2000)....................................................................................21

*Socci v. JP Morgan Chase & Co.*,
   2018 U.S. Dist. LEXIS 157301 (E.D.N.Y. Sep. 14, 2018) ....................................................24

*Sommer v. Fed. Signal Corp.*,
   79 N.Y.2d 540 (1992) ............................................................................................................23

*Sotheby's, Inc. v. Stone*,
   388 F. Supp. 3d 265 (S.D.N.Y. 2019)....................................................................................8

*Travelers Indem. Co. v. Losco Grp., Inc.*,
   136 F. Supp. 2d 253 (S.D.N.Y. 2001)....................................................................................25

*V.S. v. Muhammad*,
   595 F.3d 426 (2d Cir. 2010) ..................................................................................................10

*Westchester Cnty. Corr. Officers Benevolent Ass'n, Inc. v. Cnty. of Westchester*,
   99 A.D.3d 998 (2d Dep't 2012)..............................................................................................21

*Wolff v. Rare Medium, Inc.*,
   171 F. Supp. 2d 354 (S.D.N.Y. 2001)....................................................................................21

**Statutes**

9 NYCRR 8.202.8...................................................................................................................9

N.Y. U.C.C. § 4-A-105 ...................................................................................................... 13, 14

N.Y. U.C.C. § 4-A-202 ......................................................................................................*passim*

N.Y. U.C.C. § 4-A-203 ......................................................................................................*passim*

N.Y. U.C.C. § 4-A-204 ......................................................................................................*passim*

**Rules**

Federal Rule of Civil Procedure 8 ...........................................................................................6

## PRELIMINARY STATEMENT

JPMC's motion to dismiss erroneously contends (i) that Plaintiffs' claims are barred by a two-year contractual statute of limitations (that overrides the three-year statute of limitations under Article 4-A of the New York Uniform Commercial Code ("N.Y. U.C.C.")), (ii) that, even if not time-barred, Plaintiffs cannot recover from JPMC for the fraudulent transfers because the transfers were "authorized" within the meaning of Article 4-A of the N.Y. U.C.C., (iii) that Plaintiff Essilor has no standing to recover for the fraudulent transfers as it was not a "sender" under the N.Y. U.C.C., and (iv) that Plaintiffs' common law claims are preempted by the N.Y. U.C.C. JPMC is wrong on all of these assertions.[1]

**The statute of limitations issue** – JPMC submits factual declarations from its employees that purport to attach operative documents referenced in the Complaint. But these submissions are incomplete and insufficient, and raise fact issues that cannot be resolved on this motion to dismiss. Plaintiffs' claims are subject to a three-year statute of limitations under the N.Y. U.C.C., and, consistently, JPMC amended its Account Terms in 2017 to revise the contractual limitation period to three years as part of the implementation of Plaintiffs' cash management system. But, even if EMTC's claims were subject to a two-year statute of limitations (although JPMC admits that Essilor's Account Terms contain a three-year contractual statute of limitations), EMTC's claims are all timely as they benefit from 228 days of COVID tolling provided by a series of Executive Orders by former N.Y. Governor Cuomo. Finally, in any event, Article 4-A of the N.Y. U.C.C. does not permit contractual restrictions to limit a bank's obligation to refund unauthorized payment orders, and any such restrictions are therefore void and unenforceable.

---

[1] For brevity, Plaintiffs' brief uses the terms herein as they are defined in the Complaint.

**The Article 4-A issue about "authorized" transfers** – JPMC seeks to flip the N.Y. U.C.C. framework on its head, arguing that the customer, not the bank, is strictly liable if an employee of the customer circumvents the security processes as part of a scheme to defraud the employer. According to JPMC, the bank is off the hook so long as the transaction was "tested" in accordance with an agreed upon security procedure, regardless of whether the security procedure was commercially reasonable or whether the bank acted in good faith. *See* ECF 19, at 12-17. The relevant N.Y. U.C.C. provisions and commentary, however, state precisely the opposite.

Under the N.Y. U.C.C., a bank is strictly liable to reimburse its customer for any ***unauthorized*** electronic transfer unless the bank can prove that (i) it adhered to a contractually agreed upon, and commercially reasonable, security procedure, ***and*** (ii) it acted in good faith, *i.e.,* consistent with the customer's reasonable expectations of how the bank would implement the security procedure. *See* N.Y. U.C.C. § 4-A-204(1); *id.* § 4-A-202. In addition, even if the bank demonstrates that it applied a commercially reasonable security procedure and acted in good faith, a customer is nevertheless entitled to a refund if the customer demonstrates that any related data breach was not caused by the customer or its agent. *Id.* § 4-A-203(1)(b). JPMC's motion expressly disclaims any attempt to demonstrate any of the clear requirements set forth in this paragraph, ECF 19, at 12-13 n.7, because the factual allegations of the Complaint prevent JPMC from doing so.

So, instead, JPMC's motion goes "all in" on its position that the fraudulent transfers were "authorized," which makes no sense whatsoever either as a matter of common sense or of the N.Y. U.C.C.'s provisions. If the U.C.C. drafters intended to bless all transfers as "authorized" if a bank simply followed a security procedure, the alternative basis for shifting liability provided for in Section 4-A-202(2), which allows a bank to shift the loss if it demonstrates it followed a commercially reasonable security procedure and acted in good faith, would be entirely

unnecessary. Moreover, JPMC itself admits that EMTC's rogue employee, Phetporee, was not authorized to engage in fraud, and that the Complaint alleges that she misappropriated the second approver's credentials. ECF 19, at 14-15.  These allegations, and admissions, are sufficient to sustain Plaintiffs' Article 4-A claims on a motion to dismiss, especially since JPMC has eschewed any argument on this motion that EMTC is "otherwise bound [for Phetporee's actions] . . . under the law of agency," within the meaning of N.Y. U.C.C. § 4-A-202. *See* ECF 19, at 13.

**Essilor's standing to assert its claims** – JPMC tacitly concedes that Esslior's claims would be timely under its three-year contractual limitation provision (and under the N.Y. U.C.C.'s provisions) but contends that Essilor has no standing to seek a refund from JPMC as it is not a "sender." But Essilor is a "customer" of JPMC within the meaning of N.Y. U.C.C. § 4-A-204(1). Because EMTC's account was effectively integrated through a daily sweeping process, by which funds were transferred between Essilor and EMTC, Essilor provided "payment of the payment order" for some, or all, of the payment orders, and is entitled to a refund jointly with EMTC.

**Plaintiffs' common law claims** – It is well-settled that common law claims are not preempted by Article 4-A of the U.C.C. unless they are *inconsistent* with the statutory scheme. Here, Plaintiffs' common law claims are not subject to preemption because they focus on a separate duty agreed to by JPMC that is unrelated to the mechanics of executing payment orders.  Here, the Complaint alleges that JPMC expressly agreed to limit overdrafts of EMTC's account to $10 million daily, and that JPMC repeatedly breached that obligation and failed to notify Plaintiffs. That separate obligation has nothing to do with the mechanics of executing payment orders, and thus claims relating to that separate obligation are not preempted.

## FACTUAL BACKGROUND

Essilor is one of the three main subsidiaries of EssilorLuxottica SA, the world's leading ophthalmic optics company. Compl. ¶ 11. Its proprietary eyewear brands include Ray-Ban and many other leading eyewear brands. *Id.* EMTC is a manufacturing subsidiary of Essilor located in Thailand. *Id.* ¶ 12. Essilor and EMTC are the victims of a fraud orchestrated by a band of international cybercriminals who, over the course of three months, transferred more than $270 million from EMTC's account with JPMC. *Id.* ¶ 1.

EMTC's account was one of multiple accounts maintained by Essilor affiliates at the New York branch of JPMC as part of a broader cash management program that JPMC implemented for Essilor beginning in 2017. Compl. ¶ 16. The purpose of this system was to allow Essilor to "sweep" funds daily from its various affiliates' accounts while still ensuring that these entities had sufficient funds to operate. *Id.* ¶ 27. To this end, JPMC and Essilor agreed that overdrafts from the EMTC account would not exceed $10 million on any given date and that the "usage of these lines [would] be monitored on an ongoing basis" by JPMC. *Id.* JPMC represented that it would provide the "highest standard of service and support available" when implementing this cash management system. *Id.* ¶ 26. JPMC further represented that it was "firmly committed" to combatting money laundering and global financial crimes and, consistent with banking laws and regulations, had implemented a comprehensive anti-money laundering program that included transaction screening designed to identify suspicious transactions. *Id.* ¶¶ 22-25. In order to meet these standards, JPMC was required to develop training programs sufficient to ensure its employees would be able to spot transactions that were inconsistent with Plaintiffs' business profile. *Id.* ¶¶ 4, 39.

Although JPMC reached out to Plaintiffs to discuss potentially suspicious transactions involving EMTC's account from time to time, JPMC inexplicably did not do so for any of the

fraudulent transfers at issue in this case despite its awareness of a dramatic, and highly suspicious, change in transaction activity. Compl. ¶¶ 30-31. Prior to September 2019, the average monthly volume of transfers from the EMTC account was less than $15 million. *Id.* ¶ 33. Beginning in mid-September 2019, and continuing until mid-December 2019, transaction volume spiked to over $100 million monthly. *Id.* The number of orders doubled over this period relative to historical averages. *Id.* ¶ 34. In addition, during the relevant period, the $10 million overdraft limit was exceeded on nine separate days without any inquiry or explanation from JPMC. *Id.* ¶ 40.

The nature of the payments from EMTC's account also changed dramatically beginning in September 2019. The fraudulent transfers were all made in round dollar amounts (*i.e.*, no cents). Compl. ¶ 36. In prior periods, round dollar transfers were relatively infrequent. *Id.* The identity of the typical transfer recipients also changed in a way that should have been an obvious tip-off to JPMC. Previously, the typical recipients were other Essilor group entities, established EMTC trading partners, or companies obviously operating in the optical industry, with accounts at established international banks. *Id.* ¶ 37. Most of the fraudulent transfers, however, went to shell companies, or companies that were not involved in the optical industry, with accounts at regional banks, often in high-risk jurisdictions. *Id.* ¶¶ 37-38; Ex. A. The timing of the second approval transmitted to JPMC also changed drastically for the fraudulent transfers. Prior to the fraud, a second approval would typically not be received for hours, if not days, after the first approval. *Id.* ¶ 41. But during the period of the fraud the approval was usually provided in less than a minute. *Id.* If these red flags, and other instances of suspicious account activity alleged in the Complaint, had been timely raised with Plaintiffs, the fraud would have been detected in its early stages and Plaintiffs' losses could have been prevented.

Plaintiffs undertook a costly and burdensome process in an attempt to recover the fraudulent transfers. *Id.* ¶ 2. These efforts were partially successful, but Plaintiffs were unable to recover approximately $100 million. *Id.* Plaintiffs commenced this action on April 25, 2022, two years and 228 days after the first fraudulent transfer alleged in the Complaint. *See* Compl. Ex. A.

## ARGUMENT[2]

### I.    EMTC's claims are timely.

"A claim should only be dismissed on a motion to dismiss based on a statute of limitations defense 'if the factual allegations in the complaint clearly show that the claim is untimely.'" *SEC v. Fiore*, 416 F. Supp. 3d 306, 330-31 (S.D.N.Y. 2019) (*quoting St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 157 (E.D.N.Y. 2010)). Through its motion to dismiss, JPMC seeks resolution of a highly fact specific issue, *i.e.,* whether a set of standard Account Terms that purportedly were in place in 2015 apply to impose a two-year limitations period despite the fact that those terms were amended in 2017 to provide for a three-year limitations period. The answer to this question cannot be gleaned from the four corners of the Complaint or the incomplete factual record submitted by JPMC. JPMC's factual declarations from its two employees are incomplete and insufficient, and raise more questions than they answer. By way of example only, the Premplumjit declaration attaches an undated EMTC signature page in Exhibit 1 that contains a notation at the bottom right corner that it is 2 of 29 pages, then does not attach those other 28 pages, but instead attaches as Exhibit 2 certain unsigned "Account Terms" as the purportedly operative Account Terms.

---

[2] Pursuant to Federal Rule of Civil Procedure 8, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Asking for plausible grounds [] does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to prove the claim. *Twombly*, 550 U.S. at 556. "Only a statement of facts so conclusory that it fails to give notice of the basic events and circumstances on which a plaintiff relies should be rejected as legally insufficient." *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007). At this stage, a court is required to accept the allegations in the Complaint as true and in the light most favorable to the Plaintiffs. *Id.* at 111.

### A.   EMTC's claims are subject to a three-year limitations period and, regardless, it would be premature to rule on JPMC's statute of limitations defense.

Essilor and its parent conduct business through multiple international subsidiaries, including EMTC. Their bank accounts at JPMC are effectively integrated through a daily sweeping process as part of the broader cash management system that JPMC put in place for Essilor. *See* Compl. ¶¶ 16, 27. In order to ensure that EMTC, and other affiliates, had sufficient funding to operate, JPMC permitted overdrafts, subject to a daily limit. *Id.* ¶ 27. If the balance of any affiliate's account was negative, proceeds would be swept down from the parent company at the end of each day. *Id.* Any positive balance would be swept up to the parent. *Id*. The cash management system was not fully implemented until 2017, when the parties entered into a contract entitled "US Cash Concentration Service Terms," which JPMC failed to attach to its motion. *See id.*; Fitzgerald Decl. Ex. 1-2.

JPMC attached two sets of account terms to its motion to dismiss. One appears to be JPMC's standard terms in place in 2015, and the other a revised version of those in place in 2017. The 2015 Account Terms purport to require any actions be brought within two years. *See* ECF 20 (Premplumjit Decl.) Ex. 2 § 16.2. The 2017 Account Terms purport to require actions be brought within three years. *See* ECF 21 (Kosanovic Decl.) Ex. 1 § 16.2. Quotations to the Account Terms in the Complaint are to the terms that were negotiated in 2017. *Compare* Compl. ¶¶ 24-25 *to* ECF 21 §§ 17.5, 17.15; Fitzgerald Decl. Ex. 3 §§ 17.5, 17.15.

JPMC attaches a letter, executed by EMTC in 2015, stating "[y]our signature below represents your receipt and acceptance of the Account Terms and United States Addendum to Account Terms." *See* ECF 20 Ex. 1. But this letter does not attach any Account Terms and JPMC's declarant, Siriwan Premplumjit, does not contend that the Account Terms were attached to the executed Acceptance Letter. *Id.* ¶ 4. Premplumjit vaguely asserts that she forwarded "certain

documents" with the Acceptance Letter, but she does not identify the documents she forwarded. *Id.* ¶ 3. Although she later indicates that her declaration attaches the "Account Terms accompanying the Acceptance Letter," that does not mean that EMTC received the terms or that they were actually sent to EMTC. *Id.* ¶ 5. Even if JPMC's motion was a motion that permitted submission of evidence outside the pleadings—it is not—JPMC would be required to submit the email or other relevant correspondence showing exactly what the customer "actually received." *See Hirsch v. Citibank, N.A.*, 542 F. App'x 35, 36-37 (2d Cir. 2013). At this stage, such evidence is irrelevant because the Complaint indisputably does not contain factual allegations establishing the 2015 Account Terms, rather than the Account Terms that were in place in 2017, are the operative Account Terms. "[B]ecause 'resolution of the [D]efendants' statute of limitations argument requires a fact-specific evaluation,' it would be premature" to dismiss. *Cmty. Ass'n Underwriters of Am. v. Main Line Fire Prot. Corp.*, 2020 U.S. Dist. LEXIS 156882, at \*25 (S.D.N.Y. Aug. 28, 2020) (*quoting Canon U.S.A., Inc. v. Cavin's Bus. Sols., Inc.*, 208 F. Supp. 3d 494, 501 (E.D.N.Y. 2016))); *see also Klockner Stadler Hurter, Ltd. v. Ins. Co. of Pa.*, 785 F. Supp. 1130, 1135 (S.D.N.Y. 1990) (premature to consider dispute over what form, and resulting limitations period, was incorporated into parties' agreement).

In addition, "[u]nder New York law, 'a subsequent contract regarding the same subject matter supersedes the prior contract.'" *Sotheby's, Inc. v. Stone*, 388 F. Supp. 3d 265, 274 (S.D.N.Y. 2019) (*quoting CreditSights, Inc. v. Ciasullo*, 2007 U.S. Dist. LEXIS 25850, at \*18 (S.D.N.Y. Mar. 29, 2007)). The 2015 Account Terms state that they may be modified or amended "on notice to the Customer." ECF 20 Ex. 2 § 17.6. In 2017, Plaintiffs renegotiated the terms applicable to EMTC's account and the accounts of other Essilor entities as they worked to finalize the broader cash management agreement and the US Cash Concentration Service Terms. Those terms

incorporate "the Bank's account documentation, including terms and conditions governing the operation of accounts and services." Fitzgerald Decl. Ex. 1-2 at § 1. This reflects the intent to incorporate JPMC's standard terms as of 2017, not any terms in force two years prior. Notably, ESSIDEV, Essilor's predecessor and party to the US Cash Concentration Service Terms along with EMTC, separately executed the 2017 Account Terms in connection with the final implementation of the cash management system. *See* Fitzgerald Decl. Ex. 3. JPMC cannot dispute that its own submissions demonstrate that, in 2017, JPMC notified Plaintiffs that JPMC's standard Account Terms had been amended to provide for a three-year limitations period. ECF 21. Discovery will show this provision was intended to apply across all affiliates' accounts.

Considering the parties' entire agreement leads to one inescapable conclusion, the 2017 Account Terms are controlling and a three-year limitations period applies. Any contrary interpretation violates the fundamental canon that "[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable[,] or contrary to the reasonable expectations of the parties." *Matter of Lipper Holdings v. Trident Holdings*, 1 A.D.3d 170, 171 (1st Dep't 2003) (citations omitted). It would be nonsensical to argue that the parties intended to adopt different terms for different entities that participated in the cash management system that JPMC implemented for Essilor. The only construction that avoids this absurdity, is consistent with the intent of the parties, and is commercially reasonable, is that the 2017 Account Terms apply.

### B. EMTC's claims are subject to tolling under Executive Order No. 202.8.

JPMC's motion should also be denied because EMTC's claims are subject to tolling pursuant to Executive Order (A. Cuomo) No. 202.8 (9 NYCRR 8.202.8), which tolled limitations periods applicable to New York actions from March 20, 2020 until November 3, 2020 (*i.e.,* for a period of 228 days) in response to the COVID pandemic. *See Brash v. Richards*, 195 A.D.3d 582, 585 (2d Dep't 2021) (holding that the Executive Order No. 202.8, and subsequent orders extending

it, tolled all applicable limitations periods).[3] This Court is bound to apply the Second Department's

ruling in *Brash* as it was issued by a New York intermediate appellate court and JPMC has not

presented any compelling argument that the New York Court of Appeals would reach a contrary

result. *See V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010); *Powell*, 2022 U.S. Dist. LEXIS

93314, at *7 (holding that *Brash* is controlling). In fact, JPMC's motion does not even

acknowledge the existence of Executive Order 202.8. The first fraudulent transaction alleged in

the Complaint occurred on September 10, 2019. This action was filed on April 25, 2022, within

two years and 228 days after that first fraudulent transfer. Thus, even assuming *arguendo* that a

two-year limitations period applies, all of Plaintiffs' claims are timely.

## C.    JPMC cannot contractually modify its obligation to refund.

JPMC's argument that a two-year limitations period applies to EMTC's U.C.C. claims

should be rejected for an additional independent reason. Section 4-A-204(2) provides:

"Reasonable time under subsection (1) may be fixed by agreement as stated in subsection (b) of

Section 1—302, but the obligation of a receiving bank to refund payment as stated in subsection

(b) may not otherwise be varied by agreement." N.Y. U.C.C. § 4-A-204(2). If the Account Terms

impose a two-year period, that provision would impermissibly vary the "obligation of a receiving

bank to refund payment." N.Y. U.C.C. § 4-A-204(2). The New York Court of Appeals has rejected

a similar attempt to contractually alter statutory periods that "impair the customer's section 4-A-

204(1) right to a refund." *Regatos v. N. Fork Bank*, 5 N.Y.3d 395, 403 (2005) (cannot shorten one

year notice requirement). The unpublished cases from the Eastern District of New York relied

---

[3] *Accord Powell v. United States*, 2022 U.S. Dist. LEXIS 93314, at *7 (S.D.N.Y. May 24, 2022); *Barnes v. Uzu*, 2022 U.S. Dist. LEXIS 46014, at *24-25 (S.D.N.Y. Mar. 15, 2022); *see also Cain v. Cnty. of Niagara*, 2022 U.S. Dist. LEXIS 38140, at *17-18 (W.D.N.Y. Mar. 2, 2022) (following *Brash* "and federal courts that have addressed this issue"). Recently, in the *Matter of Roach v. Cornell Univ.*, 2022 NY Slip Op 04601, at *4-5 (3d Dep't July 14, 2022), the Third Department adopted the rule announced in *Brash*, but affirmed dismissal because even with tolling the action was untimely.

upon by JPMC (ECF 19 at 8-9) are inapposite because they did not involve an obligation to refund under Section 4-A-204, which expressly cannot be modified.

## II.   Plaintiffs' U.C.C. claims are well pled.

Plaintiffs assert claims under Section 4-A-204(1) of New York's N.Y. U.C.C., which "establishes a bank's basic obligation to make good on unauthorized and ineffective transfers." *Regatos*, 5 N.Y.3d at 401 (footnote omitted); *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 88 (2d Cir. 2010) ("under the N.Y. UCC, banks bear the risk of loss from unauthorized wire transfers (if certain conditions discussed below are met)"). Under Section 4-A-204(1)(a), "a bank is strictly liable to refund wire transfers, with interest, where the bank 'accepts a payment order issued in the name of its customer as sender which is . . . not authorized and not effective as the order of the customer under Section 4-A-202.'" *2006 Frank Calandra, Jr. Irrevocable Trust v. Signature Bank Corp.*, 503 F. App'x 51, 54 (2d Cir. 2012).[4]

By its terms, whether a payment order is "authorized" or "effective" within the meaning of Section 4-A-204(1)(a) is governed by Section 4-A-202, which allows a bank to "shift the risk of loss to the customer in one of two ways." *Patco Constr. Co. v. People's United Bank*, 684 F.3d 197, 208 (1st Cir. 2012) (applying substantively identical Massachusetts U.C.C. provision). First, the bank may show that the customer "authorized the order or is otherwise bound by it under the law of agency." N.Y. U.C.C. § 4-A-202(1). Second, the bank can shift liability if there was an agreed upon security procedure to verify orders and

> (a) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (b) the bank proves that it accepted the payment order in good faith and in compliance with the security

---

[4] Plaintiffs here do not rely on subsection (b) of Section 4-A-204(1). That provision independently obligates a bank to provide a refund if the customer can show the transfers were "not enforceable, in whole or in part, against the customer under Section 4-A-203." N.Y. U.C.C. 4-A-204(1)(b).

procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer.

N.Y. U.C.C. § 4-A-202(2); *Patco*, 684 F.3d at 208 (discussing methods of shifting liability).

JPMC's motion attempts to turn the applicable U.C.C. framework on its head, arguing that so long as JPMC performed testing of payment orders in accordance with a security procedure, a payment order, even an indisputably fraudulent payment order, was "authorized." ECF 19 at 14. This is true, according to JPMC, regardless of whether or not the bank can show that the security procedure was commercially reasonable or that it acted in good faith within the meaning of Section 4-A-202(2). *Id.* As set forth in more detail below, JPMC is wrong. Unless JPMC proves that it followed agreed upon security procedures that were commercially reasonable ***and*** that it acted in good faith, whether a transaction is authorized is determined by the law of agency. Applying those rules, the payment orders, which were executed in connection with a scheme to defraud Essilor and its affiliates, were not authorized. And both EMTC and Essilor should be permitted to jointly pursue a claim because there are potential factual issues concerning which "customer" provided "payment of the payment order" within the meaning of Section 4-A-204(1).

### A. JPMC failed to follow commercially reasonable procedures and act in good faith.

JPMC expressly disclaims any attempt to argue that it is entitled to dismissal under Section 4-A-202(2). *See* ECF 19 at 12-13 n.7. Accordingly, it makes no effort to demonstrate that its purported security procedure was commercially reasonable or that it acted in good faith. Although Section 4-A-202(2) places the burden of proof squarely upon JPMC, the Complaint contains factual allegations that are more than sufficient to rebut any contention that JPMC is entitled to a presumption under Section 4-A-202(2).

The Complaint alleges that JPMC's processes failed to conform to guidance issued by the Federal Financial Institutions Examination Council ("FFIEC"), which requires banks to include in

their layered security program "processes designed to detect anomalies and effectively respond to suspicious or anomalous activity related to . . . initiation of electronic transactions involving the transfer of funds to other parties." Compl. ¶ 29. A security procedure that fails to identify "anomalous activity" despite the bank's awareness of highly suspicious facts and trends violates this guidance and is commercially unreasonable. *See Patco*, 684 F.3d at 211 (failure to prevent fraudulent transfers "when [bank] had warning that such fraud was likely occurring" was commercially unreasonable).

Even if JPMC followed commercially reasonable procedures, JPMC cannot shift liability to its customer unless it demonstrates that it also acted in good faith. To do so, JPMC must prove that it acted honestly *and* that it accepted the payment order in accordance with applicable security procedures "in a way that reflects the parties' reasonable expectations as to how those procedures will operate." *Banco del Austro, S.A. v. Wells Fargo Bank, N.A.*, 215 F. Supp. 3d 302, 305 n.16 (S.D.N.Y. 2016) (quoting *Choice Escrow & Land Title v. BancorpSouth Bank*, 754 F.3d 611, 622 (8th Cir. 2014)); *see also* N.Y. U.C.C. § 4-A-105(1)(f) (defining "good faith").

JPMC cannot make the required showing of good faith. Plaintiffs reasonably expected that if JPMC was presented with evidence suggesting that EMTC's account was being used to facilitate a criminal enterprise, someone at JPMC would have notified Plaintiffs before allowing that criminal enterprise to siphon $270 million from EMTC's account. When EMTC's account and related cash management system were being pitched to Plaintiffs, JPMC undertook to provide a "dedicated Client Service Team" and the "highest standard of service available." Compl. ¶ 26. JPMC touted its purportedly industry leading "Global Financial Crimes Compliance" processes and commitment implementing rigorous "know your customer" procedures and "transaction screening." *Id.* ¶ 22-25. JPMC further agreed to set a daily overdraft limit to ensure that EMTC

13

would not transfer more than $10 million on any given day. *Id.* ¶ 27. JPMC employees did reach out to Plaintiffs on occasion to discuss potentially suspicious transactions and JPMC blocked transfers on its own initiative. *Id.* ¶ 30-31. But JPMC inexplicably failed to do so for any of the fraudulent transactions, despite abundant evidence of wrongdoing.

JPMC was aware of a dramatic, unexplained spike in transaction activity in EMTC's account with average transfers increasing from $15 million monthly to over $100 million during the period of the fraud. Compl. ¶ 33. It was also aware of a significant divergence in the type of transactions. Previously transfers were to business partners in the optical space, but during the fraud they were to shell companies, often located in high-risk jurisdictions, that were not involved in the eyewear business. *Id.* ¶ 37-38; Ex. A. Prior to the fraud, EMTC rarely made transfers in round dollar amounts. Virtually all of the fraudulent transfers were in rounded amounts. *Id.* ¶ 36. The timing of the approvals was also suspicious. In the past, it would typically take hours or days for a second approval; during the period of the fraud, the second approvals were typically provided in mere seconds. *Id.* ¶ 41. JPMC's failure to take action despite all flags pointing to the existence of a massive fraud is more than sufficient at the pleading stage.[5]

Finally, during the relevant period, the $10 million overdraft limit was exceeded repeatedly without any inquiry or explanation from JPMC. *See* Compl. ¶ 40. JPMC could have stopped the fraud in its tracks if it provided notice of overdrafts on just one of the overdraft dates. JPMC's execution of payment orders above and beyond the specified overdraft limits constitutes an independent reason why JPMC cannot shift the risk of loss to Plaintiffs under Section 4-A-202(2) because JPMC failed to comply with an "instruction of the customer restricting acceptance of

---

[5] *See Banco del Austro,* 215 F. Supp. 3d at 306 (resolution of good faith and commercial reasonableness could not be resolved at motion to dismiss stage); *see also Experi-Metal, Inc. v. Comerica Bank,* 2011 U.S. Dist. LEXIS 62677, at *34, 37-38 (E.D. Mich. June 13, 2011) (bank failed to meet its burden with respect to good faith when it permitted overdrafts and ignored red flags).

payment orders issued in the name of the customer." N.Y. U.C.C. Section 4-A-202(2).

**B.    The fraudulent transfers were not "authorized" under applicable agency law.**

Unable to seek refuge under Section 4-A-202(2), JPMC instead contends that a payment order is "authorized" within the meaning of Section 4-A-202(1)—even if it was the result of theft or fraud—if the bank followed an agreed upon security procedure, regardless of whether that security procedure was commercially reasonable or whether the bank acted in good faith. *See* ECF 19 at 14. JPMC's reading of the statute violates the fundamental rule of statutory construction "that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 156 (2d Cir. 2013). If the U.C.C. drafters intended to bless all transfers as authorized if a bank simply followed a security procedure, the alternative basis for shifting liability provided for in Section 4-A-202(2), which allows a bank to shift the loss if it demonstrates it followed a commercially reasonable security procedure and acted in good faith, would be entirely unnecessary. *See* N.Y. U.C.C. § 4-A-202.

JPMC's sole support for its one-sided statutory interpretation is an out of context quotation from the Official Comments. *See* ECF 19 at 14 ("'In the wire transfer business the concept of 'authorized' is different from that found in agency law. In that business a payment order is treated as the order of the person in whose name it is issued if it is properly tested pursuant to a security procedure and the order passes the test.'") (quoting N.Y. U.C.C. § 4-A-203 (cmt. 1)). JPMC excises crucial language immediately following its quotation making clear that a bank must either show that a transaction was authorized under agency law or satisfy Section 4-A-202(2):

> Section 4A–202 reflects the reality of the wire transfer business. A person in whose name a payment order is issued is considered to be the sender of the order if the order is "authorized" as stated in subsection (a) or if the order is "verified" pursuant to a security procedure in compliance with subsection (b). ***If subsection (b) does not apply, the question of whether the customer is responsible for the order is***

***determined by the law of agency.*** The issue is one of actual or apparent authority
of the person who caused the order to be issued in the name of the customer.

N.Y. U.C.C. § 4-A-203 (cmt. 1) (emphasis added).[6]

If a bank is not relying upon Section 4-A-202(2) (*i.e.,* "subsection (b)" referenced in the
above-quoted Comment), whether a transfer was authorized is "determined by the law of agency."
N.Y. U.C.C. § 4-A-203 (cmt. 1). Under the law of agency, a transaction is not authorized if the
agent exceeded the scope of her authority. *See Ford v. Unity Hosp.*, 32 N.Y.2d 464, 472 (1973)
("An agent's power to bind his principal is coextensive with the principal's grant of authority");
*see also Highland Capital Mgmt. LP v. Schneider,* 2010 U.S. App. LEXIS 12735, at *11 (2d Cir.
June 22, 2010) (agent's authority is "subject to whatever limitations the principal places on this
power, either explicitly or implicitly"). Applying agency law, courts have held a bank has an
obligation to reimburse its customer under the U.C.C. when the customer's agent exceeded the
scope of her authority.[7]

The Complaint contains more than sufficient factual matter to plausibly allege Phetporee
exceeded the scope of her authority. JPMC concedes she lacked authority to bind EMTC on her
own; a second approval was required. *See* ECF 19 at 5-6.[8] Plaintiffs allege that the required second

---

[6] References to "subsection (a)" and "subsection (b)" in this passage are to N.Y. U.C.C. Section 4-A-202(1) and
Section 4-A-202(2), respectively, as the Comments refer to the U.C.C. drafted by the Uniform Law Commission rather
than the version of the U.C.C. adopted in New York, which contains substantively identical text, but uses cardinal
numbers to identify subsections rather than letters. *See* U.C.C. §§ 4A-202(a)-(b); *id.* § 4A-203 (cmt. 1).

[7] *See Crabowski v. Bank of Boston*,  997 F. Supp. 111, 126-27 (D. Mass. 1997) (transfers not authorized under
substantively identical U.C.C. provision when "the Bank knew, through its normal 'channels of business,' that [the
customer's agent] was exceeding the scope of his authority"); *New Props., Inc. v. George D. Newpower, Jr., Inc.*,
2006 Mich. App. LEXIS 2668, at *27-28 (Mich. Ct. App. Sept. 14, 2006) (bank liable where evidence showed that
funds "were being transferred outside the authority purportedly given to" the agent in the corporate resolution
granting that agent authority).

[8] *2006 Frank Calandra, Jr. Irrevocable Trust v. Signature Bank Corp.*, cited by JPMC, is inapposite as that case
involved transfers by a trustee who was granted authority to "individually transact business" and "[t]here [were] no
provisions that place[d] limitations or conditions on [the trustee's] access to or use of the Trust funds." 816 F. Supp.
2d 222, 233-34 (S.D.N.Y. 2011). As a result, the transactions were authorized under agency law. Here, it is
indisputable that Phetporee lacked the broad grant of authority at issue in *Calandra*. Moreover, *Calandra* was
considering a summary judgment motion with a fully developed factual record.

approval was not in fact provided and Phetporee misappropriated the credentials of the second approver. *See* Compl. ¶ 19. JPMC further admits, as it must, that Phetporee lacked authority to make the transfers at issue because her authority was limited to transactions made in the course of EMTC's business and in compliance with its policies and procedures which prohibit fraudulent transactions. *See* ECF 19 at 15; *see also Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 148 (S.D.N.Y. 2000) ("as a matter of law, a principal cannot confer actual authority upon an agent to act illegally").

JPMC appears to disavow any argument based on apparent authority, as opposed to actual authority, in its brief. ECF 19 at 13 ("This motion proceeds on the first ground"). In any event, even if JPMC had advanced a theory of apparent authority, "the existence of apparent authority is normally a question of fact," *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 289 (2d Cir. 2003), and the Complaint alleges JPMC was aware of numerous red flags all suggesting that the transfers were unauthorized, *see* Compl. ¶ 32-43. "[A] third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable." *Hallock v. State*, 64 N.Y.2d 224, 231 (1984). As a result, a party must "make the necessary effort to discover the actual scope of authority." *Ford*, 32 N.Y.2d at 472; *Edinburg Volunteer Fire Co., Inc. v. Danko Emergency Equip. Co.*, 55 A.D.3d 1108, 1110 (3d Dep't 2008) ("Even if we were to find some indicia of agency related to the precise transaction at issue, plaintiff failed to make reasonable inquiry with defendant to verify the extent of Fahd's authority"). If JPMC had made the required inquiry, it would have confirmed Phetporee had exceeded her authority, the fraud would have been exposed, and additional fraudulent transfers would have been prevented.[9]

---

[9] JPMC argues that it was not required to perform any inquiry because Section 5.1 of the Account Terms states that it is "'not required to inquire into the circumstances of any transaction.'" ECF 19 at 4 (quoting Account Terms). As discussed above in Section I.C., the U.C.C. does not permit contractual abridgement of JPMC's obligations under Article 4-A. *See* N.Y. U.C.C. § 4-A-204(2). Whether a transaction is "authorized" within the meaning of Section 4-

Contrary to JPMC's contention, *see* ECF 19 at 15, Section 4-A-203 does not shift the risk of loss to the customer when an employee misappropriates approval credentials. Section 4-A-204(1) requires a bank to reimburse its customer when a payment order (a) was not authorized or effective within the meaning of Section 4-A-202; *or* (b) is not enforceable under Section 4-A-203(1). In other words, if the bank can establish Section 4-A-202 applies, the customer is nevertheless entitled to a refund if it can demonstrate that the order was not caused by a person "entrusted" to execute payment orders or that the fraudster obtained access to the account from a source other than the customer.  N.Y. U.C.C. § 4-A-203(1)(b).

JPMC argues that EMTC failed to comply with the Account Terms purportedly by "failing to safeguard the security credentials." ECF 19 at 15. But Section 2.1 of the Account Terms provides that the "Customer agrees to safeguard such security procedure and make it available only to persons duly authorized." *E.g.,* ECF 21 Ex. 1 § 2.1. JPMC cites no authority suggesting that entrusting credentials to an employee who is authorized to provide one of multiple approvals constitutes a failure to safeguard as a matter of law. Regardless, even if the Account Terms purported to relieve JPMC of its obligations under Article 4-A when there has been a failure to safeguard, the Account Terms cannot supplant the U.C.C. *See* N.Y. U.C.C. § 204(2). JPMC once again misquotes the U.C.C. commentaries, arguing that they reflect an intent to place the burden upon the customer to safeguard information. *See* ECF 19 at 16 (quoting N.Y. U.C.C. § 4-A-203 (cmt. 3)). The quoted language, however, discusses the presumption that applies only *after* a bank establishes that it followed a commercially reasonable security procedure in good faith within the meaning of Section 4-A-202(2). JPMC has expressly disavowed any protection under Section 4-

---

A-202(1) is governed by the law of agency, not the Account Terms, and the law of agency requires a party to confirm the scope of an agent's authority particularly when facts suggest that agent has exceeded the grant.

A-202(2). As the commentators note, when Section 4-A-202(2) does not apply "the bank acts at its peril in accepting a payment order that may be unauthorized" because Section 4-A-202(1) provides little protection to the bank. N.Y. U.C.C. § 4-A-203 (cmt. 3).

Similarly, contrary to JPMC's contention, *see* ECF 19 at 16 n.12, Plaintiffs did not violate Section 7 of the Account Terms as Plaintiffs did in fact report irregularities to JPMC as soon as they were discovered and well within the time required under the U.C.C. If JPMC contends more was required, the Account Terms cannot alter JPMC's substantive obligations under the U.C.C. *See Regatos*, 5 N.Y.3d at 403 (customer agreement cannot shorten U.C.C. notification period).

### C.      Essilor is a "customer" as that term is defined in the U.C.C.

JPMC argues that Essilor is not the "sender" of the payment orders and, thus, cannot pursue a claim under Section 4-A-204(1). *See* ECF 19 at 11. Section 4-A-204(1), however, requires JPMC to "refund any payment of the payment order received from the customer." N.Y. U.C.C. § 4-A-204(1). The term "customer" is defined as "a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders." *Id*. § 4-A-105(1)(c).

Essilor is indisputably a "customer." It has an account with JPMC that is part of the broader cash management system. Compl. ¶ 16, 27; ECF 21 ¶ 3-5. As discussed above, JPMC implements this cash management system through a daily sweeping process; when a subsidiary has a positive balance, it is swept up to the parent and when a subsidiary's balance is negative funds are swept down to pay the deficit. There is at least an issue of fact as to whether Essilor or EMTC provided "payment of the payment order," or both provided payment jointly and Plaintiffs should be permitted to pursue this claim jointly.[10]

---

[10] *Grain Traders v. Citibank, N.A.*, cited by JPMC, is not on point as the Plaintiff in that case was not a customer of the receiving bank. 160 F.3d 97, 101 (2d Cir. 1998). The plaintiff was seeking to recover from a bank that did not maintain an account on behalf of the plaintiff. Similarly, *Rodriguez v. Branch Banking & Trust Co.*, is not on point as the case did not involve a similar cash sweeping process and there was no other showing that the other plaintiffs were

**III.    The Complaint adequately alleges claims for breach of contract and negligence.**

The Complaint asserts common law claims wholly independent of their claims for a refund under N.Y. U.C.C. § 4-A-204(1). As discussed more fully below, these claims are not preempted because they are based on JPMC's duty to implement an agreed upon daily overdraft limit that is fully consistent with the U.C.C. Plaintiffs should be permitted to pursue claims for breach of contract or, alternatively, negligence.

**A.    Plaintiffs' common law claims are not preempted.**

Article 4-A of the U.C.C. preempts a common law claim only when such claim would be inconsistent with the provisions of Article 4-A. *See Ma*, 597 F.3d at 89 ("Not all common law claims are per se inconsistent with this regime"). "Claims that, for example, are not about the mechanics of how a funds transfer was conducted" are generally consistent with Article 4-A and not subject to preemption. *Id.*; *see also Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 796-97 (2d Cir. 2011) (breach of contract claims are not preempted by Article 4-A of the N.Y. U.C.C. when the contractual provisions at issue are consistent with Article 4-A).

Here, the common law duties relied upon by Plaintiffs are unrelated to the "mechanics of how a funds transfer was conducted." *Ma,* 597 F.3d at 89.  Plaintiffs allege that JPMC agreed to implement an overdraft limit on all of the accounts that were part of the cash management system, including EMTC's account. Compl. ¶ 27. The Complaint further alleges that JPMC breached its duty when it allowed transfers from EMTC's account that exceeded the daily limit of $10 million on nine separate dates. *Id.* ¶ 40. If JPMC had brought these overdrafts to Plaintiffs' attention, they could have stopped the scheme in its tracks. *Id.* Unlike the claim in *Ma*, Plaintiffs do not rely on

potentially "affected parties." 529 F. Supp. 3d 1309, 1322 (S.D. Fla. 2021), *rev'd*, 2022 U.S. App. LEXIS 24116 (11th Cir. Fla., Aug. 26, 2022). Plaintiffs have demonstrated that Essilor was affected as EMTC's account was integrated into the broader cash management system.

"assertions that [they] did not order or approve any of the disputed electronic transfers of funds." 597 F.3d at 90.[11] Plaintiffs rely on a breach of JPMC's wholly independent duty to monitor the account for overdrafts, and prevent such overdrafts, regardless of the cause of the overdraft. Plaintiffs allege that these breaches constitute a breach of contract and, alternatively, negligence.

### B.    JPMC breached its agreement to implement a daily overdraft limit.

JPMC's contention that Plaintiffs are required to allege their contract claim with greater specificity is wrong. Plaintiffs need only plausibly allege that there was a contract, that they adequately performed that contract, and that JPMC breached that contract to Plaintiffs' detriment. *See, e.g., CMGRP, Inc. v. Agency for the Performing Arts, Inc.*, 689 F. App'x 40, 42 (2d Cir. 2017). The Complaint easily meets this standard as it identifies the agreement to monitor for and prevent overdrafts and alleges JPMC's breaches caused damages. Compl. ¶ 26-27, 40; *see also, LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 514 (S.D.N.Y. 2014) (allegations concerning statements made in marketing materials and oral representations sufficient to allege contract formation).[12]

JPMC also argues that Plaintiffs' purported failure to "safeguard user credentials" is a "material breach" that excused JPMC's performance. ECF 19 at 20. As set forth previously, JPMC

---

[11] The other cases relied upon by JPMC in its brief (ECF 19 at 17-18) are similarly distinguishable as they involve instances where the plaintiffs challenged the manner in which a bank handled a payment order. They did not involve the bank's implementation of a separate service such as the overdraft limit alleged by Plaintiffs here.

[12] JPMC's cited cases are inapposite as the complaints failed to allege there was an agreement or that an agreement was breached. *See Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001) (plaintiff failed to allege there was a relevant representation in the merger agreement); *Shah v. Wilco Sys.*, 126 F. Supp. 2d 641, 653 (S.D.N.Y. 2000) (conclusory assertion that "'defendant breached the terms of these employment contracts'" insufficient when no explanation of how the defendant breached); *Lewis Tree Serv. v. Lucent Techs., Inc.*, 2000 U.S. Dist. LEXIS 12922, at *15-16 (S.D.N.Y. Sep. 4, 2000) (plaintiff did not allege that software seller breached a contractual provision and waived any argument that it had by failing to respond to the defendant's arguments); *Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 156 A.D.3d 464, 465 (1st Dep't 2017) (although plaintiffs alleged "conduct implicating specific provisions of the relevant contracts" they did not allege that any provision was breached); *Westchester Cnty. Corr. Officers Benevolent Ass'n, Inc. v. Cnty. of Westchester*, 99 A.D.3d 998, 999 (2d Dep't 2012) (plaintiff failed to demonstrate at the summary judgment stage that there was an agreement to make disability payments). Notably, none of these courts granted a motion to dismiss without granting leave to replead.

has not demonstrated that the Complaint establishes that Plaintiffs violated the Account Terms by entrusting credentials to an employees who was authorized to provide a second approval. In any event, the obligation to safeguard security procedures has no relationship to JPMC's agreement to monitor for overdrafts and prevent them. *See, e.g., Gallagher's NYC Steakhouse Franchising, Inc. v. NY Steakhouse of Tampa, Inc.*, 2011 U.S. Dist. LEXIS 139175, at \*15 (S.D.N.Y. Dec. 5, 2011) ("[n]o evidence has been presented that suggests that the breach of one provision would excuse breach of the other provision"). Even assuming *arguendo* that there was a relationship between the two contractual agreements, the fact finder would be required to assess whether Plaintiffs substantially performed their obligation, which generally cannot be decided as a matter of law. *See Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("whether a party has substantially performed is usually a question of fact").

JPMC's effort to recast Plaintiffs' claim as alleging a violation of anti-money laundering laws or regulations is similarly unavailing. To be sure, JPMC represented that it would monitor Plaintiffs' accounts to detect money laundering or other criminal activity. *See* Compl. ¶ 22-25. But that is not the basis of their breach of contract claim. JPMC's failure to employ adequate monitoring for money laundering activity tends to show that JPMC failed to follow an agreed upon and commercially reasonable security procedure in a manner that comported with the parties' reasonable expectations as is required under N.Y. U.C.C. § 4-A-202(2). Neither of the cases relied upon by JPMC (ECF 19 at 19) hold that a bank's failure to adhere to contractually specified anti-money laundering procedures cannot be considered when assessing whether a bank can rely on the protections afforded under Section 4-A-202(2). They merely dismiss claims when the plaintiff alleged a violation of anti-money laundering laws that do not provide for a private right of action.

Finally, JPMC falsely suggests that "the Complaint points out" that the 2015 Account Terms are the only contract that could apply in this action. ECF 19 at 20. The Complaint says no such thing. As set forth previously, the factual record demonstrates that the 2015 Account Terms were renegotiated in 2017 and the amended terms apply. In addition, those terms do not represent the complete universe of the parties' written agreements, and the Complaint does not allege otherwise. The parties entered in the US Cash Concentration Service Terms as well as other formal, relevant written agreements. *E.g.,* Fitzgerald Decl. Exs. 1-3, ECF 21 Exs. 1-2.  The Complaint further quotes from email correspondence, including correspondence reflecting JPMC's agreement to apply a daily overdraft limit. Compl. ¶ 27; *see also Nusbaum v. E-Lo Sportswear LLC*, 2017 U.S. Dist. LEXIS 198032, at \*10-13 (S.D.N.Y. Dec. 1, 2017) (emails formed a binding contract).

### C.    JPMC is alternatively liable in tort for failing to prevent overdrafts.

If there is any question as to whether JPMC had a contractual obligation to monitor the EMTC account for overdrafts, Plaintiffs should be permitted to assert a claim for negligence based on JPMC's failure to identify and prevent overdrafts. *See Melwani v. Lipton*, 2019 U.S. Dist. LEXIS 161121, at \*16-17 (S.D.N.Y. Sept. 20, 2019) (dismissal of tort claim premature where there was some question as to whether a contractual obligation existed). "[B]anks owe a duty of care to their customers" and breaches of that duty are actionable through a negligence claim. *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 667 (S.D.N.Y. 2000); *accord Colo. Capital v. Owens*, 227 F.R.D. 181, 188 (E.D.N.Y. 2005); *see also* R*ussell v. Crossland Sav. Bank*, 111 F.3d 251, 259 (2d Cir. 1997) ("banks do, in fact, owe a duty of care to their customers"); *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (1992) ("Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties").

Contrary to JPMC's contention, there is no bright line rule excusing banks from any "extracontractual duty to monitor their customers' accounts." ECF 19 at 22. *Deutsche Bank Trust Co. Ams. v. Rado Ltd. P'ship*, cited by JPMC, supports Plaintiffs as it recognizes that a party may proceed with a negligence claim if the bank had a duty to report overdrafts. *See* 819 F. App'x 66, 67 (2d Cir. 2020) (*discussing Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)). In *2006 Frank Calandra, Jr. Irrevocable Trust*, also relied upon by JPMC, the Second Circuit merely declined to find a duty to monitor when there were not facts suggesting the parties intended to treat the account as anything but a "typical bank account." 503 F. App'x at 53. Here, the Complaint alleges that the EMTC account was part of a broader cash management system involving Essilor and its affiliates, that JPMC would perform a daily sweeping process to settle balances among the relevant Essilor affiliates, and that JPMC would implement a daily overdraft limit. *See* Compl. ¶ 27. If JPMC did not have a contractual duty to prevent overdrafts, under the circumstances, JPMC had an extracontractual duty to report and prevent overdrafts.[13]

JPMC argues that Plaintiffs were in the "best position" to detect the fraud that was being perpetrated. ECF 19 at 23. But JPMC agreed that any attempt to transfer more than $10 million from EMTC in any given day would be rejected, and that EMTC and Essilor would be notified. If that $10 million overdraft limit had been properly monitored and notification had been given, even on just one of the nine overdraft days, the fraud could have been prevented. In any event, JPMC's claim of comparative fault fails because "it is clear under New York law that the issue of

---

[13] These allegations are sufficient to establish a relationship beyond the "standard banker-depositor contract" at issue in *Socci v. JP Morgan Chase & Co.*, 2018 U.S. Dist. LEXIS 157301, at *8 (E.D.N.Y. Sep. 14, 2018) cited by JPMC. JPMC cites other case law that is inapposite because the courts found a specific obligation in contract and, thus, found tort claims duplicative. *See, e.g., BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,* 949 F. Supp. 2d 486, 5o5 (S.D.N.Y. 2013). Here, Plaintiffs' negligence claim is pled in the alternative.

comparative negligence is a question of fact proper for determination by a jury." *Boutsis v. Home Depot*, 371 F. App'x 142, 144 (2d Cir. 2010).

Finally, JPMC argues that Plaintiffs cannot prove damages because the Account Terms purport to limit Plaintiffs to recovery of damages caused by JPMC's willful misconduct or gross negligence. This exculpatory provision is not a basis for dismissal because "plaintiffs have alleged the type of conduct that smacks of intentional wrongdoing and evinces a reckless indifference to the rights of others." *Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 18 N.Y.3d 675, 684 (2012) (allegations that the defendant installed a security system, but failed to monitor that system despite knowing that someone was making attempts to override the system were sufficient to constitute willful conduct or gross negligence). Here, the Complaint alleges that JPMC put a mechanism in place to prevent overdrafts, but completely failed to implement it or notify Plaintiffs of the overdrafts. At a minimum, these allegations are sufficient to defeat JPMC's motion to dismiss because the "issue of gross negligence is a question of fact for a jury to determine." *Travelers Indem. Co. v. Losco Grp., Inc.*, 136 F. Supp. 2d 253, 256 (S.D.N.Y. 2001); *accord C.M v. Estate of Archibald,* 2022 U.S. Dist. LEXIS 64328, at \*19 (S.D.N.Y. Apr. 6, 2022). JPMC's observation that the Complaint does not refer to "gross negligence," ECF 19 at 24, is beside the point because the issue of willful conduct or gross negligence arises only because JPMC is seeking to assert an affirmative defense based upon a purported exculpatory provision. Whether Plaintiffs refer to conduct as "intentional" or "grossly negligent" is irrelevant as "[s]imply adding [a] conclusory word" does not "transform" the fundamental nature of factual allegations. *See Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 62 (2d Cir. 2012).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs submit that JPMC's motion should be denied.

Dated: September 9, 2022

 /s/ *William A. Maher*

William A. Maher
Steven S. Fitzgerald
Ariel B. Moore
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
wmaher@wmd-law.com
sfitzgerald@wmd-law.com
amoore@wmd-law.com

*Attorneys for Plaintiffs*