**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ESSILOR MANUFACTURING (THAILAND) CO., LTD.,<br><br>                       Plaintiff,<br><br>      v.<br><br>J.P. MORGAN CHASE BANK, N.A.,<br><br>                Defendant. | Case No. 1:22-cv-03361<br><br>**Request for International Judicial Assistance in the Authorization of a Commissioner pursuant to Chapter II, Article 17 of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters** |

The United States District Court for the Southern District of New York presents its compliments to the Ministère de la Justice and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above captioned matter.  This request is made pursuant to, and in conformity with, Chapter II, Article 17 of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Evidence Convention").

This Court requests that the Ministère de la Justice approve the taking of evidence by Alexander Blumrosen under Article 17 as described herein.  While a trial date has not yet been set in this action, in the United States, parties may move for summary judgment in advance of trial.  A party moving for or opposing summary judgment must present evidence to support its arguments, as they do at trial.  This Court therefore makes this request to facilitate resolution of the pending proceedings in New York.

The particulars of this Hague Evidence Request are as follows.

1.    **Sender**                              Honorable Lewis J. Liman
                                                        District Judge

United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007

| | | |
|---|---|---|
| **2.** | **Central Authority of the Requested State** | Ministère de la Justice<br>Direction des Affaires Civiles et du Sceau<br>Département de l'entraide, du droit international privé et européen (DEDIPE)<br>13, Place Vendôme<br>75042 Paris Cedex 01 |
| **3.** | **Person To Whom The Executed Request Is To Be Returned** | Alan E. Schoenfeld<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>Tel.: (212) 937-7294<br>Email: alan.schoenfeld@wilmerhale.com<br>Attorney for Defendant JPMorgan Chase Bank, N.A. |

**IN CONFORMITY WITH CHAPTER II, ARTICLE 17 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:**

**4.      Specification Of The Day By Which The Requesting Authority Requires Receipt Of The Response To The Letter Of Request**

The requesting authority would greatly appreciate a response to the Request within 10

days or as soon thereafter as is practicable.

| | | |
|---|---|---|
| **5a.** | **Requesting Judicial Authority** | Honorable Lewis J. Liman<br>District Judge<br>United States District Court for the Southern District of New York |
| **5b.** | **To The Competent Authority Of** | Ministère de la Justice<br>Direction des Affaires Civiles et du Sceau<br>Département de l'entraide, du droit international privé et européen (DEDIPE)<br>13, Place Vendôme<br>75042 Paris Cedex 01 |
| **5c.** | **Case Name And** | *Essilor Manufacturing* |

| | | |
|---|---|---|
| **Identifying Number** | | *(Thailand) Co., Ltd. v. JPMorgan Chase Bank, N.A.*, 1:22-cv-03361 (LJL) |

**6.**    **Names And Addresses Of The Parties And Their Representatives**

**a.  Plaintiff**

Essilor Manufacturing (Thailand) Co., Ltd.
Lat Krabang Industrial Estate Free Zone No. 213
Chalongkrung Road, Lamplatiew, Lat Krabang
Bangkok 10520, Thailand

**Representatives**

William A. Maher
Steven S. Fitzgerald
Ariel B. Moore
Randall R. Rainer
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110

**b.  Defendant**

JPMorgan Chase Bank, N.A.
1111 Polaris Parkway
Columbus, OH 43240

**Representatives**

Alan E. Schoenfeld
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Margarita M. Botero
Wilmer Cutler Pickering Hale and Dorr LLP
1225 Seventeenth Street
Suite 2600
Denver, CO 80202

**7.    Authority Appointing Commissioner, Pending Approval Of The Ministère de la Justice**

Honorable Lewis J. Liman
District Judge
United States District Court for the Southern District of New York

**8.    Commissioner**

Alexander Blumrosen
4, Avenue Hoche
75008 Paris
France

Attached hereto as Exhibit A is the Order of the United States District Court of the Southern District of New York

appointing Mr. Blumrosen as Commissioner, pending approval of the Ministère de la Justice.

9.    **Nature Of The Proceedings**

Plaintiff, through its Complaint filed on April 25, 2022, alleges that this case arises out of a complex fraud orchestrated against Essilor International SAS ("Essilor") and Essilor Manufacturing (Thailand) Co., Ltd. ("EMTC") from mid-September 2019 through mid-December 2019 by a group of international cybercriminals.  Complaint (attached to this request as Exhibit B) ¶ 1.  More specifically, the Complaint alleges that the fraud was accomplished with the active assistance of a then-EMTC employee, Chamanun Phetporee ("Phetporee"), Ex. B, Complaint ¶ 18, who misappropriated payment order approval credentials, Ex. B, Complaint ¶ 19.  According to the Complaint, the types of payment orders issued during the fraud were suspicious and should have alerted JPMC to the fraudulent activity.  Ex. B, Complaint ¶ 36.  The Complaint further alleges that scheme resulted in the transfer of approximately $272 million from an account in the name of EMTC maintained at a New York, New York branch of Defendant JPMorgan Chase Bank, N.A. ("JPMC").  Ex. B, Complaint ¶ 2.  EMTC alleges that, as of April 25, 2022, it has been unable to recover approximately $100 million.  Ex. B, Complaint ¶ 2.  As a result, the Complaint brought claims under New York's Uniform Commercial Code, for breach of contract, and for negligence, and seeks from JPMC a refund of all unrecovered funds, interest on the refundable amount, expenses incurred to mitigate damages, and attorneys' fees and costs – with the total requested compensation exceeding $133 million.

In the fall of 2022, the parties briefed JPMC's motion to dismiss the Complaint.  On January 4, 2023, this Court dismissed without leave to amend EMTC's negligence claim, and dismissed with leave to amend EMTC's contract claim.  *See* Motion to Dismiss Decision (attached to this request as Exhibit C).  EMTC subsequently declined to amend the Complaint.

Thus, the sole remaining claim in this action is under section 4A-204 of New York's Uniform Commercial Code.[1]  JPMC, by way of its February 24, 2023 answer and responses to the complaint, denies the facts set forth in support of Plaintiff's claim.

| | | |
|---|---|---|
| **10a.** | **Evidence To Be Obtained** | Defendant JPMC seeks documents, electronically-stored information, and other information maintained by Essilor International SAS ("Essilor"), 147, rue de Paris 94220 Charenton-le-Pont, France. |
| **10b.** | **Purpose Of The Evidence** | The documents requested from Essilor may be relevant to the pending proceeding and may assist this Court in resolving the dispute presented in the civil action before it. |

**11.     Documents Or Other Property To Be Inspected**

On January 18, 2023, JPMC served its First Request For Production of Documents.  *See* Exhibit D.[2]  Those requests included a carveout for documents subject to France's blocking statute.  *Id.* at ¶ 9 ("For the avoidance of doubt, these Requests do not seek any Documents or Communications subject to the French blocking statute (French law 68-678 of 26 July 1968 and all amendments thereto) or any other similar statute.").  JPMC now seeks permission to solicit from Essilor documents in its possession that are responsive to the requests in Exhibit C, subject to any objections Essilor is entitled to make under the relevant rules of civil procedure and the orders of this Court.  Because Essilor is incorporated and has its principal place of business in France, the documents and other information responsive to JPMC's requests are also in France. The French blocking statute protects those documents, and the parties must utilize the Hague Evidence Convention to obtain them.  This Court therefore requests that Essilor produce these documents through the Commissioner, Alexander Blumrosen, upon obtaining authorization from

---

[1]  Essilor was originally a plaintiff in the litigation but its claims were dismissed in the Court's January 4, 2023 order.  *See* Exhibit C.  Because Essilor declined to amend the Complaint, it is no longer a plaintiff.
[2]  These requests were initially served on both EMTC and then-plaintiff Essilor, but Essilor is no longer a plaintiff.

the French Ministère de la Justice.  Documents will be produced in accordance with procedures outlined in the case's protective order, which has yet to be entered.

## 12.    Special Methods Or Procedures To Be Followed

Under the laws of the United States, a party has a privilege to refuse to disclose the contents of a confidential communication between that party and an attorney that was made for the purpose of obtaining legal advice ("attorney-client privilege").  United States law also recognizes a testimonial privilege for individuals against criminal self-incrimination.  This testimonial privilege does not apply to production of documents by an entity such as Essilor. Outside the strict area of privilege, certain limited immunities are available that may place restrictions on the giving of evidence, such as the limited protection of documents created by attorneys in anticipation of litigation ("work product immunity").  As provided under Article 11(b) of the Hague Evidence Convention, it is requested that Essilor be allowed to refuse to provide any documents if and to the extent that such documents are subject to attorney-client privilege, work product immunity, or any other applicable privileges under United States law. Disputes over whether a privilege actually exists will be addressed by this Court under the controlling law of privilege.  The parties reserve all rights to require productions to conform with the requirements under the Federal Rules of Civil Procedure.

## 13.    Fees

The costs of this specific Hague Evidence Convention request, including the fees of the Commissioner, will be borne by JPMC, provided that each party will be responsible for the fees and expenses, if any, of its own attorneys relating to this specific Hague Evidence Convention request.

**14.**     **Justification For Proceeding Via Commissioner**

The parties are seeking appointment of a Commissioner under Article 17, rather than a letter of request, because it is the most efficient means of procuring evidence necessary to the resolution of this action without violation of the French blocking statute.  It is also furthers France's interest in judicial economy, since proceeding via Commissioner privatizes the discovery process and obviates the need to utilize French courtrooms and judicial resources.

Date of Request:  April 26, 2023

_____
Hon. Lewis J. Liman
District Judge
United States District Court for the Southern
District of New York

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ESSILOR MANUFACTURING (THAILAND)
CO., LTD.,

                          Plaintiff,

     v.

J.P. MORGAN CHASE BANK, N.A.,

                          Defendant.

---

Case No. 1:22-cv-03361

**ORDER GRANTING JOINT
LETTER MOTION TO APPOINT
COMMISSIONER FOR
DISCOVERY IN FRANCE AND
FOR ISSUANCE OF REQUESTS
FOR INTERNATIONAL
JUDICIAL ASSISTANCE UNDER
ARTICLE 17 OF THE HAGUE
CONVENTION**

THIS MATTER having come before the Court on the joint letter motion of Plaintiff

Essilor Manufacturing (Thailand) Co., Ltd. ("EMTC") and Defendant JPMorgan Chase Bank,

N.A. ("JPMC") to Appoint Commissioner for Discovery in France and for Issuance of Requests

for International Judicial Assistance under Article 17 of the Hague Convention (Dkt. 48),

     IT IS ORDERED:

     1.     that pursuant to Article 17 of the Hague Convention on the Taking of Evidence

Abroad in Civil or Commercial Matters of March 18, 1970 (the "Hague Evidence Convention"),

Alexander Blumrosen, whose address is 4, Avenue Hoche, 75008 Paris, France (the

"Commissioner") is hereby duly appointed, pending the approval of the French Ministère de la

Justice, as a commissioner to:  (i) receive from Essilor and EssilorLuxottica documents and

electronically-stored information ("ESI") that are produced in this action; and (ii) transmit those

documents and ESI to counsel for the parties in accordance with Chapter II, Article 17 of the

Hague Evidence Convention;

     2.     that the Requests for International Judicial Assistance in the Authorization of a

Commissioner Pursuant to Chapter II, Article 17 of the Hague Convention on the Taking of

Evidence Abroad in Civil or Commercial Matters in France from Essilor International SAS and

EssilorLuxottica SA, attached to this Order as Exhibits 1 and 2 (the "Requests") are hereby

issued as the Court's requests and are incorporated herein;

      3.      that counsel for JPMC file, or request the Commissioner to file, this signed Order

and the Requests, along with French translations of both documents, with the Ministère de la

Justice, Direction des Affaires Civiles et du Sceau, Département de l'entraide, du droit

international privé et européen (DEDIPE), 13, Place Vendôme, 75042 Paris Cedex 01, within ten

(10) business days of the entry of this Order.


Dated:  April 26, 2023

 

_____
Hon. Lewis J. Liman
District Judge
United States District Court for the Southern District of
New York

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
    :
    :
ESSILOR INTERNATIONAL SAS and       :    Index No. 22-cv-3361
ESSILOR MANUFACTURING (THAILAND) CO.,  :
LTD.,    :    **COMPLAINT**
    :
    :    **DEMAND FOR JURY**
    Plaintiffs,    :    **TRIAL**
    :
    :
    -against-    :
    :
J.P. MORGAN CHASE BANK, N.A.,    :
    :
    :
    Defendant.    :
---------------------------------------------------------------- x

Essilor International SAS ("Essilor") and Essilor Manufacturing (Thailand) Co., Ltd. ("EMTC") (Essilor and EMTC sometimes are referred to hereafter as "Plaintiffs"), by and through their attorneys, bring this action against Defendant J.P. Morgan Chase Bank, N.A. ("Defendant," or "JPM"), and allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are the victims of a complex fraud orchestrated by international cybercriminals resulting in approximately $272 million of fraudulent transfers from an EMTC account maintained at a New York, NY branch of JPM (the "NY Account"). The transfers were made from mid-September 2019 until mid-December 2019.

2.      Plaintiffs, through a costly and burdensome process, have been able to recover some of the fraudulently transferred funds. To date, however, Plaintiffs have been unable to recover transfers totaling approximately $100 million.  The fraudulent transfers are identified in more detail in Exhibit A attached hereto.[1]

3.      When JPM described its services to EMTC, and to EMTC's parent company, Essilor, JPM recited its "commitment to the delivery of the highest standard of service and support available" and promised that it would put in place a "dedicated Client Service Team" to provide "strategic focus, direction and excellence in client service and support." JPM, Essilor, and EMTC also agreed that the NY Account would be subject to a daily overdraft limit ("DOL") of $10 million.

---

[1] Exhibit A is based on information currently available to Plaintiffs and is not necessarily an exhaustive list of the fraudulent transfers for which JPM is liable. As set forth below, under New York law, JPM is liable for losses relating to *all* unauthorized transfers from the EMTC account regardless of whether they are listed on Exhibit A.

4.     During the parties' communications, JPM emphasized its commitment to fighting global financial crimes and described applicable account controls designed to achieve that end. JPM represented that transactions would be monitored for money laundering and other suspicious activity in accordance with regulatory compliance and warned that such monitoring could delay execution. Under anti money laundering ("AML") laws and regulations, JPM was required to monitor EMTC's account activity, including any unusually large volume of transfers, and report suspicious activity. JPM was tasked with developing an effective training program and an understanding of Plaintiffs' business sufficient to assess whether transactions were suspicious, including patterns of transactions that did not fit EMTC's normal business activities, larger than usual transaction volume, and transactions with high-risk countries.

5.     From time to time, JPM employees did reach out to EMTC or Essilor to communicate about transactions that were potentially suspicious. These communications confirmed Plaintiffs' understanding that JPM was conducting the transaction monitoring that JPM described to Plaintiffs. However, when presented with the highly suspicious pattern of fraudulent transactions at issue in this action, JPM inexplicably failed to notify or contact EMTC or Essilor.

6.     JPM was aware of a dramatic change in activity in the NY Account beginning in September 2019, but JPM did not sound the alarm. The average monthly dollar volume of transactions skyrocketed from $15 million to over $100 million and JPM never asked for, or received, an explanation for the increased volume. The number of payment orders doubled relative to historic averages. During the three-month period of the fraud, EMTC repeatedly exceeded the DOL, which was expressly agreed to by JPM, and JPM failed to notify or contact EMTC or Essilor.

7.     The fraudulent transfers were all made in round dollar amounts (*i.e.*, no cents), which was a dramatic departure from prior periods where round dollar transfers were relatively infrequent. The identity of the typical transfer recipients also changed dramatically. Previously, the typical recipients were established EMTC trading partners, or companies obviously operating in the same optical industry as Essilor and EMTC, with accounts at established international banks. During the period when the fraudulent transfers were made, most of the transfers went to shell companies, or companies that were not involved in the optical industry, with accounts at regional banks, often in high-risk jurisdictions.

8.     JPM was aware of other red flags. During the period when the fraud was perpetrated, the timing of second approvals for the transfers at EMTC occurred immediately after the first approval, which was unusual and is a suspiciously short period of time. JPM was also aware that one of the fraudsters provided false reports to the Bank of Thailand, misrepresenting the identity of the beneficiaries of fraudulent transfers.

9.     If JPM had reported these red flags to Essilor and EMTC, the fraud would have been detected in its early stages and Plaintiffs' losses could have been prevented.

10.     Pursuant to Section 4-A-204 of New York's Uniform Commercial Code ("U.C.C."), a bank is liable for unauthorized transfers unless it can show that (i) it followed an agreed upon, and commercially reasonable, security procedure for authorization of payment orders *and* (ii) that it acted in good faith. JPM cannot satisfy this test here and, thus, it is liable for the fraudulent transfers.  In addition, JPM is liable for violations of common law duties, as set forth herein.

## PARTIES

11.     Essilor is a French simplified joint-stock company with its principal place of business located in Charenton-le-Pont, France. Essilor is one of the three main subsidiaries of EssilorLuxottica SA, the world's leading ophthalmic optics company. Its proprietary eyewear brands include Ray-Ban and many other leading eyewear brands. EssilorLuxottica is listed on the Euronext Paris stock exchange and is included in the Euro Stoxx 50 index. It has large operations in the U.S., including a global research and development center in Dallas, Texas and production facilities in various cities including Charlottesville, Virginia and Salt Lake City, Utah.

12.     EMTC is a Thai limited company with its principal place of business in Bangkok, Thailand. EMTC is a wholly owned subsidiary of Essilor and operates a manufacturing plant in Thailand, one of Essilor's 14 global operation plants. EMTC has a U.S. bank account with JPM (*i.e.*, the NY Account), which it accesses to purchase supplies and conduct other transactions in U.S. dollars.

13.     JPM is a national banking association with its home office in Columbus, Ohio.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b). The NY Account is an account with a JPM branch in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District. Additionally, venue is proper as the account terms applicable to the NY Account contain a forum selection clause selecting the jurisdiction of the JPM branch (*i.e.,* New York) as the appropriate forum for disputes.

## FACTUAL BACKGROUND

I.        **The Fraudulent Transfers**

16.        Essilor, EMTC, and JPM have a long-standing banking relationship. EMTC's

NY Account was based in a JPM branch located in New York, NY. The NY Account was

opened as part of a larger cash management solution, implemented in March 2017, that also

involved certain other JPM accounts utilized by Essilor subsidiaries.

17.        From mid-September 2019 until mid-December 2019 (the "Fraudulent Period"),

international cybercriminals caused EMTC to make approximately 243 fraudulent payments

resulting in the transfer of approximately $272,151,000 out of the NY Account. The funds were

deposited to a multitude of straw man accounts located throughout the world.

18.        The cybercriminals enlisted a then-current employee of EMTC, Chamanun

Phetporee ("Phetporee"), to initiate the fraudulent payment orders. When Phetporee initiated the

fraudulent payment orders, she acted beyond the scope of her authority. Phetporee has been

taken into custody by Thai law enforcement authorities and charged with multiple crimes.

19.        Phetporee was not authorized to approve payment orders from the NY Account on

her own. Two separate approvals at EMTC were required to process a payment order. While

Phetporee was able to provide the first approval, a separate approval from a specifically

designated EMTC employee was required. Phetporee misappropriated the credentials of the

designated second approver. In any event, Phetporee's authority, and any second approver's

authority, was limited to transactions that were permitted under Essilor's and EMTC's policies

and procedures, which do not permit fraudulent transfers.

20.        Pursuant to NY U.C.C. § 4-A-204, JPM is liable for all unauthorized transfers

from the NY Account unless it can demonstrate (i) that it followed an agreed upon, and

commercially reasonable, security procedure for authorization of payment orders *and* (ii) that it acted in good faith. Good faith in this context includes honesty in fact and actions that comport with the parties' reasonable expectations as to how the security procedures would operate.

21.     JPM cannot make the required showing because it overlooked numerous highly suspicious facts relating to the payment orders that alerted it, or should have alerted it, to the fraudulent nature of the transactions.

## II.     Plaintiffs Reasonably Understood that JPM Would Report Suspicious Activity

22.     Based on their communications, Plaintiffs reasonably understood that JPM would monitor the NY Account, including for fraud prevention and AML compliance. JPM's website contains a page entitled "Global Financial Crimes Compliance," which emphasizes its commitment to combatting global financial crimes and describes measures JPM purportedly implemented in furtherance of its commitment. This webpage states:

> JPMorgan Chase & Co. ('JPMC') and each of its majority-owned subsidiaries (together with JPMC, the 'Firm') are firmly committed to participating in international efforts to combat money laundering and the funding of terrorist activities. . . . The Firm has implemented a risk-based global Anti-Money Laundering ('AML') Compliance Program ('AML Program') designed to comply with AML laws and regulations in the U.S.

23.     The purpose of an AML program is to deter criminals from transferring and obtaining illicit funds through the financial system, and JPM was legally obligated to ensure it did not support money laundering activities. JPM was required to monitor EMTC's account activity, including any unusually large volume of transfers, and report suspicious activity. It was further required to develop an understanding of EMTC's business sufficient to assess whether transactions were suspicious. Suspicious activities include unusual transaction patterns, a larger than usual volume of transactions, and transactions with high-risk countries. JPM was supposed

to provide training to its employees sufficient to ensure they could identify suspicious transactions and adapt to emerging criminal methodologies.

24.     Section 17.5 of the Account Terms applicable to the NY Account confirms that JPM would adhere to its AML policy when administering the NY Account and cautions that adherence to such provision will result in "transaction screening" that may cause delays. That section states, in part:

> Both the Bank and the Customer represent that it shall comply with applicable laws and regulations. *The Bank is required to act in accordance with Bank policies, the laws and regulations of various jurisdictions relating to the prevention of money laundering* and the implementation of sanctions, including but not limited to regulations issued by the U.S. Office of Foreign Assets Control. *The Bank is not obligated to execute payment orders or effect any other transaction where* the beneficiary or other payee is a person or entity with whom the Bank is prohibited from doing business by any law or regulation applicable to the Bank, or *in any case where compliance would, in the Bank's opinion, conflict with applicable law or banking practice or its own policies and procedures*. . . . *Transaction screening may result in delays* in the posting of transactions and/or funds availability. In this context, the Bank may require the Customer to make changes to the activity in the Customer's Accounts, including if necessary to cease and desist from using the Accounts for particular types of transactions or for transactions involving particular parties from time to time.

(Emphasis added).

25.     Similarly, Section 17.15 of the Account Terms provides, in part: "To fulfill the Bank's 'know your customer' responsibilities, the Bank will request information from the Customer from time to time regarding the Customer's organization, business. [sic] The Bank may also request further information and/or documentation in connection with the provision of the Services."

26.     JPM's Cash Management Services "Welcome Guide" offered assurances of JPM's "commitment to the delivery of the highest standard of service and support available" and a "dedicated Client Service Team" that would provide EMTC with "strategic focus, direction and

excellence in client service and support." Likewise, an email from JPM promised "robust" service, and referenced JPM's ability to "leverage [its] strong expertise to help Essilor with setting up the most efficient and optimized solutions."

27.     As noted, the NY Account was opened as part of a broader cash management system among multiple Essilor-affiliated companies. In order to ensure that EMTC, and other affiliates, had sufficient funding to operate, JPM permitted overdrafts, subject to a daily limit, and negative balances would ultimately be settled through the daily cash sweeping process. Under this system, if the balance of any affiliate's account was negative, proceeds would be swept down from the parent company at the end of each day. Conversely, any positive balance would be swept up to the parent. Thus, EMTC would begin each day with a zero balance. JPM described the overdraft limit process in an email noting that:

> intraday overdraft ('IDOD') limits will be set up, either to be shared by the participating entities or applied individually to each bank account participating in the cash pool. We will work closely with Essilor to determine the appropriate overdraft (intraday and overnight) limits required to support your daily transactional requirements. The *usage of these lines will also be monitored on an ongoing basis* to ensure that the limits remain adequate to enable the efficient processing of your transactions.

(Emphasis added).

28.     Plaintiffs requested in writing that JPM institute a daily overdraft limit (*i.e.*, a "DOL") of US $10 million for the NY Account. JPM agreed to do so. When implemented correctly, a DOL can, among other things, mitigate against unauthorized and/or fraudulent transfers because it ensures that unusual overdraft activity will be brought to the bank's, the account holder's, and any other relevant parties' attention. JPM should have automatically blocked any transfers that exceeded the DOL and contacted Plaintiffs. The DOL constituted a written instruction from EMTC and Essilor to block any daily transfers from the NY Account

exceeding $10 million. This arrangement was mutually beneficial. Without it, JPM would effectively extend EMTC unlimited credit as its account's balance is set at zero at the beginning of each day. The DOL reflects the Plaintiffs' reasonable understanding that JPM was monitoring the amount of the transfers from the NY Account and should have alerted the Plaintiffs to the unusual fact that the DOL was repeatedly being exceeded during the Fraudulent Period, sometimes by more than $20 million, which could have avoided many later unauthorized and fraudulent transfers.

29.     The Federal Financial Institutions Examination Council ("FFIEC") issues guidance concerning security procedures applicable to banks and online transfers, including its bulletin titled "Authentication in an Internet Banking Environment" and a 2011 supplemental bulletin. The FFIEC guidance describes commercially reasonable practices for authenticating users and for performing risk assessment. This guidance further requires banks to include in their layered security program "processes designed to detect anomalies and effectively respond to suspicious or anomalous activity related to . . . initiation of electronic transactions involving the transfer of funds to other parties." If JPM had complied with these standards, the fraudsters could not have executed the fraudulent transfers, which should have been identified as "anomalous activity."

30.     From time to time, JPM employees did ask for additional details regarding transfers from EMTC's NY Account. For example, in 2019, JPM sent an email to an EMTC employee and another email to Phetporee (copying this other EMTC employee) inquiring about a message for a $500,000 payment to a beneficiary and relaying a request for further details from "our compliance team." Although JPM sought further information regarding this particular transaction, it failed to identify the suspicious trading activity, described herein. JPM's

10

compliance inquires and account monitoring confirmed Plaintiffs' understanding that JPM was monitoring account activity and would report any red flags to Essilor and EMTC.

31.     JPM also demonstrated that it would block transfers on its own initiative, even when those transfers should have been made automatically because they were executed through the SWIFT (Society for Worldwide Interbank Financial Telecommunications) network. On December 11, 2019, Essilor attempted to transfer $19 million from its JPM account to an account it held in another bank using the SWIFT network. This transfer, which was not fraudulent, was blocked presumably because JPM detected unusual account activities. Despite repeated inquiries, JPM has never explained why it blocked this transfer, but failed to block the fraudulent transfers.

**III.      JPM Ignored Highly Suspicious Account Activity**

32.     The transactions from the Fraudulent Period were markedly different than those from January 2017 – August 2019 (the "Pre-Fraudulent Period"), both in terms of the number and aggregate value of payment orders per month, as well as the types of transactions.

**A.      Transaction Volume Spiked During the Fraudulent Period**

33.     During the Pre-Fraudulent Period, the average total amount of transfers per month was less than $15 million. During the Fraudulent Period, the average monthly dollar volume of transfers spiked dramatically. In October 2019, approximately $33,222,000 was transferred from the NY Account, *i.e.*, double historic averages. Transfers dramatically escalated thereafter with approximately $119,354,000 in November 2019 and approximately $140,117,000 in December 2019.

34.     The number of monthly payment orders out of the NY Account also doubled during the Fraudulent Period, relative to the Pre-Fraudulent Period. In 2017, there was an average of 32 payment orders per month out of the NY Account. In 2018, there was an average

11

of 54 payment orders per month out of the NY Account. Between January and August 2019, there was an average of 56 payment orders per month out of the NY Account. During the three-month Fraudulent Period, there was an average of 102 payment orders out of the NY account, with over 100 payment orders made in each of October, November, and December 2019.

35.     As set forth previously, JPM was required to take note of transfer volumes that were much higher than usual and make further inquiries. If it had done so, the fraudulent transfers could have been avoided, or unwound in the early stages of the fraud, and future fraudulent transfers would have been prevented.

**B.     The Types of Payment Orders During the Fraudulent Period were Suspicious**

36.     The types of payment orders initiated out of the NY Account during the Fraudulent Period deviated substantially when compared to the account activity in the Pre-Fraudulent Period. For example, during the Pre-Fraudulent Period, most payment orders out of the NY Account were for a very specific amount of money, down to the cents (*e.g.,* $18,203.96 or $34,270.80), with very limited exceptions. During the Fraudulent Period, there was an uptick in round-number (*i.e.*, no cents) payment orders. In fact, all of the fraudulent transfers were round figures. This dramatic departure from prior periods was highly suspicious and, either alone or with other red flags, should have caused JPM to investigate further and to report these red flags to Plaintiffs.

37.     The increase in round-number payments also coincided with payment orders to a variety of new beneficiaries. Most of the beneficiaries during the Pre-Fraudulent Period were either recognizable businesses within the optical industry or subsidiaries of Essilor. It is clear from entity names that many of the beneficiaries during the Fraudulent Period did not operate within the optical industry (*e.g.*, Guangzhou Wendy Hair Products, Citgo Oil Trading LLC,

Maskhoa Coffee Roost Limited, Dekwa Furniture Global, Wealthy Creation Asia Private Limited, Charity Njabili). These are not entities that EMTC had transacted with prior to the Fraudulent Period. Further, transactions made during the Pre-Fraudulent Period were almost exclusively transmitted through the same four large international banks, specifically (1) Citibank N.A., (2) JPMorgan Chase Bank, (3) Standard Chartered Bank and (4) HSBC Bank USA, N.A. The transactions made during the Fraudulent Period, by contrast, were mainly transmitted through small, regional banks located in Southeast Asia, including China and other high-risk jurisdictions.

38.     JPM should have conducted further research into the entities that were designated to receive these highly suspicious transfers. If it had done some basic research, it would have quickly confirmed that the vast majority of the fraudulent transfers were being made to shell entities, or to straw man accounts created to facilitate the fraud. Of the fraudulent transfers, 174 went to entities (72 entities in total) that were easily identified as shell entities with no purpose except to facilitate fraud. JPM could have made this assessment by performing Google searches and reviewing incorporation documents. JPM had the capacity to perform this research, as bank AML groups routinely employ such resources to detect potential fraud and money laundering.

39.     As noted above, JPM was required to develop an understanding of EMTC's business sufficient to identify transactions that would be considered out of the norm for EMTC. JPM knew EMTC was a manufacturing entity that rarely transacted in round figures and generally only transacted with legitimate trading businesses that maintained accounts at large international banks. The transactions during the Fraudulent Period were dominated by noticeable deviations from EMTC's usual practice and should have prompted JPM to investigate and notify Plaintiffs.

### C.   Overdrafts Spiked During the Fraudulent Period

40.    As noted, JPM agreed to institute a DOL of $10 million for the NY Account. During the three-month Fraudulent Period, the DOL was exceeded at least nine times. In contrast, during the Pre-Fraudulent Period, which spanned three years (or 12 times as long as the Fraudulent Period), no transactions exceeded the DOL during that entire period. The high incidence of overdrafts was further strong evidence of unauthorized account activity.  Yet JPM did not notify EMTC and Essilor of the overdrafts or stop transfers from the account that exceeded the $10 million DOL. If JPM had promptly notified Plaintiffs of overdrafts during the Fraudulent Period, it would have alerted Plaintiffs to the fraud. It would also have allowed Plaintiffs to promptly address the larger overdrafts, including two dates on which overdrafts exceeded $30 million (*i.e.,* more than $20 million over the $10 million DOL).

### D.   The Timing of Approvals was Suspicious

41.    JPM's stated security protocol required a two-step verification process. First, a "maker" would initiate a payment order. However, that transaction would not be processed until two separate "approvers" approved the payment order. The transaction log for the NY Account shows that, for 91 of the fraudulent transfers, the second approval occurred *less than 60 seconds* after the first approval. This datapoint, which JPM was aware of because it is reflected in the transaction log created by its own systems, was unusual and was an obvious red flag that one person was providing both approvals. During the Pre-Fraudulent Period, and for non-fraudulent transactions generally, the second approval at EMTC did not take place *for ten hours or more*. The substantially quicker approval times should have caused JPM to question the validity of these transactions and contact EMTC and Essilor.

14

### E.  JPM Knew that Phetporee Provided False Quarterly Reports To Regulators

42.  JPM also knew, or should have known, that Phetporee provided false quarterly reports of payment orders to a regulator, the Bank of Thailand. Plaintiffs and JPM agreed to a procedure whereby EMTC would send JPM monthly reports for validation prior to submission to the Bank of Thailand. On October 21, 2019, Phetporee sent reports to JPM employees (Siriwan Premplumjit and Knokporn Thongkomol) for review prior to sending them to the Bank of Thailand. The monthly report for September 2019 falsely represented that three transfers were from the NY Account to another EMTC account maintained with JPM in Bangkok. JPM knew, or should have known, this representation was false because the transfers were actually made to third parties, not to another EMTC account.  This discrepancy should have prompted JPM to inquire further and notify Plaintiffs of the discrepancy.

### F.  Called Back and Rejected Payment Orders

43.  During the Fraudulent Period, there were an increased number of callback requests, which are requests from EMTC for a return of funds. Phetporee recalled more than 40 payment orders during the Fraudulent Period. During the Pre-Fraudulent period only one order was called back. In addition, JPM initially rejected at least 20 transfers due to errors in the payment orders made by Phetporee during the Fraudulent Period. JPM should have recognized these call backs and rejections as red flags and notified Plaintiffs. If it had, Phetporee's participation in the fraud would have been discovered and the bulk of the fraudulent transactions would have been prevented.

**FIRST CAUSE OF ACTION**
**(Article 4-A of the N.Y. Uniform Commercial Code)**

44.     Plaintiffs incorporate the paragraphs above as if fully set forth herein.

45.     Section 4-A-204(1) of the N.Y. Uniform Commercial Code provides in pertinent

part:

> If a receiving bank accepts a payment order issued in the name of its customer as
> sender which is (a) not authorized and not effective as the order of the customer
> under Section 4-A-202, . . . the bank shall refund any payment of the payment
> order received from the customer to the extent the bank is not entitled to enforce
> payment and shall pay interest on the refundable amount calculated from the date
> the bank received payment to the date of the refund.

46.     The fraudulent transfers at issue were not authorized. Phetporee did not have

authority to make transfers without approval from a separately designated second approver at

EMTC. Even if the second approval had been provided, Phetporee's authority, and the authority

of any second approver, was limited to transactions permissible under Plaintiffs' policies and

procedures, which did not permit fraudulent payment orders.

47.     Phetporee lacked apparent authority to enter into the fraudulent transfers because

JPM knew, or should have known, of highly unusual account activity in the NY Account. A

commercially reasonable actor, and certainly a sophisticated bank like JPM, would have been

alerted to the fact that the transfers were fraudulent and, thus, unauthorized. At a minimum, the

suspicious or unusual account activity would have led a commercially reasonable actor to make

further inquiries. If those inquiries were made, they would have confirmed that Phetporee lacked

actual authority.

48.     Because the fraudulent transfers were not authorized, JPM is required to refund

the transfers pursuant to Article 4-A of the N.Y. U.C.C. because JPM cannot establish that it (i)

16

followed commercially reasonable and agreed upon security procedures; and (ii) acted in good faith and in accordance with the reasonable expectations of the parties.

49.     As a result, section 4-A-204(1) of the N.Y. U.C.C. requires that JPM refund the payment orders made during the Fraudulent Period (minus any amounts already refunded or recovered), plus interest.

50.     To date, JPM has failed to comply with Section 4-A-204(1) by refusing to refund the payment orders made during the Fraudulent Period (minus the amount already refunded or recovered) to Plaintiffs.

51.     As a direct and proximate result of JPM's breaches of its duty, Plaintiffs have suffered damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Breach of Contract)**

52.     Plaintiffs incorporate the paragraphs above as if fully set forth herein.

53.     Plaintiffs entered into a valid and binding agreement governing the NY Account and the broader cash management system that was put in place in 2017 involving EMTC and other Essilor subsidiaries.

54.     JPM breached its obligations under the contract.

55.     Plaintiffs have performed their obligations under the contract.

56.     JPM's breaches caused Plaintiffs to suffer damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Negligence)**

57.     Plaintiffs incorporate the paragraphs above as if fully set forth herein.

17

58.     As customers of JPM, JPM owed Plaintiffs a duty of care, independent of their contractual agreement, to act in a manner consistent with commercially reasonable standards.

59.     JPM violated this duty of care.

60.     As a direct and proximate result of JPM's negligence, Plaintiffs suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment as follows:

A.     Judgment against the Defendant on all causes of action and awarding compensatory damages in favor of Plaintiffs in an amount to be determined at trial, plus interest thereon;

B.     Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.     Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated: April 25, 2022

*/s/ William A. Maher*

William A. Maher
Steven S. Fitzgerald
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
wmaher@wmd-law.com
sfitzgerald@wmd-law.com

*Attorneys for Plaintiffs*

**Exhibit A**

| Date | Transaction Amount (USD) | Beneficiary Name |
|---|---|---|
| 09/10/2019 | 750,000.00 | China New Building Group Overseas Invesment Ltd |
| 09/17/2019 | 1,200,000.00 | Nssp (Hong Kong) Ltd |
| 09/28/2019 | 56,000.00 | Wannaphon Damkhonburi |
| 09/30/2019 | 100,000.00 | Akm Sejati Enterprise |
| 09/30/2019 | 350,000.00 | Legasi Progresif Sdn Bhd |
| 09/30/2019 | 400,000.00 | Legasi Progresif Sdn Bhd |
| 10/02/2019 | 250,000.00 | Efan Trading Co Ltd |
| 10/02/2019 | 250,000.00 | Hongkong Oriental Union Ltd |
| 10/02/2019 | 500,000.00 | Chao Feng Chu |
| 10/02/2019 | 350,000.00 | Rhf Marketing Sdn Bhd |
| 10/02/2019 | 250,000.00 | Linyi Hemiao Int Trade |
| 10/02/2019 | 1,000,000.00 | Edna Hongkong Co Ltd |
| 10/02/2019 | 56,000.00 | Jeil Machinery Enterprise |
| 10/02/2019 | 400,000.00 | Hefan Trade Ltd |
| 10/03/2019 | 150,000.00 | Vv Closet Resources |
| 10/03/2019 | 150,000.00 | Jasa Cipta Rembaka Resources |
| 10/03/2019 | 1,260,000.00 | Nakeha Ltd |
| 10/03/2019 | 1,300,000.00 | Sun Wai Lok Hk Int |
| 10/07/2019 | 250,000.00 | Greater House Tech Services Llc |
| 10/07/2019 | 900,000.00 | Ilab Factory Co Ltd |
| 10/07/2019 | 800,000.00 | Ilab Factory Co Ltd |
| 10/07/2019 | 70,000.00 | Akm Sejati Enterprise |
| 10/07/2019 | 80,000.00 | Jeil Machinery Enterprise |
| 10/07/2019 | 250,000.00 | Greater House Tech Services Llc |
| 10/07/2019 | 1,800,000.00 | Nakeha Ltd |
| 10/07/2019 | 100,000.00 | Dekwa Furniture Global |
| 10/07/2019 | 100,000.00 | Zainoor Global Services |
| 10/07/2019 | 150,000.00 | Fsd City Center Sdn Bhd |
| 10/09/2019 | 200,000.00 | Liew Stainless Steel Construction Works |
| 10/09/2019 | 100,000.00 | Jeil Machinery Enterprise |
| 10/10/2019 | 100,000.00 | Zainoor Global Services |
| 10/10/2019 | 100,000.00 | Dekwa Furniture Global |
| 10/15/2019 | 200,000.00 | Eastern Hardware Global Resources |
| 10/15/2019 | 200,000.00 | Fivestar Vision Resources |

# Exhibit A

| Date | Transaction Amount (USD) | Beneficiary Name |
|---|---|---|
| 10/15/2019 | 200,000.00 | Jsn Tools Resources |
| 10/15/2019 | 200,000.00 | Marnix Re Services |
| 10/15/2019 | 150,000.00 | Omega Asset Management |
| 10/15/2019 | 1,560,000.00 | Rivosa Ltd |
| 10/15/2019 | 1,560,000.00 | Idrisco Private Ltd |
| 10/16/2019 | 80,000.00 | Jeil Machinery Enterprise |
| 10/16/2019 | 99,000.00 | Al Zaafaran Trading Sdn Bhd |
| 10/16/2019 | 100,000.00 | Pt Borneo Prima Coal |
| 10/16/2019 | 500,000.00 | Drifa Private Ltd |
| 10/17/2019 | 100,000.00 | Zainoor Global Services |
| 10/17/2019 | 150,000.00 | Coolibree Gmbh Enterprise |
| 10/17/2019 | 150,000.00 | Pt Ansuransi Jasa Enterprise |
| 10/17/2019 | 100,000.00 | Dekwa Furniture Global |
| 10/17/2019 | 151,000.00 | M&J Global Resources |
| 10/21/2019 | 560,000.00 | Tonga Development Bank |
| 10/22/2019 | 850,000.00 | Guangdong Bainuo Supply Co Ltd |
| 10/22/2019 | 1,000,000.00 | Foshan Gaoming Hengrui Export |
| 10/22/2019 | 500,000.00 | Idrisco Private Ltd |
| 10/22/2019 | 500,000.00 | Drifa Private Ltd |
| 10/23/2019 | 100,000.00 | Amen Ogbebor |
| 10/29/2019 | 1,250,000.00 | Guangzhou Wendy Hair Products |
| 10/29/2019 | 1,250,000.00 | Aslan Int Private Ltd |
| 10/29/2019 | 1,500,000.00 | Idrisco Private Ltd |
| 10/29/2019 | 1,250,000.00 | Al Loaloa Al Baydaa Electronic Llc |
| 10/29/2019 | 1,250,000.00 | Citgo Oil Trading Llc |
| 10/29/2019 | 1,800,000.00 | Drifa Private Ltd |
| 10/29/2019 | 1,800,000.00 | Idrisco Private Ltd |
| 10/31/2019 | 1,800,000.00 | Excellence Agro Resources Sdn Bhd |
| 10/31/2019 | 2,000,000.00 | Excellence Agro Resources Sdn Bhd |
| 10/31/2019 | 1,200,000.00 | One Concept Holding Sdn Bhd |
| 10/31/2019 | 1,300,000.00 | One Concept Holding Sdn Bhd |
| 11/01/2019 | 250,000.00 | Fsg Spor Giyim Sanayi Ve Dis |
| 11/01/2019 | 100,000.00 | Eveline Rahmat |
| 11/01/2019 | 250,000.00 | Arif Odunkiran |

**Exhibit A**

| Date | Transaction Amount (USD) | Beneficiary Name |
|---|---|---|
| 11/01/2019 | 250,000.00 | Batuhan Bal |
| 11/01/2019 | 250,000.00 | Kalbe Tekstil Dis Ticaret Sanayi |
| 11/01/2019 | 250,000.00 | Rml Mobilya Ithalat Ihracat Dis |
| 11/01/2019 | 800,000.00 | Ilab Factory Co Ltd |
| 11/01/2019 | 800,000.00 | Ilab Factory Co Ltd |
| 11/01/2019 | 800,000.00 | Ilab Factory Co Ltd |
| 11/04/2019 | 1,800,000.00 | Pt Bank Muamalat Indonesia Tbk |
| 11/04/2019 | 1,900,000.00 | Pt Bank Muamalat Indonesia Tbk |
| 11/04/2019 | 2,000,000.00 | Pt Bank Muamalat Indonesia Tbk |
| 11/04/2019 | 2,100,000.00 | Pt Bank Muamalat Indonesia Tbk |
| 11/04/2019 | 2,200,000.00 | Pt Bank Muamalat Indonesia Tbk |
| 11/07/2019 | 1,000,000.00 | Wealthy Creation Asia Private Ltd |
| 11/07/2019 | 1,000,000.00 | Aslan Int Private Ltd |
| 11/07/2019 | 1,000,000.00 | Stenheim Private Ltd |
| 11/07/2019 | 1,500,000.00 | Aslan Int Private Ltd |
| 11/07/2019 | 1,500,000.00 | Stenheim Private Ltd |
| 11/07/2019 | 1,500,000.00 | Wealthy Creation Asia Private Ltd |
| 11/08/2019 | 2,000,000.00 | Drifa Private Ltd |
| 11/08/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 11/08/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 11/08/2019 | 1,900,000.00 | Phima Private Ltd |
| 11/08/2019 | 2,100,000.00 | Phima Private Ltd |
| 11/12/2019 | 1,000,000.00 | Al Loaloa Al Baydaa Electronic Llc |
| 11/12/2019 | 2,000,000.00 | 24K Group Ltd |
| 11/12/2019 | 2,000,000.00 | Pak Way Link Trading Dmcc |
| 11/12/2019 | 1,500,000.00 | Pt Putra Perkasa Jaya |
| 11/13/2019 | 1,000,000.00 | Idrisco Private Ltd |
| 11/13/2019 | 1,500,000.00 | Phima Private Ltd |
| 11/13/2019 | 1,000,000.00 | Idrisco Private Ltd |
| 11/13/2019 | 1,500,000.00 | Kveta T And C Doo |
| 11/13/2019 | 1,500,000.00 | Drifa Private Ltd |
| 11/14/2019 | 300,000.00 | Eveline Rahmat |
| 11/14/2019 | 1,000,000.00 | Al Loaloa Al Baydaa Electronic Llc |
| 11/14/2019 | 1,000,000.00 | Ouligao Trading Co Ltd |

**Exhibit A**

| Date | Transaction Amount (USD) | Beneficiary Name |
|---|---|---|
| 11/14/2019 | 1,500,000.00 | Ouligao Trading Co Ltd |
| 11/14/2019 | 1,000,000.00 | Al Saaha Almzdawajah Electronic Llc |
| 11/14/2019 | 2,000,000.00 | Grid Global Commercial Brokerage Llc |
| 11/14/2019 | 1,500,000.00 | Godstime Excel |
| 11/15/2019 | 2,000,000.00 | Bv Euro Services Co Ltd |
| 11/15/2019 | 250,000.00 | Vincent Chua Hock Seng |
| 11/15/2019 | 249,000.00 | Myride Auto Inc |
| 11/19/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 11/19/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 11/19/2019 | 2,000,000.00 | Drifa Private Ltd |
| 11/19/2019 | 2,000,000.00 | Phima Private Ltd |
| 11/19/2019 | 2,000,000.00 | Phima Private Ltd |
| 11/19/2019 | 500,000.00 | Vincent Chua Hock Seng |
| 11/19/2019 | 2,000,000.00 | Bakkali Ltd |
| 11/19/2019 | 300,000.00 | Eveline Rahmat |
| 11/19/2019 | 350,000.00 | Kitti Yimplysin |
| 11/22/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 11/22/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 11/22/2019 | 2,000,000.00 | Drifa Private Ltd |
| 11/22/2019 | 2,000,000.00 | Phima Private Ltd |
| 11/22/2019 | 2,000,000.00 | Phima Private Ltd |
| 11/26/2019 | 400,000.00 | Eveline Rahmat |
| 11/27/2019 | 1,000,000.00 | Mr Trade Co Ltd |
| 11/27/2019 | 1,000,000.00 | Pj Import And Export Co Ltd |
| 11/27/2019 | 1,000,000.00 | Najmat Al Zain Aluminium & Glass Contracting Llc |
| 11/28/2019 | 850,000.00 | Fiberex Private Ltd |
| 11/28/2019 | 2,000,000.00 | Ruichida Trading Co Ltd |
| 11/28/2019 | 2,000,000.00 | Yirui (Hong Kong) Trading Co Ltd |
| 11/28/2019 | 1,300,000.00 | Aslan Int Private Ltd |
| 11/28/2019 | 2,000,000.00 | Cromax Ltd |
| 11/28/2019 | 2,000,000.00 | Zythos Ltd |
| 11/28/2019 | 350,000.00 | Kitti Yimplysin |
| 11/28/2019 | 350,000.00 | Amaco Int Co Ltd |
| 11/29/2019 | 2,000,000.00 | Yirui (Hong Kong) Trading Co Ltd |

**Exhibit A**

| Date | Transaction Amount (USD) | Beneficiary Name |
|---|---|---|
| 11/29/2019 | 500,000.00 | Edison P Buisa |
| 11/29/2019 | 500,000.00 | Edison P Buisa |
| 12/01/2019 | 400,000.00 | United Star Industrial Group Ltd |
| 12/02/2019 | 1,400,000.00 | Hong Kong Chen Yun Trading Co Ltd |
| 12/02/2019 | 1,600,000.00 | Hong Kong Bangcheng Trading Ltd |
| 12/02/2019 | 2,000,000.00 | Hong Kong Bangcheng Trading Ltd |
| 12/02/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 12/02/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 12/02/2019 | 1,600,000.00 | Ehb Services Ltd |
| 12/02/2019 | 2,000,000.00 | Drifa Private Ltd |
| 12/02/2019 | 2,000,000.00 | Phima Private Ltd |
| 12/02/2019 | 2,000,000.00 | Phima Private Ltd |
| 12/02/2019 | 1,600,000.00 | Hong Kong Chen Yun Trading Co Ltd |
| 12/02/2019 | 1,600,000.00 | Hong Kong Chen Yun Trading Co Ltd |
| 12/02/2019 | 2,000,000.00 | Hong Kong Chen Yun Trading Co Ltd |
| 12/02/2019 | 1,400,000.00 | Stenheim Private Ltd |
| 12/02/2019 | 1,600,000.00 | B And L Legal Consultancy |
| 12/02/2019 | 1,400,000.00 | Hong Kong Bangcheng Trading Ltd |
| 12/02/2019 | 1,400,000.00 | B And L Legal Consultancy |
| 12/02/2019 | 2,000,000.00 | B And L Legal Consultancy |
| 12/02/2019 | 1,400,000.00 | Ehb Services Ltd |
| 12/02/2019 | 2,000,000.00 | Ehb Services Ltd |
| 12/02/2019 | 350,000.00 | Maskhao Coffee Roost Ltd |
| 12/03/2019 | 2,000,000.00 | Stenheim Private Ltd |
| 12/03/2019 | 350,000.00 | Lee Chee Wee |
| 12/03/2019 | 250,000.00 | Mdeme Eyengue Letricia Marie Louise |
| 12/03/2019 | 250,000.00 | Kiyo Shigenami |
| 12/03/2019 | 250,000.00 | Charity Njabili |
| 12/03/2019 | 250,000.00 | Charity Njabili |
| 12/03/2019 | 250,000.00 | Emmanuel C Idoko |
| 12/03/2019 | 250,000.00 | Rana Muhammad Babar Muhammad Akhtar |
| 12/03/2019 | 500,000.00 | Rana Muhammad Babar Muhammad Akhtar |
| 12/03/2019 | 1,400,000.00 | Hong Kong Chen Yun Trading Co Ltd |
| 12/03/2019 | 2,000,000.00 | Hong Kong Chen Yun Trading Co Ltd |

**Exhibit A**

| Date | Transaction Amount (USD) | Beneficiary Name |
|---|---|---|
| 12/03/2019 | 1,500,000.00 | Aslan Int Private Ltd |
| 12/03/2019 | 1,600,000.00 | Aslan Int Private Ltd |
| 12/03/2019 | 1,900,000.00 | Aslan Int Private Ltd |
| 12/03/2019 | 1,600,000.00 | Stenheim Private Ltd |
| 12/03/2019 | 1,500,000.00 | Sumec Machinery And Electric |
| 12/03/2019 | 1,700,000.00 | Sumec Machinery And Electric |
| 12/03/2019 | 1,800,000.00 | Sumec Machinery And Electric |
| 12/03/2019 | 250,000.00 | Tangu Victory |
| 12/03/2019 | 350,000.00 | Thanawat Service & Travel Co Ltd |
| 12/03/2019 | 350,000.00 | Kitti Yimplysin |
| 12/03/2019 | 2,000,000.00 | Dortex Private Ltd |
| 12/03/2019 | 1,800,000.00 | Dortex Private Ltd |
| 12/03/2019 | 1,900,000.00 | Dortex Private Ltd |
| 12/03/2019 | 2,100,000.00 | Dortex Private Ltd |
| 12/03/2019 | 2,200,000.00 | Dortex Private Ltd |
| 12/04/2019 | 360,000.00 | Chao Feng Chu |
| 12/04/2019 | 1,400,000.00 | Hk Juli Int Trading Ltd |
| 12/04/2019 | 2,000,000.00 | Talidi Private Ltd |
| 12/04/2019 | 350,000.00 | Chao Feng Chu |
| 12/04/2019 | 1,600,000.00 | Yirui (Hong Kong) Trading Co Ltd |
| 12/04/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 12/04/2019 | 1,600,000.00 | Hk Juli Int Trading Ltd |
| 12/04/2019 | 1,400,000.00 | Yirui (Hong Kong) Trading Co Ltd |
| 12/04/2019 | 1,250,000.00 | Vina Global Link Ltd |
| 12/04/2019 | 840,000.00 | Godstime Excel |
| 12/04/2019 | 850,000.00 | Ilab Factory Co Ltd |
| 12/04/2019 | 2,000,000.00 | Phima Private Ltd |
| 12/04/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 12/04/2019 | 2,000,000.00 | Hk Juli Int Trading Ltd |
| 12/04/2019 | 900,000.00 | Ilab Factory Co Ltd |
| 12/04/2019 | 2,000,000.00 | Drifa Private Ltd |
| 12/04/2019 | 2,000,000.00 | Phima Private Ltd |
| 12/04/2019 | 2,000,000.00 | Yirui (Hong Kong) Trading Co Ltd |
| 12/04/2019 | 1,400,000.00 | Phima Private Ltd |

**Exhibit A**

| Date | Transaction Amount (USD) | Beneficiary Name |
|---|---|---|
| 12/04/2019 | 1,600,000.00 | Phima Private Ltd |
| 12/04/2019 | 2,000,000.00 | Trust Logistics Ltd |
| 12/04/2019 | 2,000,000.00 | Trust Logistics Ltd |
| 12/04/2019 | 1,000,000.00 | Phima Private Ltd |
| 12/04/2019 | 2,000,000.00 | Phima Private Ltd |
| 12/04/2019 | 1,000,000.00 | Talidi Private Ltd |
| 12/04/2019 | 2,000,000.00 | Talidi Private Ltd |
| 12/04/2019 | 1,000,000.00 | Idrisco Private Ltd |
| 12/04/2019 | 1,000,000.00 | Idrisco Private Ltd |
| 12/04/2019 | 1,000,000.00 | Drifa Private Ltd |
| 12/04/2019 | 2,000,000.00 | Drifa Private Ltd |
| 12/04/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 12/04/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 12/06/2019 | 500,000.00 | Eveline Rahmat |
| 12/08/2019 | 500,000.00 | Hong Kong Wanyigou Trade Ltd |
| 12/08/2019 | 500,000.00 | Checkov Intelcom Inc |
| 12/08/2019 | 500,000.00 | Lansi Trading Co Ltd |
| 12/09/2019 | 580,000.00 | Compass Picture Private Ltd |
| 12/09/2019 | 480,000.00 | Wu Lihua |
| 12/09/2019 | 480,000.00 | Zhang Haijun |
| 12/09/2019 | 850,000.00 | Ilab Factory Co Ltd |
| 12/10/2019 | 800,000.00 | Lau Hiu Chun |
| 12/10/2019 | 500,000.00 | Yulia Enterprise Co Ltd |
| 12/11/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 12/11/2019 | 2,000,000.00 | Idrisco Private Ltd |
| 12/11/2019 | 2,000,000.00 | Drifa Private Ltd |
| 12/11/2019 | 2,000,000.00 | Phima Private Ltd |
| 12/11/2019 | 2,000,000.00 | Phima Private Ltd |
| 12/11/2019 | 2,000,000.00 | Talidi Private Ltd |
| 12/11/2019 | 1,000,000.00 | Phima Private Ltd |
| 12/11/2019 | 1,000,000.00 | Idrisco Private Ltd |
| 12/11/2019 | 1,000,000.00 | Idrisco Private Ltd |
| 12/11/2019 | 1,000,000.00 | Drifa Private Ltd |
| 12/11/2019 | 1,000,000.00 | Phima Private Ltd |

**Exhibit A**

| Date | Transaction Amount (USD) | Beneficiary Name |
|---|---|---|
| 12/11/2019 | 1,000,000.00 | Talidi Private Ltd |
| 12/11/2019 | 250,000.00 | Ningbo Wanhe Import & Export |
| 12/11/2019 | 250,000.00 | Dazhan Camping Stove Co Ltd |
| 12/11/2019 | 250,000.00 | Dazhan Camping Stove Co Ltd |
| 12/12/2019 | 480,000.00 | Chao Feng Chu |

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/04/2023
```

------------------------------------------------------------------------X
                                             :

ESSILOR INTERNATIONAL SAS and        :
ESSILOR MANUFACTURING (THAILAND) CO.,  :
LTD.,                                      :
                                             :

                  Plaintiffs,       :             22-cv-3361 (LJL)
                                        :

         -v-                       :        OPINION AND ORDER
                                        :

J.P. MORGAN CHASE BANK, N.A.,        :
                                           :

                 Defendant.       :
                                           :
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       Defendant J.P. Morgan Chase Bank, N.A. ("JP Morgan" or "Defendant") moves to

dismiss the complaint against it pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt.

No. 18.  For the following reasons, Defendant's motion to dismiss is granted in part and denied

in part.

## BACKGROUND

       The Court accepts as true for purposes of this motion the well-pleaded factual allegations

of the complaint, Dkt. No. 1 ("Complaint"), and the documents incorporated by reference

therein.

       This case arises out of a complex fraud orchestrated against plaintiffs Essilor

International SAS ("Essilor") and Essilor Manufacturing (Thailand) Co., Ltd. ("EMTC," and,

together with Essilor, "Plaintiffs") from mid-September 2019 through mid-December 2019 by a

group of international cybercriminals.  Dkt. No. 1 ¶ 1.  The scheme resulted in the transfer of

approximately $272 million from an account in the name of EMTC maintained at a New York,

New York branch of JP Morgan.  *Id.* ¶ 2.  As of April 25, 2022, Plaintiffs were able to recover

approximately $172 million, but have been unable to recover approximately $100 million.  *See id.*

Essilor is a French simplified joint-stock company with its principal place of business in Charenton-le Pont, France.  *Id.* ¶ 11.  It is one of three main subsidiaries of EssilorLuxottica SA, the world's leading ophthalmic company.  *Id.*  EMTC, a wholly owned subsidiary of Essilor, is a Thai limited company with its principal place of business in Bangkok, Thailand.  *Id.* ¶ 12.  EMTC operates a manufacturing plant in Thailand.  *Id.*  EMTC has a U.S. bank account with JP Morgan, a national banking association; EMTC uses this account to purchase supplies and conduct other transactions in U.S. dollars.  *Id.* ¶¶ 12–13.

EMTC and Essilor both had long-standing relationships with JP Morgan.  *Id.* ¶ 16.  Although long in allegations about the fraud and the red flags that allegedly accompanied it, the Complaint is short on allegations about the nature and timing of the relationships of each of EMTC and Essilor with JP Morgan.  As noted, Plaintiffs allege that EMTC had an account at a JP Morgan branch located in New York, New York (the "NY Account").  *Id.*  Plaintiffs also allege that a "broader cash management system . . . was put in place in [March] 2017 involving EMTC and other Essilor subsidiaries."  *Id.* ¶ 53; *see also id.* ¶ 16.  The cash management system ("Cash Management System") ensured that EMTC and other affiliates had sufficient funds to operate.  *Id.* ¶ 27.  JP Morgan permitted overdrafts, subject to a daily limit; JP Morgan would settle negative balances through the daily cash sweeping process.  *Id.*  If the balance of any affiliate's account was negative, proceeds would be "swept down" from Essilor at the end of each day, while positive balances would be "swept up" to Essilor.  *Id.*  As a result, the account of each affiliate would begin each day with a balance of $0.  *Id.*  The Complaint alleges that the NY

Account was opened pursuant to the Cash Management System, presumably also in March 2017.
*See id.* ¶¶ 16, 27, 53.

The parties have submitted a number of documents that each claims constitutes the
relevant agreements between JP Morgan and Plaintiffs.  Defendant has submitted a declaration
from Siriwan Premplumjit, a Vice President and Client Services Manager at JPMorgan Chase
Bank, N.A.–Bangkok Branch and the dedicated client suite manager for EMTC (the
"Premplumjit Declaration"), declaring that EMTC's JP Morgan account was opened in
September 2015 and was governed by a set of account terms ("EMTC Account Terms").  *See*
Dkt. No. 20 ¶¶ 3–5.  The EMTC Account Terms give "[e]ach Authorized Person . . . , subject to
any written limitation provided by [EMTC] and received and accepted by [JP Morgan]," the
authority to "give instructions [], including requests and payment orders, by means other than the
signing of an [i]tem, with respect to any Account transaction . . . ."  Dkt. No. 20-2 § 1.2.
Authorized Person is defined as "a person authorized to act on behalf of [EMTC] . . . with
respect to the Accounts and Services."  *Id.* § 1.1.  The EMTC Account Terms also provide that
"[w]hen issuing instructions, [EMTC] is required to follow [JP Morgan]'s security procedures as
communicated to [EMTC] by [JP Morgan] from time to time," and that "[u]pon receipt of an
instruction, [JP Morgan] will use the security procedures to verify that the instruction is effective
as that of [EMTC]."  *Id.* § 2.1.  The EMTC Account Terms further state:  "It is understood that
the purpose of the security procedure is to verify the authenticity of, and not to detect errors in,
[i]nstructions."  *Id.*  The EMTC Account Terms impose a two-year statute of limitations for
claims in connection with any account.  *Id.* § 16.2 ("Any claim in connection with any Account
or Service, unless a shorter period of time is expressly provided, must be brought against [JP

Morgan] within two (2) years of the occurrence of the event giving rise to the claim, except as prohibited by applicable law.").

Plaintiffs contest that the EMTC Account Terms apply to the NY Account. In support of its contention, Plaintiffs have submitted copies of two contracts entitled "US Cash Concentration Service Terms (Multi Entity)." Dkt. Nos. 29-1, 29-2. The first agreement, effective March 10, 2017, is between JP Morgan and a number of Essilor-affiliated customers, including EMTC, for cash concentration services. *See* Dkt. No. 29-1 §§ 1, 4(a). It requires JP Morgan to transfer funds to and from a list of customer accounts identified in an attached schedule in accordance with certain instructions and selections agreed to by JP Morgan and the customers. *Id.* § 1 & Sch. A. Schedule A identifies Essidev SASU ("Essidev") as the "Master Customer," identifies an EMTC account (number 496591988) as a "participating account," permits overdrafts among the participating accounts, and indicates that intercompany reporting services were not requested in connection with the cash concentration services. *See id.* Sch. A & nn.2, 5, 15. The second agreement, which is undated, mirrors the first, but lists Essilor as the "Master Customer" and Essidev as the only "participating account."[1] *See* Dkt. No. 29-2, Sch. A. Schedule A also

---

[1] The relationship between Essidev and Essilor is not entirely clear based on the information provided by Plaintiffs. In Plaintiffs' memorandum of law in opposition to JP Morgan's motion to dismiss, Plaintiffs suggest that Essidev is "Essilor's predecessor." *See* Dkt. No. 28 at 9. However, Essilor's relationship to the Cash Management System is through this separate agreement, which lists the Essidev account, the master account in the agreement to which EMTC is a party, as a participating account. *Compare* Dkt. No. 29-1 Sch. A (listing Essidev Account 826175593 as the "Master Customer Account"), *with* Dkt. No. 29-2 Sch. A (listing Essidev Account 826175593 as a "Customer Account"). Through the operation of these two agreements, it is possible that Essilor was integrated into a broader cash concentration system with Essidev and EMTC; Essilor would daily sweep money from Essidev's account through the operation of the agreement provided to the Court at Dkt. No. 29-2, which in turn would daily sweep money from EMTC's account through the operation of the agreement provided to the Court at Dkt. No. 29-1. But the Court struggles to see how Essidev is the "predecessor" to Essilor. If Essidev were a true predecessor to Essilor, then Essilor would have stepped into the shoes of Essidev, not have been integrated into the Cash Management System through a separate agreement.

permits overdrafts between the participating accounts and indicates that intercompany reporting services were not requested in connection with the cash concentration services. *Id.* Sch. A & n. 15. EMTC is not identified as a party to this contract. Plaintiffs have also submitted a set of account terms between JP Morgan and Essidev ("Essidev Account Terms"). *See* Dkt. No. 29-3. The Essidev Account Terms are similar to the EMTC Account Terms, except the statute of limitations is three years. *Id.* § 16.2.

Plaintiffs allege that from mid-September 2019 until mid-December 2019 (the "Fraudulent Period"), approximately 243 fraudulent payments were made from EMTC's NY Account, resulting in the fraudulent transfer of approximately $272,151,000. Dkt. No. 1 ¶ 17. This fraud was accomplished with the active assistance of a then-EMTC employee, Chamanun Phetporee ("Phetporee"). *Id.* ¶ 18. JP Morgan's security protocol involved a two-step verification process for the NY Account. *Id.* ¶ 41. First, the "maker" would initiate a payment order. *Id.* Two separate "approvers" would then have to approve the payment order before it was executed. *Id.* Phetporee was authorized to provide the first approval. *Id.* ¶ 19. To obtain the required second approval, Phetporee misappropriated the credentials of the designated second approver. *Id.* The nature of the transactions from EMTC's NY Account differed markedly during the Fraudulent Period from their nature prior to that period. *Id.* ¶ 32. During the period prior to September 2019, the average total dollar value of transfers per month was less than $15 million. *Id.* ¶ 33. In October 2019, approximately $33,222,000 was transferred from the NY Account. *Id.* The average increased to $119,354,000 in November 2019 and $140,117,000 in December 2019. *Id.* Similarly, the number of monthly payment orders from the NY Account doubled after September 2019. *Id.* ¶ 34. In 2017, there was an average of thirty-two payment orders per month from the NY Account. *Id.* In 2018, there was an average of fifty-four payment

orders per month from the NY Account. *Id.* And between January and August 2019, there was

an average of fifty-six payment orders per month from the NY Account. *Id.* In contrast, during

the three-month period from October 2019 through December 2019, there was an average of 102

payment orders from the NY Account, with over a hundred payment orders made in each of

October, November, and December 2019. *Id.*

Plaintiffs allege that, based on JP Morgan's communications, they "reasonably

understood that [JP Morgan] would monitor the NY Account" for this type of fraudulent activity.

*Id.* ¶ 22. Plaintiffs point to both JP Morgan's legal and contractual obligations. Plaintiffs

specifically point to a section of JP Morgan's website, which describes the company's anti-

money laundering efforts designed to comply with "laws and regulations in the U.S." *Id.* Based

on this portion of the website, Plaintiffs claim that JP Morgan "was required to monitor EMTC's

account activity . . . [and] to develop an understanding of EMTC's business sufficient to assess

whether transactions were suspicious." *Id.* ¶ 23. Plaintiffs highlight Section 17.5 of,

presumably, the Essidev Account Terms, which states, in relevant part,

> [JP Morgan] is required to act in accordance with [JP Morgan] policies, the laws
> and regulations of various jurisdictions relating to the prevention of money
> laundering and the implementation of sanctions, including but not limited to
> regulations issued by the U.S. Office of Foreign Assets Control. . . . Transaction
> screening may result in delays in the posting of transactions and/or funds
> availability.

*Id.* ¶ 24. And Section 17.15 indicates that JP Morgan might request additional information from

EMTC to fulfill its "know your customer" requirements. *Id.* ¶ 25.

Plaintiffs also claim that JP Morgan had separate contractual obligations to monitor

EMTC's account. In an email, JP Morgan described the overdraft limit process that was

integrated into its Cash Management System:

> intraday overdraft ("IDOD") limits will be set up, either to be shared by the
> participating entities or applied individually to each bank account participating in

the cash pool. We will work closely with Essilor to determine the appropriate overdraft (intraday and overnight) limits required to support your daily transactional requirements. The *usage of these lines will also be monitored on an ongoing basis* to ensure that the limits remain adequate to enable the efficient processing of your transactions.

*Id.* ¶ 27 (emphasis added). Plaintiffs claim that they asked JP Morgan in writing to institute a daily overdraft limit of $10 million for the NY Account and JP Morgan agreed to do so. *Id.* ¶ 28. As a result, Plaintiffs allege that JP Morgan "should have automatically blocked any transfers that exceeded the [daily overdraft limit] and contacted Plaintiffs" and that the daily overdraft limit "constituted a written instruction form EMTC and Essilor to block any daily transfers for the NY Account exceeding $10 million." *Id.*

Plaintiffs further allege that the types of payment orders issued during the Fraudulent Period were suspicious and should have alerted JP Morgan to the fraudulent activity. *Id.* ¶ 36. Prior to October 2019, most payment orders from the NY Account were for very specific amounts, which almost always included fractional dollars (*i.e.*, cents). *Id.* In contrast, all of the fraudulent transfers were round-dollar payments orders. *Id.* Additionally, most of the beneficiaries of the payment orders prior to October 2019 were either recognizable businesses within the optical industry or subsidiaries of Essilor; from October 2019 through December 2019, the beneficiaries had names including Guangzhou Wendy Hair Products, Citgo Oil Trading LLC, Maskhoa Coffee Roast Limited, Dekwa Furniture Global, Wealthy Creation Asia Private Limited, and Charity Njabili, suggesting that they did not operate within the optical industry. *Id.* ¶ 37. These were not entities with which EMTC had previously transacted. *Id.* Further, transactions prior to the Fraudulent Period were almost exclusively transmitted through Citibank N.A., JP Morgan, Standard Chartered Bank, or HSBC Bank USA, N.A. *Id.* Transactions during the Fraudulent Period tended to be transmitted through small, regional banks located in Southeast Asia, including in China and other high-risk jurisdictions. *Id.* Plaintiff

alleges that, 174 of the fraudulent transfers went to seventy-two entities "that were easily identifiable"—through Google searches or a review of incorporation documents—"as shell entities with no purpose except to facilitate fraud."  *Id.* ¶ 38.

Plaintiffs allege there were other suspicious facts or red flags that should have alerted JP Morgan to the fraudulent transactions.  For the three-year period prior to October 2019, the daily overdraft limit of $10 million was never exceeded.  *Id.* ¶ 40.  During the Fraudulent Period, however, the limit was exceeded on at least nine occasions.  *Id.*  Prior to October 2019 and for non-fraudulent transactions generally, the second approval in the two-step verification process did not take place for ten or more hours.  *Id.* ¶ 41. However, for ninety-one of the fraudulent transfers, the second approval occurred less than 60 seconds after the first approval.  *Id.* Additionally, during the Fraudulent Period, Phetporee recalled more than forty payment orders; prior to October 2019 only one order had been recalled.  *Id.* ¶ 43.  Finally, JP Morgan initially rejected at least twenty transfers during the Fraudulent Period due to errors in payment orders made by Phetporee.  *Id.*  Plaintiffs allege that had the red flags been reported to Essilor and EMTC, the fraud would have been detected in its early stages and Plaintiffs' losses could have been prevented.  *Id.* ¶ 9; *see also id.* ¶ 43.  In fact, Plaintiffs allege that it was JP Morgan's practice to flag suspicious transactions to Plaintiffs.  For example, in 2019 JP Morgan sent two emails, one to an unnamed EMTC employee and another to Phetporee with the unnamed EMTC employee copied, requesting further details for a $500,000 payment.  *Id.* ¶ 30.  Additionally, on December 11, 2019, JP Morgan blocked an attempt by Essilor to transfer $19 million, which was not fraudulent, from its account without explanation.  *Id.* ¶ 31.

Finally, Plaintiffs allege that Phetporee provided false quarterly reports of payment orders to a regulator, the Bank of Thailand.  *Id.* ¶ 42.  JP Morgan reviewed monthly reports before

EMTC submitted these reports to the Bank of Thailand.  *Id.*  On October 21, 2019, Phetporee

sent a monthly report to two JP Morgan employees that falsely represented that three transfers

from the NY Account were made to another EMTC account maintained with JP Morgan in

Bangkok.  *Id.*  The Complaint alleges that JP Morgan knew or should have known that the

transfers were actually made to third parties and not to another EMTC account.  *Id.*

Based on these allegations, the Complaint asserts three causes of action against JP

Morgan: (1) failure to comply with Article 4-A of the New York Uniform Commercial Code

(First Cause of Action), *id.* ¶¶ 44–51; (2) breach of contract (Second Cause of Action), *id.* ¶¶ 52–

56; and (3) negligence (Third Cause of Action), *id.* ¶¶ 57–60.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on April 25, 2022.  Dkt. No. 1.  On July 15, 2022,

Defendant filed a motion to dismiss, along with a supporting memorandum of law and two

supporting declarations.  Dkt. Nos. 18–21.  On September 9, 2022, Plaintiffs filed a

memorandum of law in opposition to the motion to dismiss along with a supporting declaration

and corrected exhibit to the supporting declaration.  Dkt. Nos. 28–30.  On September 30, 2022,

Defendants filed a reply memorandum of law in further support of their motion.  Dkt. No. 31.

The Court heard oral argument on the motion on December 6, 2022.  *See* Dkt. No. 39.  At oral

argument, the Court requested supplemental letter briefing on whether the EMTC Account

Terms with the two-year statute of limitations should be considered integral to the Complaint and

thus could be incorporated by reference into the Complaint.  *See* December 6, 2022 Oral

Argument Tr. ("Tr.") 67.  Plaintiffs and Defendant submitted the supplemental letter briefing on

December 13, 2022.  Dkt. Nos. 37–38.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

Defendant argues that the Complaint must be dismissed in full. First, it argues that EMTC's claims against JP Morgan are barred by the two-year statute of limitations in the EMTC Account Terms. *See* Dkt. No. 19 at 7–9. In the alternative, Defendant argues that EMTC's Uniform Commercial Code ("U.C.C.") claim fails because the payment orders were "authorized" within the meaning of the N.Y. U.C.C. and that Essilor cannot maintain a claim against JP Morgan under the N.Y. U.C.C. because it was not the "sender" of the payment orders and thus cannot obtain a refund. *Id.* at 11–17. Finally, Defendant argues that EMTC's common law claims are preempted by the N.Y. U.C.C., *id.* at 17–18, Plaintiffs' contract claims are

inadequately pled, *id.* at 18–20, and Plaintiffs' negligence claims do not allege a legally cognizable duty independent of the contracts between Plaintiffs and JP Morgan, breach, or compensable damages, *id.* at 20–24.

The Court addresses each of Defendant's arguments in turn and holds that EMTC's N.Y. U.C.C. § 4-A-204(1) claim survives, but that Essilor's N.Y. U.C.C. § 4-A-204(1) and Plaintiffs' common-law claims must be dismissed.

## I.     Statute of Limitations

Defendant argues that EMTC's claims are time barred by the EMTC Account Terms, which provide that "[a]ny claim in connection with any Account or Service, unless a shorter period of time is expressly provided, must be brought against [JP Morgan] within two (2) years of the occurrence of the event giving rise to the claim, except as prohibited by applicable law." Dkt. No. 20-2 § 1.2; *see* Dkt. No. 19 at 7.  The Complaint in this action was filed in April 2022, more than two years after the last payment order at issue.  Defendant thus argues that Plaintiffs claims are time-barred.  *See* Dkt. No. 19 at 8–9.  Plaintiffs counter, in part, that the parties cannot, under Article 4-A of the N.Y. U.C.C., contractually modify the statute of limitations period for seeking a refund because Section 4-A-204(2) provides that "the obligation of a receiving bank to refund payment as stated in subsection (b) may not . . . be varied by agreement."  Dkt. No. 28 at 10.

Before deciding whether the parties are permitted to modify the contractual statute of limitations period, the Court must decide whether the EMTC Account Terms and its two-year statute of limitations can be considered on a motion to dismiss.  Defendant argues that the EMTC Account Terms can be considered at the motion to dismiss stage because they are "both integral to Plaintiffs' claims and incorporated by reference" therein.  *See* Dkt. No. 37 at 1.  Specifically, Defendant contends that EMTC's status as a JP Morgan customer is integral to each of Plaintiffs'

claims.  *See* Dkt. No. 37 at 1-3.  Plaintiffs counter that the EMTC Account Terms should not be

considered at the motion to dismiss stage because "the Complaint does not reference" the EMTC

Account Terms, Plaintiffs' claims are not reliant on the EMTC Account Terms, and there are

factual issues surrounding the authenticity and continued force of the EMTC Account Terms.

*See* Dkt. No. 38.

  As an initial matter, the fact that the Complaint does not specifically reference the EMTC

Account Terms is wholly irrelevant.  "'[W]hen a plaintiff chooses not to attach to the complaint

or incorporate by reference a [document] upon which it solely relies and is integral to the

complaint,' the court may nevertheless take the document into consideration in deciding the

defendant's motion to dismiss, without converting the proceeding to one for summary

judgment." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)

(quoting *Cortec Indus., Inv. v. Sum Holdings*, 949 F.2d 42, 47–48 (2d Cir. 1991)).  "As a

necessary corollary to the foregoing principles, a plaintiff cannot avoid judicial consideration of

a document upon which it bases its complaint by the expedient refusal to attach it to the pleading

or refer to it *in haec verba*."  *Bongiorno v. Baquet*, 2021 WL 4311169, at *10 (S.D.N.Y.

Sept. 20, 2021).  "Where a plaintiff has 'reli[ed] on the terms and effect of a document in

drafting the complaint,' and that document is thus 'integral to the complaint,' we may consider

its contents even if it is not formally incorporated by reference." *Broder v. Cablevision Sys.

Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (alteration in original).  "Th[is] exception thus prevents

plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting."

*Glob. Networks Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (citation

omitted).

However, "[e]ven where a document is considered integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist[s] no material disputed issues of fact regarding the relevance of the document." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (internal quotation marks and citations omitted)). "Indeed, evidentiary uncertainty is a primary reason why courts have refused to consider such submissions at the pleadings stage." *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 224 (S.D.N.Y. 2018). This requirement—that there be "no dispute" as to the authenticity, accuracy, or relevance of the document—has been strictly interpreted by courts in this Circuit. *See Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co.*, 2016 WL 4382709, at *7 (S.D.N.Y. Aug. 16, 2016); *see also Savides v. United Healthcare Servs., Inc.*, 2019 WL 1173008, at *2 (S.D.N.Y. Mar. 13, 2019) (collecting cases). "[E]ven implicit, conclusory, contradictory, or implausible objections to the authenticity or accuracy of a document render consideration impermissible." *Mbody Minimally Invasive Surgery, P.C.*, 2016 WL 4382709, at *7 (quoting *UPS Store, Inc. v. Hagan*, 99 F. Supp. 3d 426, 435 (S.D.N.Y. 2015)); *see also Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 416 n.4 (S.D.N.Y. 2010) ("[W]hile Plaintiffs' attempt to slalom their way through these documents may not be well-founded, and while Plaintiffs may face a rocky road in thwarting Defendants' inevitable summary judgment motion, the Court will apply [Second Circuit precedent] and decline to consider these documents at this time.").

Here, Plaintiffs raise sufficient challenges to the authenticity and continued relevance of the EMTC Account Terms, both in its briefing and at oral argument, to prevent the Court from considering the EMTC Account Terms at the motion-to-dismiss stage. Plaintiffs dispute the authenticity of the EMTC Account Terms. The Premplumjit Declaration states that the EMTC

Account Terms were sent to EMTC and a signed acceptance letter showing EMTC's "receipt and acceptance of the Account Terms" was returned to JP Morgan.  Dkt. No. 20 ¶¶ 3–4.  Plaintiffs, however, argue that they never received the EMTC Account Terms and thus cannot be bound by them.  *See* Dkt. No. 38 at 3 ("Based upon a good faith search, EMTC does not have the purported [account terms] in its files, and thus disputes having ever received them."); Tr. 31 ("My position is that we never got [the EMTC Account Terms].").  They also question the authenticity of the signature included in the Premplumjit Declaration as it applies to the EMTC Account Terms.  *See* Dkt. No. 28 at 7–8; Tr. 37–38.  There is thus an issue of fact as to whether the EMTC Account Terms are authentic as applied to Plaintiffs and thus binding on them.  *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) (noting under New York law that offeree must be on at least inquiry notice of contract terms to be bound by them).

Plaintiffs also question the relevance of the EMTC Account Terms.  In their supplemental briefing, Plaintiffs assert that "in 2017, JPMC and Essilor negotiated a set of account terms to apply to all of Essilor's affiliates, including EMTC, that contains a three-year contractual statute of limitations, when they negotiated the Cash Concentration Service Terms."  Dkt. No. 38 at 3; *see also* Dkt. No. 28 at 9.  Plaintiffs thus suggest that, even if the EMTC Account Terms were received and accepted by EMTC, they were no longer relevant by 2019 when the fraudulent transactions occurred.[2]  *See Structured Asset Sales, LLC v. Sheeran*, 2021 WL 1199495, at *10

---

[2] Plaintiffs have not provided the Court with the account terms that they claim novated any previous EMTC agreement.  Plaintiffs submitted account terms entered into between Essidev and JP Morgan.  *See* Dkt. No. 29-3.  The Essidev Account Terms contain a provision stating that they "supersede and replace any other account conditions previously sent to the [c]ustomer."  *Id.* § 17.3.  However, this contract, only applies to Essidev, not EMTC.  *See Analect LLC v. Fifth Third Bancorp*, 380 F. App'x 54, 56 (2d Cir. 2010) (noting that parent and subsidiary are "legally distinct entities and a contract under the corporate name of one is not treated as that of both").  At this stage, it is sufficient that Plaintiffs have represented to the Court that the EMTC Account Terms are no longer relevant, if they ever were.  *See Mbody Minimally Invasive*

(S.D.N.Y. Mar. 30, 2021) ("Where, as here, there are material disputes of fact regarding the relevance of a document, the Court should not rely on that document as a basis for dismissal."); *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 179 (S.D.N.Y. 2007) (refusing to consider agreement at motion to dismiss stage when "the parties disagree about whether and how the draft agreement relates to their relationship").

The Court thus declines to consider the EMTC Account Terms at the motion-to-dismiss stage and thus will not dismiss the Complaint as time barred. *See Banca Commerciale Italiana v. N. Tr. Int'l Baking Corp.*, 160 F.3d 90, 93–95 (2d Cir. 1998) (holding that Article 4-A claims are governed by a three-year statute of limitations period). Because the Court declines to consider the EMTC Account Terms, it will not address whether, if the EMTC Account Terms were admissible at this stage, the parties were permitted to vary the statute of limitations by agreement.

## II.   N.Y. U.C.C. Claim

Defendant argues that both Essilor's and EMTC's N.Y. U.C.C. § 4-A-204(1) claims fail. The Court addresses each in turn and finds that, while Essilor's N.Y. U.C.C. § 4-A-204(1) claim fails as a matter of law, EMTC's presents a question of fact that cannot be decided at the motion-to-dismiss stage.

### A.   Statutory Overview

"Article 4-A of the UCC governs the procedures, rights, and liabilities arising out of commercial electronic funds transfers." *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998). Article 4-A was adopted because "attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable

---

*Surgery, P.C.* 2016 WL 4382709, at *7.

instrument law or the law of check collection have not been satisfactory."  N.Y. U.C.C.

§ 4-A-102 (cmt.).  As a result, the National Conference of Commissioners on Uniform State

Laws and the American Law Institute drafted Article 4-A, which was adopted by the New York

legislature in 1990 and became effective on January 1, 1991.  *See Banque Worms v.*

*BankAmerica Int'l*, 570 N.E.2d 189, 194–95 (N.Y. 1991).  Notably, the drafters of Article 4-A

"use[d] precise and detailed rules to assign responsibility, define behavioral norms, allocate risks

and establish limits on liability, rather than to rely on broadly stated, flexible principles."  N.Y.

U.C.C. § 4-A-102 (cmt.).

This precise language is reflected in the definitions provided in Article 4-A.  *See id.*

§§ 4-A-103–105.  A "payment order" is defined as "an instruction of a sender to a receiving

bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a

fixed or determinable amount of money to a beneficiary."  *Id.* § 4-A-103(1)(a).  In turn, a

"sender" is defined as "the person giving the instruction to the receiving bank," *id.*

§ 4-A-103(1)(e), and the "receiving bank" is defined as "the bank to which sender's instruction is

addressed," *id.* § 4-A-103(1)(d).  A "customer" in contrast, "means a person, including a bank,

having an account with a bank or from whom a bank has agreed to receive payment orders."  *Id.*

§ 4-A-105(1)(c).  "Person" is undefined in Article 4-A but is defined in N.Y. U.C.C.

Section 1-201 to include "an individual . . . or any other legal or commercial entity."  N.Y.

U.C.C. § 1-201(b)(27); *see* N.Y. U.C.C. § 1-201(a) ("Unless the context otherwise requires,

words or phrases defined in this section, or in the additional definitions contained in other

articles of this act that apply to particular articles or parts thereof, have the meanings stated.").

Whether the bank or customer bears the risk of loss for a fraudulent wire transfer is

determined by the interlocking provisions of Sections 4-A-202, 4-A-203, and 4-A-204.

Section 4-A-204(1)(a) provides that "[i]f a receiving bank accepts a payment order issued in the name of its customer as sender which is [] not authorized *and* not effective as the order of the customer under Section 4-A-202 . . . the bank shall refund any payment of the payment order received from the customer."  N.Y. U.C.C. § 4-A-201(a) (emphasis added).  For the bank's refund obligations to be triggered under Section 4-A-204(1)(a), then, the payment order must be both not authorized and not effective; if it is authorized or if it is effective, there is no refund obligation.  In turn, Section 4-A-202 defines "authorized" and "effective."  A payment order can be "authorized" in one of two ways.  First, a "payment order received by the receiving bank is the *authorized* order of the person identified as sender if that person authorized the order."  *Id.* § 4-A-202(1) (emphasis added).  Second, the payment order is authorized if "the person identified as sender . . . is otherwise bound by it under the law of agency."  *Id.*  A "payment order received by the receiving bank is *effective* as the order of the customer" if "a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure," and that security procedure is both "commercially reasonable" and "the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer."  *Id.* § 4-A-202(2) (emphasis added).  A "security procedure" is a "procedure established by agreement of a customer and a receiving bank for the purpose of [] verifying that a payment order or communication amending or cancelling a payment order is that of the customer."  *Id.* § 4-A-201.

If a payment order is not authorized under Section 4-A-202(1), but is effective under Section 4-A-202(2), Section 4-A-203(1) limits the circumstances under which a bank is entitled

to enforce payment (*i.e.*, demand payment) of a payment order.  *See id.* § 4-A-203(1)(a)–(b); *see also id.* § 4-A-204 (provided that a customer is entitled to a refund if the payment order is "not enforceable, in whole or in part, against the customer under Section 4-A-203").  First, the receiving bank may by "express written agreement" limit the circumstances under which it is entitled to enforce payment.  *Id.* § 4-A-203(1)(a).  Second, the customer is entitled to a refund if it can demonstrate that it was not at fault for the fraudulent payment order.  *Id.* § 4-A-203(1)(b). As Section 203(1)(b) establishes,

> The receiving bank is not entitled to enforce or retain payment of the payment order if the customer proves that the order was not caused, directly or indirectly, by a person (i) entrusted at any time with duties to act for the customer with respect to payment orders or the security procedure, or (ii) who obtained access to transmitting facilities of the customer or who obtained, from a source controlled by the customer and without authority of the receiving bank, information facilitating breach of the security procedure, regardless of how the information was obtained or whether the customer was at fault.

*Id.*

## B.    Essilor's N.Y. U.C.C. § 4-A-204(1) Claim

As discussed above, a receiving bank must "refund any payment of the payment order received from the customer" "[i]f a receiving bank accepts a payment order issued in the name of its customer as sender which is" neither authorized nor effective.  *Id.* § 4-A-204(1)(a). Defendant argues that Essilor cannot sustain a claim under N.Y. U.C.C. § 4-A-204(1), because the Complaint fails to allege that Essilor was the "sender" of the payment orders.  Dkt. No. 19 at 11–12.  Plaintiffs counter that it is a question of fact whether Essilor is entitled to a refund under N.Y. U.C.C. § 4-A-204(1).  Dkt. No. 28 at 19.  The Court disagrees.

Section 4-A-204(1) establishes that only the customer who issued the payment order is entitled to a refund from the receiving bank.  Section 4-A-204(1) is only triggered when the "receiving bank accepts a payment order issued in the name of *its customer as sender*."  In turn,

Section 4-A-204(1) limits the party entitled to a refund to "*the* customer" (i.e., the customer as sender).  As a result, Essilor must have been the "sender"—that is, "the person giving the instruction to the receiving bank," *id.* § 4-A-103(1)(e)—to have standing under Section 4-A-204(1).  The Complaint makes no allegations that any of the fraudulent wire transfers were initiated by Essilor.  Rather, it suggests that each of the fraudulent payments came from an EMTC account, *see* Dkt. No. 1 ¶ 17 (alleging that, during the Fraudulent Period, "international cybercriminals *caused EMTC* to make approximately 243 fraudulent payments resulting in the transfer of approximately $272,151,000 out of the NY Account"), and that each fraudulent payment order was initiated using EMTC's security procedure, *see* Dkt. No. 1 ¶ 19 (describing the security procedure to approve EMTC payment orders and suggesting that each fraudulent payment order went through this process).  Thus, absent allegations that Essilor was the sender of any of the payment orders, Essilor's N.Y. U.C.C. § 204(1) claim cannot stand.

Plaintiffs' argument that the Cash Management System creates "an issue of fact as to whether Essilor or EMTC provided 'payment of the payment order,' or both provided payment jointly and Plaintiffs should be permitted to pursue this claim jointly" is unavailing.  Dkt. No. 28 at 19.  Which party provided "payment of the payment order" is not determinative of the party entitled to a refund.  It is the party's status as the *sender* that entitles that party to a refund, and Plaintiffs have not pled sufficient allegations to establish that Essilor was a sender of any of the fraudulent payment orders.[3]

---

[3] Additionally, Plaintiffs have not alleged facts to support that Essilor provided payment of any of the payment orders.  First, it is possible that the EMTC account had sufficient funds to cover at least some of the fraudulent wire transfers in full.  Second, based on the agreements provided to the Court, and as described above, *see supra* p. 4 n.1, it appears that the Cash Management System operated in the following way:  Essidev's account would sweep excess and insufficient funds from and to EMTC's account daily and in turn, Essilor's account would sweep excess and insufficient funds from and to Essilor's account daily.  *See* Dkt. Nos. 29-1, 29-2.  Thus, it is

The nature of the Cash Management System established between Essilor and JP Morgan does not support Essilor's Article 4-A claim. The Cash Management System maintained a zero cash balance in EMTC's account by, each day, sweeping excess funds from EMTC's account to Essilor's and filling any shortfalls in EMTC's account by sweeping funds down from Essilor's. *See* Dkt. No. 1 ¶ 27. Article 4-A, however, only governs "funds transfer[s] . . . commonly referred to in the commercial community as a wholesale wire transfer . . . a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment." N.Y. U.C.C. § 4-A-102 (cmt.); *see also Grain Traders, Inc.*, 160 F.3d at 100. The Cash Management System agreement, *see* Dkt. No. 29-1 ("Cash Management System Agreement"), does not establish, and Plaintiffs do not allege, that the intercompany payments between EMTC's and Essilor's accounts were initiated through a series of payment orders and thus would constitute wire transfers governed by Article 4-A. *See* N.Y. U.C.C. Law § 4-A-104(1) ("'Funds transfer' means the series of transactions, beginning with the originator's *payment order*, made for the purpose of making payment to the *beneficiary of the order*." (emphasis added)).

## C.   EMTC's N.Y. U.C.C. § 4-A-204(1) Claim

Defendant argues that EMTC's N.Y. U.C.C. § 4-A-204(1) claim fails, because EMTC "authorized" each of the fraudulent payment orders. *See* Dkt. No. 18 at 11–17.[4] Because most

---

entirely possible that the Essidev account could have fully funded any EMTC overdrafts without involvement of the Essilor account. In such situation, Essilor could not have paid any of the payment orders, directly or indirectly. In fact, Plaintiffs have pled no facts that suggest Essilor paid *any* of the fraudulent payment orders.

[4] Defendant notes, as the language of N.Y. U.C.C. Section 4-A-204(1) makes clear, that Plaintiffs are not entitled to a refund of the fraudulent payment orders if the payment orders were *either* authorized *or* effective under Section 4-A-202. *See* Dkt. No. 31 at 6. Thus, Defendant "expressly disclaim[s] for the purposes of this motion only that [the payment orders] were also 'effective.'" *Id.*; *see* Dkt. No. 19 at 12 ("Accordingly, the Court need not analyze on this motion whether the payment orders were also 'effective.'"). Further, as described above, *supra* II.A,

payment orders are initiated through electronic messages, it is impossible to determine the

identity of the person initiating the payment order.  *Id.* at 13.  Banks thus rely upon security

procedures to determine whether a payment order is authorized; Defendant argues that "the

person identified as sender . . . authorized the order" under Section 4-A-202(1) if the payment

order is "tested" pursuant to agreed upon security procedures and the payment order passes that

test.  *See id.* 13–14.  It is irrelevant for authorization purposes, according to Defendant, whether

the security procedures were compromised; what matters is that the payment orders were issued

pursuant to the agreed upon security procedures.  *See id.* 14–15.  In this context, EMTC

"authorized" the wire transfers, even if Phetporee misappropriated his colleague's credentials,

because JP Morgan received two approvals for each wire transfer and, as a result, each wire

transfer was made pursuant to the agreed upon security procedure.  *Id.* ("[R]eceipt by [JP

Morgan] of the two approvals [one, from Phetporee, and the other, from Phetporee's 'colleague,'

whose credentials Phetporee misappropriated] fully satisfied the dual-approver [security]

procedure agreed to by EMTC and [JP Morgan]—thereby confirming that the wires were in fact

initiated and authorized by EMTC.").  This argument fails to persuade the Court that EMTC

authorized the fraudulent payment orders within the meaning of the N.Y. U.C.C. and thus that

Defendant is entitled to an order of dismissal.

    "[O]ne of the most basic interpretive canons[ is] that a statute should be construed so that

effect is given to all its provisions, so that no part will be inoperative or superfluous, void or

---

there are two ways that a payment order can be "authorized" under Section 4-A-202(1): "the
person identified as sender . . . authorized the order" or the person "is otherwise bound by it
under the law of agency."  N.Y. U.C.C. § 4-A-202(1).  Defendant also "expressly disclaim[s] for
purposes of this motion only any reliance on Phetporee's agency (*i.e.*, the second way of
establishing authority)."  Dkt. No. 31 at 6 (cleaned up).  As a result, the only issue on this motion
to dismiss is whether "the person identified as sender . . . authorized the order."  *See id.*

insignificant." *Corley v. United States*, 556 U.S. 303, 314, (2009) (internal quotation marks and citation omitted and alteration accepted); *see Mary Jo C. v. New York State & Loc. Ret. Sys.*, 707 F.3d 144, 156 (2d Cir. 2013). Defendant's interpretation of Section 4-A-202(1) reads "effective[ness]" out of Article 4-A. Section 4-A-202(2) sets forth two necessary preconditions for a security procedure to be deemed "effective." First, the security procedure must be "commercially reasonable." N.Y. U.C.C. § 4-A-202(2)(a). Second, the bank must have acted "in good faith" and "in compliance with the security procedure and any [other] written agreement or instruction." *Id.* § 4-A-202(2)(b). In contrast, Defendant's interpretation of "authorized" only requires that the payment order be verified according to the agreed upon security procedure, irrespective of the commercial reasonableness of the security procedure or the receiving bank's good faith. *See* Dkt. No. 19 at 14 ("[E]lectronic wire transfers are authorized within the meaning of § 4-A-202(1) if bank customers issue them in compliance with security procedures that certify users." (internal quotation marks and citation omitted) (cleaned up)). Under Defendant's reading of the statute, Section 4-A-202(2)'s additional requirements would become superfluous. Because Section 4-A-204(1)(a) requires that a payment order be both not authorized and not effective for the payment order to be refunded, a bank would only need to demonstrate that a security procedure existed and the payment order was issued pursuant to that procedure; it would never need to meet the stricter requirements of Section 4-A-202(2). As a result, there would be no incentive for a bank to provide its customers with commercially reasonable security procedures, to act in good faith, or to comply with its customers' other written instructions. *See id.* § 4-A-202(2). Stated differently, Section 4-A-202(2) would not lose any meaning under this interpretation if the requirements that the payment order also be "not effective as the order of the customer under Section 4-A-202" were excised from the statute.

22

Defendant's interpretation of "authorized" would also make Section 4-A-203 superfluous. Section 4-A-203 further limits the circumstances under which an accepted payment order is "effective," but only applies to an accepted payment order that is "not, under subsection (1) of Section 4-A-202, an authorized order of a customer identified as sender, but is effective." N.Y. U.C.C. § 4-A-203(1). The effect of Section 4-A-203 is to render the customer responsible for an unauthorized payment order when an effective system is in place, save for the circumstances where the customer can show it was not at fault for the fraudulent payment order. But, under Defendant's reading, Section 4-A-203 would never be triggered. Every payment order that is verified according to the stricter requirements of Section 4-A-202(2) would definitionally be "authorized" under Section 4-A-202(1). There would be no circumstance where a payment order was both "effective" and unauthorized. Thus, Section 4-A-203(1), and the corresponding provisions in Section 4-A-204, *see id.* § 4-A-204(1)(b) (a customer is entitled to a refund if the payment order is "not enforceable, in whole or in part, against the customer under Section 4-A-203"), would do no work and be rendered surplusage.[5]

---

[5] Defendant points to one case, *Elite Investigations v. Bank of New York*, 2006 WL 3232185 (N.Y. Sup. Ct. 2006) to support its reading of the statute. Defendant argues that *Elite Investigations* stands for the proposition that "wires issued with approved security codes [are] 'authorized' under U.C.C. § 4-A-202(a), despite dishonest employee using another employee's security codes to initiate fraudulent wires." Dkt. No. 31 at 6. In *Elite Investigations*, the plaintiff sued to recover funds for payments that it claimed were initiated by an employee who had misappropriated his company's security credentials. 2006 WL 3232185, at *4. The court concluded that the "debits to Elite's BNY accounts were 'authorized' payments." *Id.* However, it is unclear whether the court was deciding the case on Section 4-A-202(1) or 4-A-202(2) grounds, despite using language from Section 4-A-202(1): immediately after finding that the payment were "authorized" the court cites to both sections. *Id.* And the court cites to a New York State Court of Appeals case, *Banque Worms v. BankAmerica International*, 570 N.E.2d 189, 197 (N.Y. 1991), that *only* discusses Section 202(2). *Id.* In any event, a decision from New York Supreme Court is not binding on this Court.

Perhaps recognizing this flaw in its argument, Defendant, for the first time at oral argument, sought to distinguish between first-party and third-party frauds.  As Defendant asserted,

> All we are . . . cleaving off from the coverage of Article 4-A . . . is true first-party fraud where it is in-house people entrusted with security credentials using those [credentials] improperly or misappropriating them.  Every other species of fraud that involves third parties in one respect or another is still covered by Article 4-A and requires the bank to ensure [compliance with Section 4-A-202(2).]

Tr. 20 (cleaned up).  Stated differently, Defendant attempts to draw a distinction between embezzlement and by third-party theft through "[f]ishing attacks, account takeover," and similar situations.  *Id.*  On Defendant's theory, Section 4-A-203 would require the receiving bank to show that it had an "effective" security procedure when the payment order was the result of a third-party fraud but not when it was the result of a first-party fraud.  Defendant points to nothing in the statutory text that would limit its more expansive interpretation of "authorized" in this way.  Instead, Defendant points to the purpose of Article 4-A, as evidence by Section 4-A-203: "[T]he drafters of [Article] 4-A did[ not] want banks to be in the position of acting as insurers for their customers and their customers' failure to safeguard security credentials that are entrusted to trusted employees."  *Id.*  But even Defendant's more limited interpretation of "authorized" would render portions of Section 4-A-203, the very provision that Defendant claims to be giving meaning to, inoperative.

As relevant here, under Section 4-A-203, a receiving bank cannot retain payment "if [first] the customer proves that the order was not caused, directly or indirectly, by a person [] entrusted at any time with duties to act for the customer with respect to payment orders or the security procedures."[6]  *Id.* § 4-A-203(1)(b)(i).  A "payment order . . . caused, *directly* . . . by a

---

[6] The customer must also prove that "the order was not caused, directly or indirectly, by a person . . . who obtained access to transmitting facilities of the customer or who obtained, from a

person [] entrusted at any time with duties to act for the customer with respect to payment orders

or the security procedures" is a first-party fraud, *id.* (emphasis added); an "in-house person

entrusted with security credentials" "misapropriat[es]" those credentials for fraudulent purposes,

*see* Tr. 20.  It also reflects what the Complaint alleges happened in this case: Phetporee, who was

entrusted with EMTC's security credentials through his approval authority, directly caused the

fraudulent payment orders by misappropriating the second approver's credentials.  *See* Dkt.

No. 1 ¶ 19.  Under Defendant's refined interpretation of § 4-A-202(1), however, "directly"

becomes surplusage; because all such payment orders would be "authorized,"

Section 4-A-203(1), which only applies to "effective" payment orders that are *not* authorized,

could never apply.  *See id.* § 4-A-203(1).  Rather than looking to the definition of "authorized" to

shift losses from first-party frauds to customers, Article 4-A looks to the effectiveness of the

payment order.  The Court thus refuses to accept either of Defendant's interpretations of

"authorized," both of which would render statutory provisions superfluous.  *See Pharaohs GC,*

*Inc. v. United States Small Bus. Admin.*, 990 F.3d 217, 227 (2d Cir. 2021) (rejecting

interpretation of statute that would leave "several provisions of the [statute] superfluous");

*Burrus v. Vegliante*, 336 F.3d 82, 91 (2d Cir. 2003) ("Where possible we avoid construing a

statute so as to render a provision mere surplusage.").

Defendant points to a section of the commentary on Section 4-A-202 to support its

interpretation of authorized.[7]  Comment 1 reads:  "In the wire transfer business the concept of

'authorized' is different from that found in agency law.  In that business a payment order is

---

source controlled by the customer and without authority of the receiving bank information
facilitating breach of the security procedure."  N.Y. U.C.C. § 4-A-203(1)(b)(ii).
[7] The commentary to Section 4-A-202 is found after Section 4-A-203.  *See* N.Y. U.C.C. § 4-A-
202 (cmt.) ("This section is discussed in the Comment following Section 4A-203.").

treated as the order of the person in whose name it is issued if it is properly tested pursuant to a

security procedure and the order passes the test." *Id.* § 4-A-203 (cmt. 1).  Defendant asserts that

"the commentary [thus] makes clear that 'electronic[]' wire transfers are 'authorized' within the

meaning of § 4-A-202(1) if bank customers issue them in compliance with 'security

procedure[s]' that certify users, which banks can then 'test[]' 'on the basis of . . . a computer

screen.'"  Dkt. No. 19 at 14 (quoting N.Y. U.C.C. § 4-A-203 (cmt. 1)).  This interpretation,

however, relies on selective quotations of the commentary.  The remainder of the comment

makes clear that § 4-A-202(1) was not designed to import "security procedures" into the

definition of "authorized."  The comment reads in part,

> Section 4A-202 reflects the reality of the wire transfer business. . . . *If [subsection
> (2)] does not apply, the question of whether the customer is responsible for the
> order is determined by the law of agency. . . .  If the customer is bound by the order
> under any of these agency doctrines, [subsection (1)] treats the order as authorized
> and thus the customer is deemed to be the sender of the order.*  In most cases,
> however, [subsection (2)] will apply.  In that event there is no need to make an
> agency law analysis to determine authority.  Under Section 4A-202, the issue of
> liability of the purported sender of the payment order will be determined by agency
> law only if the receiving bank did not comply with [subsection (2)].

N.Y. U.C.C. § 4-A-203 (cmt. 1) (cleaned up) (emphasis added).  Although the comment suggests

that "the concept of 'authorized' is different from that in agency law," *id.*, it makes clear, by only

referencing agency law—and not security procedures—when describing the function of

subsection (1), that a bank's recourse to security procedures is limited to verifying "the

authenticity of payment orders issued to the bank in the name of the customer as sender," *id.* § 4-

A-202(2), under subsection (2).

   This general idea is prevalent throughout the comments to Sections 4-A-202 and

4-A-203.  Comment 3, for example, describes the purpose of subsection (2), which "is based on

the assumption that losses due to fraudulent payment orders can best be avoided by the use of

commercially reasonable security procedures, and that the use of such procedures should be

encouraged." *Id.* § 4-A-203 (cmt. 3) (cleaned up).  As Comment 3 continues, "The subsection

[(*i.e.*, subsection (2))] is designed to protect both the customer and the receiving bank.  A

receiving bank needs to be able to rely on objective criteria to determine whether it can safely act

on a payment order.  Employees of the bank can be trained to 'test' a payment order according to

the various steps specified in the security procedure."  Under Defendant's reading of

"authorized," this comment would apply equally to subsection (1) as it does to subsection (2); if

a bank were able to conclude that a payment order was "authorized" based on a security

procedure, then the parties would be encouraged to implement security procedures and the bank

would be protected when it relies on "objective criteria" in deeming a payment order authorized

and processing the payment order.  But the commentary singles out the role that security

procedures play in subsection (2) without acknowledging the apparently identical role that they

would play in subsection (1) if Defendant's interpretation of "authorized" were adopted.

The cases that the commentary provide to "illustrate[]" the "scope of Section 4A-202"

further underscore the conclusion that security procedures are only relevant to determining

whether or not a payment order is "effective," not whether it is authorized.  *See id.* 4-A-203

(cmt. 2).  In Case #1, "A payment order purporting to be that of Customer is received by

Receiving Bank but the order was fraudulently transmitted by a person who had no authority to

act for Customer."  *Id.*  Case #1 is analogous to the situation here:  Phetporee initiated the

fraudulent payment orders without the authority of EMTC.  The comment concludes that the

customer will take the loss (absent "additional facts on which an estoppel might be found")

unless "there was verification in compliance with [subsection (2)], . . . [and] Section 4A-203

[does not] appl[y]."  *Id.*  The comments thus make clear that security procedures are only used to

test the "effective[ness]" of a payment order under subsection (2), not whether the payment order

was "authorized" under subsection (1).

Notably, this interpretation is consistent with how the drafters of Article 4-A understood

Section 4-A-202 to function.  In June 1990, *The Business Lawyer* dedicated a special issue to

articles[8] addressing Article 4-A, written primarily by those involved in its drafting, "to provide

an early source of discussion of Article 4A in light of its anticipated enactment in several large

commercial states in 1990, with effective dates perhaps in 1991."  *See* Fred H. Miller and

William B. Davenport, *Introduction to the Special Issue on the Uniform Commercial Code*, 45

Bus. Law. 1389, 1392 (1990).  As J. Kevin French, an advisor to the Article 4-A Drafting

Committee wrote in a special issue of *The Business Lawyer* at the time of Article 4-A's adoption,

"Subsection ([1]) of section 4A-202 can be said generally to cover cases where security

procedures are not used."  J. Kevin French, *Unauthorized and Erroneous Payment Orders*,

45 Bus. Law. 1425, 1429 (1990); *see also* Thomas C. Baxter, Jr. and Raj Bhala,[9] *The*

*Interrelationship of Article 4A With Other Law*, 45 Bus. Law. 1485, 1500 (1990) (describing

how, if "a bank and its customer have not agreed upon a security procedure to determine the

'authenticity of orders,'" the parties must look to whether the payment order was "authorized").

The drafters of Article 4-A, like the comments to Section 4-A-202 suggest, understood

authorization to involve tools other than security procedures, which only establish whether or not

---

[8] These articles expanded on presentations given during a program sponsored by the Committee
on the Uniform Commercial Code and the Ad Hoc Committee on Payment Systems at the
American Bar Association 1989 Annual Meeting.  *See* Fred H. Miller and William B. Davenport,
*Introduction to the Special Issue on the Uniform Commercial Code*, 45 Bus. Law. 1389, 1389
nn.a, aa, 1392 (1990).
[9] At the time the article was written, Thomas C. Baxter, Jr. was the chair of the Subcommittee on
Proposed U.C.C. Article 4A and the Ad Hoc Committee on Payment Systems; Raj Bhala was a
Federal Resrve Bank of New York lawyer.  *See* Thomas C. Baxter, Jr. and Raj Bhala, *The*
*Interrelationship of Article 4A With Other Law*, 45 Bus. Law. 1485, 1485 nn.a, aa (1990).

a payment order is "effective."  *Cf.  Hedged Inv. Partners, L.P. v. Norwest Bank Minnesota, N.A.*, 578 N.W.2d 765, 774 (Minn. Ct. App. 1998) ("Although it is tempting to treat 'authorized payment orders' and 'verified payment orders' as interchangeable, the concepts are quite different.  The concept of an 'authorized payment order' is rooted in traditional banking transactions in which there is some type of personal contact between the sender and the receiving bank. . . .  By contrast, a 'verified payment order' is a distinct concept, designed for situations in which there is no personal contact between the sender and the receiving financial institution.").

Defendant argues that this interpretation "read[s] the first and most obvious way of showing that a wire transfer is authorized—by showing that the person identified as sender authorized it—out of the statute entirely."  Dkt. No. 31 at 7; *see also* Tr. 19 ("[Plaintiffs] don't give any meaning to authorization as a freestanding term.").  This contention glosses over another interpretation of that clause:  It applies to natural persons.  The definition of "person" under Article 4-A extends to "individual[s]."  *See* N.Y. U.C.C. § 1-201(b)(27).  The law of agency, however, does not apply to individuals.  *See* Restatement (Third) of Agency, Intro. (2006) ("[T]he common law of agency, encompasses the legal consequences of *consensual relationships* in which one person (the 'principal') manifests assent that another person (the 'agent') shall, subject to the principal's right of control, have power to affect the principal's legal relations through the agent's acts and on the principal's behalf." (emphasis added)).  Thus, the clause "if that person authorized the order" accomplishes what "if that person . . . is otherwise bound by [the order] under the laws of agency" cannot; it expands the concept of "authorized" to include wire transfers issued in the name of individuals.  *See Panjiva, Inc. v. United States Customs & Border Prot.*, 342 F. Supp. 3d 481, 490 (S.D.N.Y. 2018), *aff'd*, 975 F.3d 171 (2d Cir. 2020) ("[W]here . . . [there are] two competing interpretations of a statute, the rule against

superfluities 'favors that interpretation which avoids surplusage.'" (quoting *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012)).  Defendant's motion to dismiss EMTC's Section 4-A-204(1) claim is thus denied.

### III.    Breach of Contract

Plaintiffs allege that Defendant breached the "valid and binding agreement governing the NY Account and the broader cash management system that was put in place in 2017."  Dkt. No. 1 ¶ 53.  Plaintiffs provided this agreement in a supporting declaration filed in response to JP Morgan's motion to dismiss and acknowledged that it was bound by it.  *See* Dkt. No. 29-1; Tr. 33 ("[W]e are willing to be bound by those documents" attached to Dkt. No. 29.).  It is incorporated by reference.  Defendant contends that the contract claim must be dismissed (1) as it relates to EMTC, because EMTC's contract claims are preempted by Article 4-A of the N.Y. U.C.C., *see* Dkt. No. 19 at 17–18, and (2) as it relates to Essilor, because the Complaint fails to allege the contract and contract provision that was breached and how, *see id.* at 18–19.

In its memorandum of law in opposition to the motion to dismiss, Plaintiffs clarify the provision they allege was breached by JP Morgan:  JP Morgan "agreed to implement an overdraft limit on all of the accounts that were part of the cash management system, including EMTC's account" and JP Morgan breached this agreement "when it allowed transfers from EMTC's account that exceeded the daily limit of $10 million on nine separate occasions."  Dkt. No. 28 at 20 (citing Dkt. No. 1 ¶¶ 27, 40); *see also* Dkt. No. 38 ("Plaintiffs allege that JPMC breached its agreement to monitor the NY Account for overdrafts, to limit overdrafts of the EMTC account to $10 [million] daily, and to notify Plaintiffs if that overdraft limit was breached.").  Plaintiffs thus argue that EMTC's contract claim is not preempted by Article 4-A of the N.Y. U.C.C., *id.* at 20–21, and EMTC and Essilor alleged the existence and breach of a contract with sufficient specificity, *id.* at 21.

"Article 4A precludes customers from bringing common law claims inconsistent with the statute." *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89 (2d Cir. 2010). "The Official Comment to Section 4-A-102 states that the provisions of Article 4-A 'represent a careful and delicate balancing of [competing] interests and are intended to be the exclusive means of determining the rights, duties, and liabilities of the affected parties in any situation covered by particular provisions of the Article.  Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.'"  *Grain Traders, Inc.*, 160 F.3d at 102–03 (quoting N.Y. U.C.C. § 4-A-102 (cmt.)).  Thus, "common law claims [are preempted] when such claims would impose liability inconsistent with the rights and liabilities expressly created by Article 4-A." *Id.* at 103. However, not all common law claims are preempted by Article 4-A.  "Claims that, for example, are not about the mechanics of how a funds transfer was conducted may fall outside of this regime." *Ma*, 597 F.3d at 89; *see also Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 797 (2d Cir. 2011) ("[A] common law breach of contract claim is not preempted by Article 4-A to the extent the provisions are not inconsistent with Article 4-A or they fall within one of the areas where a variance is permitted.").  "[T]he critical inquiry is whether [Article 4-A's] provisions protect against the type of underlying injury or misconduct alleged in a claim." *Ma*, 597 F.3d at 89–90.

Here, Plaintiffs' breach of contract claim falls outside of Article 4-A and is not preempted.  Plaintiffs allege that a "NY Account was opened as part of a larger cash management solution, implemented in March 2017."  Dkt. No. 1 ¶ 16; *see also id.* ¶¶ 27, 53. The Cash Management System ensures a zero-cash balance in each subsidiary's account by sweeping excess funds up to and covering negative balances by sweeping funds down from the

parent company.  *See id.* ¶ 27; Dkt. No. 29-1, Sch. A n.6 (defining "Zero-Balance Account,"

EMTC's account type).  Plaintiffs specifically allege that it was the agreement that governs the

Cash Management System that was violated by Defendant.  *See* Dkt. No. 1 ¶ 53.  The injury

caused by a violation of the Cash Management System Agreement falls outside of Article 4-A.

As described above, the Cash Management System does not involve wholesale wire transfers,

and thus "[is] not about the mechanics of how a funds transfer was conducted."  *Ma*, 597 F.3d at

89.  Instead, the Cash Management System governs what happens at the end of each day to the

balances in the participating accounts (including EMTC's) and the participating accounts'

relationship to the master customer account.  *See generally* Dkt. No. 29-1.  Because the Cash

Management System Agreement governs conduct wholly outside of wire transfers and

establishes rights and liabilities that are not addressed by Article 4-A, Plaintiffs' claim based on

the Cash Management System Agreement is not preempted by Article 4-A.  *See Huang v. Hong*

*Kong & Shanghai Banking Corp. LTD*, 2022 WL 4123879, at *3 (S.D.N.Y. Sept. 9, 2022)

(concluding that the relevant analysis is whether "the claims are about events that occurred either

before or after the processing of the wire transfer").

However, Plaintiffs fail to adequately plead breach of the Cash Management System

Agreement.  "Under New York law, a breach of contract claim requires proof of (1) an

agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4)

damages."  *Fischer & Mandell, LLP*, 632 F.3d at 799.  Plaintiffs claim that Defendant failed to

monitor for and prevent overdrafts above an agreed-upon $10 million limit.  *See* Dkt. No. 28 at

21; Dkt. No. 1 ¶¶ 3, 28, 40.  This obligation, however, is found nowhere in the Cash

Management System Agreement that Plaintiffs provided to the Court.  *See* Dkt. No. 29-1.  In

fact, the 2017 Cash Management System Agreement, which Plaintiffs allege was breached, *see*

Dkt. No. 1 ¶ 53, granted JP Morgan discretion whether to permit overdrafts.  The agreement

states that JP Morgan "may refuse or reverse" wire transfers if Plaintiffs' accounts have

insufficient funds and that, if JP Morgan effects wire transfers that result in overdrafts, "such

overdraft[s] shall be immediately due and payable by" the customer.  Dkt. No. 29-2 § 2.  Further,

Plaintiffs explicitly agreed that the master account (in this case Essidev) could "overdraw when

necessary, to fund customer account" by marking "YES" next to the appropriate box in Schedule

A.  *See id.* Sch. A. nn. 5, 12 & accompanying text.  The Cash Management System Agreement

thus expressly contemplates that there may be overdrafts both in the individual accounts that

were parties to the Cash Management System Agreement and collectively among the accounts.

And nowhere does the Cash Management System Agreement *limit* the size of the overdraft that

JP Morgan could permit or give Plaintiffs the option to limit the size; the overdraft determination

was left entirely to JP Morgan's discretion.  Finally, pursuant to the Cash Management System

Agreement, JP Morgan offered Plaintiffs the option to receive "intercompany report[s]" that

would track accumulated inter-account balances and a calculation of intercompany or

intracompany earnings and borrowing charges, in addition to "any additional" information

Plaintiffs requested.  *See* Dkt. No. 29-1, Sch. A nn.15–19 & accompanying text; *see also id.* § 6

("If the Customer selects . . . the Intercompany Reporting Service feature . . . , [JP Morgan] will

provide the affected Customer with reports, for the Customer Accounts, detailing: (i) a tracking

of accumulated inter-account balance transfers; and (ii) a calculation of intercompany or

intracompany earnings and borrowing charges.").  Plaintiffs elected not to receive such services,

however, by marking the box requesting such services "NO."  *Id.* Sch. A text accompanying

n.15.  Thus, Defendant was not required by the Cash Management System Agreement to either

alert Plaintiffs to the overdrafts or block the overdrafts, *see* Dkt. No. 28 at 20–21, and Plaintiffs'

breach of contract claim for damages fails.[10]  *See Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081–82 (N.Y. 1984) (holding that without "words of promise" there can be no "breach of contract subjecting the nonfulfilling party to liability for damages").

Recognizing this deficiency in its pleadings, Plaintiffs argue that they have instead alleged the existence of a second contract, one that, in contrast to the Cash Management System Agreement, *did* affirmatively obligate JP Morgan to "monitor for and prevent overdrafts."  *See* Dkt. No. 28 at 21.  But this agreement is not the subject of Plaintiffs' Second Cause of Action. The Second Cause of Action alleges that Defendant breached "a valid and binding agreement governing the NY Account and the broader cash management system that was put in place in 2017 involving EMTC and other Essilor subsidiaries."  Dkt. No. 1 ¶ 53.  Plaintiffs represent that this agreement was the one provided to the Court in its supporting declaration.  *See* Dkt. No. 29-2.  Plaintiffs cannot now claim that a *separate* agreement, one wholly inconsistent with the agreement they allege was breached, *see* Tr. 39 (acknowledging that "[t]here is nothing in that document that refers specifically to the $10 million overdraft [limit]"), serves as the basis for their breach of contract claim.  "It is well established in this district that a plaintiff cannot amend his pleadings in his opposition briefs."  *Fac., Alumni, & Students Opposed to Racial References v. N.Y. Univ. L. Rev.*, 2020 WL 1529311, at *7 (S.D.N.Y. Mar. 31, 2020); *see Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (holding that a complaint cannot be amended

---

[10] Although the Complaint alleges that JP Morgan failed to report suspicious activity, *see* Dkt. No. 1 ¶¶ 22–25, Plaintiffs have represented that these allegations are unrelated to their breach of contract claim, *see* Dkt. No. 28 at 22 ("To be sure, [JP Morgan] represented that it would monitor Plaintiffs' accounts to detect money laundering or other criminal activity.  But that is not the basis of their breach of contract claim." (internal citation omitted)).  This Court thus does not consider Defendant's argument that Plaintiffs have impermissibly sought to create a private right of action in the anti-money laundering statutes and to dress up a statutory claim as a breach of contract claim.  *See* Dkt. No. 19 at 19–20.

through opposition briefing); *Watkins v. Harlem Ctr. for Nursing & Rehab., LLC*, 2021 WL 4443968, at *2 (S.D.N.Y. Sept. 28, 2021) (same).  The Court will follow that rule here and dismiss Plaintiffs breach of contract claim.[11]

## IV.   Negligence

Finally, Plaintiffs fail to state a claim for negligence against Defendant.  Plaintiffs' third cause of action against EMTC states simply that JP Morgan owed "Plaintiffs a duty of care, independent of their contractual agreement, to act in a manner consistent with commercially reasonable standards."  Dkt. No. 1 ¶ 58.  In their memorandum in opposition to JP Morgan's motion to dismiss, Plaintiffs clarify the duty that JP Morgan allegedly owed them: a duty "to identify and prevent overdrafts."  Dkt. No. 28 at 23.  Plaintiffs allege that JP Morgan violated this duty of care and Plaintiffs suffered damages as a direct and proximate result of JP Morgan's negligence.  Dkt. No. 1 ¶¶ 59–60.  Defendant counters that Plaintiffs have not adequately alleged a contractual duty that JP Morgan owed Plaintiffs and that, even if they have, they have not plausibly alleged breach of this duty or compensable damages.  Dkt. No. 19 at 20–24.  The Court finds that Plaintiffs have failed to allege an extracontractual duty that JP Morgan owed them.[12]

---

[11] The Court questions whether Plaintiffs have pled sufficient facts to establish that a separate contract that would have obligated JP Morgan to monitor, report, and block overdrafts was formed between JP Morgan and themselves.  Plaintiffs allege that JP Morgan described something called an "intraday overdraft ('IDOD')" in an email.  *See* Dkt. No. 1 ¶ 27.  "Plaintiffs then requested in writing that [JP Morgan] institute a daily overdraft limit (*i.e.*, a 'DOL') of US $10 million for the NY Account.  JPM agreed to do so."  *Id.* ¶ 28.  But besides an apparent obligation to "monitor[]" Plaintiffs' overdrafts in connection with an IDOD, *id.* ¶ 27, which Plaintiffs do not claim JP Morgan failed to do, Plaintiffs allege no facts that agreeing to a DOL obligated JP Morgan to either report overages to Plaintiffs or to block such overages.  Rather, Plaintiffs argue that a DOL "ensures that unusual overdraft activity will be brought to the bank's, the account holder's, and any other relevant parties' attention" and that the "DOL constituted a written instruction from EMTC and Essilor to block any daily transfers from the NY Account." *Id.* ¶ 28.  However, these are precisely the kinds of conclusory allegations that the Court, without more, is not obligated to accept.

[12] Because Plaintiffs' negligence claim relates to the Cash Management System, and not the payment orders, the claim is not displaced by Article 4-A of the N.Y. U.C.C.  *See supra*

Under New York law, a claim for negligence requires, first, that a plaintiff allege "the defendant owed the plaintiff a cognizable duty of care as a matter of law." *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir.1998).  "Whether a defendant owes a duty of care to a plaintiff 'is a question of law that the Court may properly determine on a motion to dismiss.'" *Qube Films Ltd. v. Padell*, 2014 WL 3952931, at *7 (S.D.N.Y. Aug. 12, 2014) (quoting *Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 27 (S.D.N.Y. 2009), *aff'd* 382 F. App'x 107 (2d Cir. 2010)) (Nathan, J.).  "[A] breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated.  Such a 'legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract.'" *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012) (internal citation omitted) (quoting *Clark-Fitzpatrick v. Long Island R.R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987)).  "A legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship." *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992).  "Professionals," for example, can become liable in tort if they fail to exercise reasonable care, without regard to the contractual relationship between the parties.  *Id.*  "The New York Court of Appeals has never found financial institutions . . . to be professionals for these purposes, and defendants do not cite to any New York decisions holding [otherwise] . . .  On the contrary, courts have found that in actions involving the contractual duties of corporations and financial institutions, a negligence action may not be maintained and parties must proceed under a contract theory." *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 670 (S.D.N.Y. 2008) (Chin, J.); *see also Abhyankar by Behrstock v. JPMorgan Chase, N.A.*, 2020 WL 4001661, at *5

---

pp. 31–32.

(S.D.N.Y. July 15, 2020) ("Typically, under New York law, a bank does not have an extracontractual duty to its depositors."); *JPMorgan Chase Bank, N.A. v. Freyberg*, 171 F. Supp. 3d 178, 191 (S.D.N.Y. 2016) ("[T]he relationship between a bank and its depositor is that of debtor and creditor, which, without more, is not a fiduciary or special relationship." (internal quotation marks and citation omitted)).[13]

Plaintiffs' claim that Defendant owed it an extracontractual duty to monitor and report on overdrafts in EMTC's account fails for two reasons.  First, Defendant's obligations related to the Cash Management System and overdraft reporting *are* governed by contract; Defendant offered Plaintiffs the opportunity to receive regular reports on overdrafts, but Plaintiffs explicitly declined this option in the Cash Management System Agreement.  *See* Dkt. No. 29-1, Sch. A nn.15–19 & accompanying text; *see also id.* § 6.  If the email exchange cited in the Complaint, *see* Dkt. No. 1 ¶¶ 27–28, altered Plaintiffs' and Defendant's contractual relationship, Plaintiffs' recourse against Defendant's would still be found in contract, not in tort.  Stated differently, Plaintiffs have not adequately demonstrated how this email exchange created a common-law duty to "report and prevent overdrafts," Dkt. No. 28 at 24, separate and apart from Defendant's

---

[13] The cases that Plaintiffs cite for the generalized proposition that "'[b]anks owe a duty of care to their customers' and breaches of that duty are actionable though a negligence claim," Dkt. No. 28 at 23 (quoting *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 667 (S.D.N.Y. 2000)), are inapposite.  All the cases can be traced to a single Second Circuit decision, *King v. Crossland Sav. Bank*, 111 F.3d 251 (2d Cir. 1997).  *King* upheld the district court's grant of summary judgment on the plaintiffs' negligence claim and, in the process, noted that the district court "[c]onced[ed] that banks do, in fact, owe a duty of care to their customers." *Id.* at 259.  However, the factual circumstances in *King* are very different from the ones here; *King* involved the false arrest of the plaintiffs when the defendant bank erroneously reported to the New York Police Department that the cashier checks they sought to exchange had been lost or stolen.  *Id.* Thus, to the degree that the Second Circuit was endorsing the district court's view that banks owe customers a generalized duty of care, the duty of care owed by the bank was not a duty owed by the bank acting in its professional capacity.  The case does not support the imposition of a duty of care owed by a bank to its customers under the circumstances presented here.

contractual obligations to the contrary.  *See Trez Cap. (Fla.) Corp. v. Noroton Heights & Co., LLC*, 2022 WL 16833701, at \*18 (S.D.N.Y. Nov. 8, 2022) ("If the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort." (quoting *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980))); *Luxonomy Cars, Inc. v. Citibank, N.A.*, 408 N.Y.S.2d 951, 954 (2d Dep't 1978) ("The allegations that Citibank recklessly accelerated the loan . . . and failed to exercise reasonable care in accelerating the loan and debiting Luxonomy's checking account . . . do no more than assert violations of a duty which is identical to and indivisible from the contract obligations which have allegedly been breached.  Since there is no tortious violation of an independent duty, these causes of action must be dismissed.").

In fact, the duty the Plaintiffs claim they were owed—a duty to monitor and report overdrafts—has been rejected by the Second Circuit.  "As a general matter, 'a depositary bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation.'"  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 287 (2d Cir. 2006) (quoting *Norwest Mortgage, Inc. v. Dime Sav. Bank of N.Y.*, 721 N.Y.S.2d 94, 95 (2d Dep't 2001)); *see also 2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*, 503 F. App'x 51, 54 (2d Cir. 2012) (extending *Lerner* to trust accounts); *Deutsche Bank Tr. Co. Americas v. Rado Ltd. P'ship*, 819 F. App'x 66 (2d Cir. 2020) (same).  If banks have no duty to monitor the fiduciary and fiduciaries and trustees for whose benefit they are opened, then logically there should be no extracontractual duty to report and prevent overdraft activity on behalf of Plaintiffs.[14]  To the degree that JP Morgan was required to do so, that duty must be

---

[14] The Second Circuit and New York courts recognize an exception to this general rule:  "[A] bank may be liable for participation in [such a] diversion, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed."  *Lerner*, 459 F.3d at 287

found in contract, not tort.  The Court thus finds that Defendant did not owe Plaintiffs an extracontractual duty to monitor and prevent overdrafts, and Plaintiffs' negligence cause of action is accordingly dismissed.[15]

## CONCLUSION

The motion to dismiss for failure to state a claim upon which relief can be granted is GRANTED IN PART and DENIED IN PART without prejudice to Plaintiffs' filing of an amended complaint solely with respect to its claims for breach of contract.  Plaintiffs must file any amended complaint within thirty days of the date of this Opinion and Order.

The Clerk of Court is respectfully directed to close Dkt. No. 18.


SO ORDERED.


Dated: January 4, 2023
      New York, New York

                                        LEWIS J. LIMAN
                              United States District Judge

---

(quoting *In re Knox*, 477 N.E.2d 448, 451 (N.Y. 1985)).  Plaintiffs have not argued that JP Morgan's actions fit into this exception.

[15] Because the Court has found that Defendant did not owe Plaintiffs a duty under these circumstances, the Court does not address whether Plaintiffs have pled sufficient allegations that Defendant breached a duty or whether Plaintiffs have pled compensable damages.  *See* Dkt. No. 19 at 23–24.

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ESSILOR INTERNATIONAL SAS and ESSILOR MANUFACTURING (THAILAND) CO., LTD.,<br><br>                              Plaintiffs,<br><br>        v.<br><br>J.P. MORGAN CHASE BANK, N.A.,<br><br>                              Defendant. | Case No. 1:22-cv-03361 |

### DEFENDANT'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS ESSILOR INTERNATIONAL SAS AND ESSILOR MANUFACTURING (THAILAND) CO., LTD.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the applicable Local Civil Rules for the U.S. District Court for the Southern District of New York ("Local Civil Rules"), Defendant hereby requests that Plaintiffs Essilor International SAS ("Essilor") and Essilor Manufacturing (Thailand) Co., Ltd. ("EMTC") produce for inspection and copying all documents specified in the Requests for Production ("Requests") below. The production shall be made, and the Requests interpreted, in accordance with the Definitions and Instructions immediately below. Plaintiffs' production shall be made to the law offices of Wilmer Cutler Pickering Hale and Dorr LLP, attention Alan Schoenfeld, 7 World Trade Center, 250 Greenwich St., New York, NY 10007, within 30 days of service of this request on Plaintiffs or at a time and place agreed to by the parties.

## **DEFINITIONS**

1.      The definitions and rules of construction set forth in Federal Rule of Civil

Procedure 34 and Local Civil Rule 26.3 shall apply to these Requests and are incorporated as if

fully set forth herein.

2.      "You" and "Your" include Essilor, EMTC, and all present or former

representatives or agents, and any person, including attorneys, acting on behalf of any of the

foregoing.

3.      "Action" refers to the above-captioned case, *Essilor International SAS and*

*Essilor Manufacturing (Thailand) Co., Ltd. v. J.P. Morgan Chase Bank, N.A.*, Case No. 1:22-cv-

03361 (S.D.N.Y.).

4.      "Complaint" refers to the Complaint filed in *Essilor International SAS and*

*Essilor Manufacturing (Thailand) Co., Ltd. v. J.P. Morgan Chase Bank, N.A.*, Case No. 1:22-cv-

03361 (S.D.N.Y.) on April 25, 2022.

5.      "JPMC" refers to JPMorgan Chase Bank, N.A., the defendant in this lawsuit.

6.      "Document" is defined to be synonymous in meaning and equal in scope to the

usage of this term in Federal Rule of Civil Procedure 34(a), including, but not limited to,

electronic or computerized data compilations, electronic chats, texts, app-based records, email

communications, other electronically stored information from personal computers, voice

recordings, handwritten notes, and hard copy documents.

7.      "Communication" refers to the transmittal of information (in the form of facts,

ideas, inquiries, or otherwise) regardless of form (e.g., email, letter, notes, telephone

conversation), including without limitation all correspondence and advertisements.

8.     "Concerning" means referencing, relating to, describing, evidencing, reflecting, constituting, documenting, or recording.

9.     "Wire Transfers" means all wires listed in Exhibit A of the Complaint and any other payment orders for which EMTC seeks a refund from JPMC.

10.     "Electronic Wires" means all funds transfers made by payment order.

11.     The use of the singular herein shall be deemed to encompass the use of the plural and vice versa.

12.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Requests all information that might otherwise be construed as outside of their scope.

13.     The term "any" includes "all" and "each," and the term "all" includes "any," and the term "each" includes "every."

14.     To the extent these Requests employ terms used in the Complaint, such use is without prejudice to the rights of Defendants.

## **<u>INSTRUCTIONS</u>**

1.     If any Document or information responsive to any of the following Requests is being withheld on a claim of attorney-client privilege, work-product protection, or any other privilege, the procedures set forth in Local Civil Rule 26.2 shall apply.  Local Civil Rule 26.2 is incorporated as if fully set forth herein.

2.     You are reminded of Your obligation under Federal Rule of Civil Procedure 26(e) to make further or supplemental productions of responsive Documents created, discovered, or acquired between the date of initial production and any time thereafter, including the time of trial.

3.      If objection is made to any of these Requests, the response shall state whether
Documents are being withheld from inspection and production on the basis of such objection, or
whether inspection and production of the responsive Documents will occur notwithstanding such
objection.

4.      These Requests call for the production of all Documents and Communications
within Your possession, custody, or control, wherever located, including those Documents and
Communications in the possession, custody, or control of Your counsel or former attorneys,
investigators, accountants, agents, or representatives.  If You cannot respond to these Requests in
full after exercising due diligence to secure the Documents or Communications requested, You
shall so state and respond to the extent possible, specifying the reason for, and nature of, Your
inability to respond to the remainder.

5.      If any requested Document or Communication has been lost, destroyed,
transferred voluntarily or involuntarily to others, or otherwise disposed of, You shall state the
circumstances surrounding such disposition, including the identity of person(s) having
knowledge as to the circumstances of such disposition, the date or approximate date of such
disposition, the location where the Document or Communication was destroyed, the type of
Document or Communication, the information contained therein, and the identity of all person(s)
who had knowledge of the Document's or Communication's contents.

6.      If there are no Documents or Communications responsive to a particular Request
in Your possession, custody, or control, provide a written response so stating.

7.      If You believe that any Request, Definition, or Instruction is ambiguous, in whole
or in part, You must nonetheless respond and (i) set forth the text deemed ambiguous and (ii)
describe the manner in which You construed the Request in order to frame Your response.  If

You object to a Request on the ground that production would be unduly burdensome, You must produce all responsive Documents to that Request that You can produce without undue burden and explain which Documents are being withheld and the exact nature of the burden.

8.      Produce all ESI that is responsive to the requests below pursuant to the terms set forth in a forthcoming order governing the production of electronically stored information, to be stipulated to by the parties and entered by the Court.

9.      For the avoidance of doubt, these Requests do not seek any Documents or Communications subject to the French blocking statute (French law 68-678 of 26 July 1968 and all amendments thereto) or any other similar statute.

## REQUESTS

1.      All Documents and Communications concerning the Wire Transfers.

2.      All Documents and Communications concerning the cancellation, reversal, or request to return the Wire Transfers.

3.      All Documents and Communications concerning your efforts to recover the Wire Transfers.

4.      Documents sufficient to show the amounts recovered on each Wire Transfer.

5.      All Documents and Communications concerning any investigation or inquiry conducted by You or any other party regarding the Wire Transfers, Chamanun Phetporee, Sakchai Boonsuya, or any employee involved in the execution of the Wire Transfers.

6.      All Documents and Communications concerning any cybersecurity incidents from August 2019 through the present, including but not limited to incidents involving unauthorized access to Your systems and electronic facilities, ransomware attacks, data breaches, and other cybersecurity threats.

7.      All Documents and Communications concerning any assessments, reviews, audits or inquiries into Your cybersecurity standards, practices, policies, and procedures.

8.      All Documents and Communications concerning EMTC's account at JPMC, including but not limited to Documents relating to the account's security procedures for initiating and executing Electronic Wires and all agreements relating to the account.

9.      All Documents and Communications concerning Essilor's account at JPMC, including but not limited to Documents relating to the account's security procedures for initiating and executing Electronic Wires and all agreements relating to the account.

10.      All Documents and Communications concerning the terms governing the cash management system that was implemented in 2017, including but not limited to the alleged US $10-million daily-overdraft-limit.

11.      All Documents showing Your policies, practices, or procedures concerning the initiation and execution of Electronic Wires, as of August 2019 through the present.

12.      All Documents showing Your policies, practices, or procedures concerning the cancellation, reversal, or request to return Electronic Wires, as of August 2019 through the present.

13.      All Documents showing Your policies, practices, or procedures concerning potentially suspicious or fraudulent Electronic Wires, as of August 2019.

14.      All files compiled or held by Your Human Resources Department concerning Chamanun Phetporee or Sakchai Boonsuya.

15.      All Documents and Communications produced to any nonparty or received from any nonparty, including but not limited to any federal, state, or local governmental agency, official, committee, court of law, auditor, or external consultant—whether in the United States or

abroad—concerning this lawsuit or the subject matter of this lawsuit, including but not limited to the Wire Transfers, the criminal prosecutions of Chamanun Phetporee and Sakchai Boonsuya, and Your efforts to recover the Wire Transfers.

16.    All Communications with any nonparty, including but not limited to any federal, state, or local governmental agency, official, committee, or court of law—whether in the United States or abroad—concerning this lawsuit or the subject matter of this lawsuit, including but not limited to the Wire Transfers, the criminal prosecutions of Chamanun Phetporee and Sakchai Boonsuya, and Your efforts to recover the Wire Transfers.

17.    All Documents and Communications concerning the "Fraud discovered by Essilor International," and the company's "control activities," "investigation," and "regular payment process and systems," as those terms are used in EssilorLuxottica's 2019 Universal Registration Document.

18.    All Documents and Communications concerning "complaints" filed by Essilor in "Thailand and in other jurisdictions," as well as Essilor's "mobiliz[ation]" of "all available internal and external resources to put an immediate end to these fraudulent activities and implement remedial actions," including the company's "comprehensive investigations" and "actions to seek to recover the misappropriated funds in order to mitigate the impact on the Group," as those terms are used in EssilorLuxottica's 2019 Universal Registration Document.

19.    All Documents and Communications concerning Essilor's "implement[ation]" of "a wide range of corrective measures under the supervision of the EssilorLuxottica Board of Directors," including "reorganiz[ing] its Treasury and local management in Thailand," as those terms are used in EssilorLuxottica's 2019 Universal Registration Document.

20.     All Documents and Communications concerning the "Nomination and Compensation Committee of Essilor International (SAS)['s]" recommendation that its "Board of Directors" "should not pay any variable compensation to Laurent Vacherot in his capacity as Chief Executive Officer of Essilor International (SAS) in 2019" "[i]n view of the fraud that took place at an Essilor plant in Thailand," as those terms are used in EssilorLuxottica's 2019 Universal Registration Document.

21.     All Documents and Communications concerning the "legal and consultancy expenses (related to both investigation activities and funds recovery)" that "[t]he Company" "incurred" in connection with the Wire Transfers, as those terms are used in EssilorLuxottica's 2020 Interim Financial Report.

22.     All Documents and Communications produced by You to third parties, including but not limited to external resources hired by You, that conducted investigations or inquiries concerning the Wire Transfers and engaged in efforts to recover the Wire Transfers.

23.     All Communications between EMTC or Essilor, on the one hand, and third parties, including but not limited to external resources hired by You, on the other hand, concerning the Wire Transfers.

24.     All Documents and Communications concerning the alleged negotiations of the terms applicable to EMTC's account at JPMC in 2017, including an alleged negotiation of a three-year statute of limitations for claims arising out of EMTC's account at JPMC.

25.     All Documents and Communications concerning insurance policies You have reviewed in connection with the Wire Transfers, including but not limited to insurance policies and Documents submitted to support insurance claims You have made in connection with the alleged Wire Transfers.

26.     All Documents and Communications concerning the allegations and claims in the Complaint, including Documents and Communications that You reference in, considered, or relied on in drafting the Complaint.

27.     All Documents and Communications that concern, are referenced or identified in, or that You considered in drafting any written discovery or in responding to any written discovery in this Action.

28.     All Documents and Communications considered by or provided to any expert You retained or consulted in connection with this Action.

29.     All Documents and Communications produced or provided to You by any nonparty concerning this Action.

30.     All Documents and Communications constituting or concerning any method of computation or quantification of the alleged damages sustained by You as a result of the conduct alleged in the Complaint.


Dated:  January 18, 2023                    /s/ Alan E. Schoenfeld

                                            Alan E. Schoenfeld
                                            WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
                                            7 World Center
                                            250 Greenwich Street
                                            New York, NY 10007
                                            (212) 937-7294 (t)
                                            (212) 230-8888 (f)
                                            alan.schoenfeld@wilmerhale.com

                                            Margarita M. Botero
                                            WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
                                            1225 Seventeenth St.
                                            Suite 2600
                                            Denver, CO 80202

(720) 274-3130 (t)
(720) 274-3133 (f)
margarita.botero@wilmerhale.com

*Attorneys for Defendant JPMorgan Chase Bank,*
*N.A.*