**WOLLMUTH MAHER & DEUTSCH LLP**
500 FIFTH AVENUE
NEW YORK, NEW YORK 10110

November 10, 2023

The motion at Dkt. No. 88 was
resolved by the orders at Dkt.
Nos. 77 and 86. The Clerk of
Court is respectfully directed to
close the motion at Dkt. No. 88.
Date: December 5, 2023

SO ORDERED.

*[signature]*

LEWIS J. LIMAN
United States District Judge

**VIA ECF**
The Honorable Lewis J. Liman
United States District Court, S.D.N.Y.
500 Pearl Street, Room 701
New York, New York 10007

Re: ***Essilor International SAS, et al. v. JPMorgan Chase Bank, N.A.*, No. 22-cv-3361**

Dear Judge Liman:

Plaintiff Essilor Manufacturing (Thailand) Co., Ltd. ("EMTC") moves for a discovery Order compelling Defendant J.P. Morgan Chase Bank, N.A. ("JPMC") to (i) produce in unredacted form a group of related emails and attachments relating to JPMC's statute of limitations defense, which it has withheld as privileged or produced in an overly redacted form; and (ii) perform supplemental searches JPMC has refused to conduct to locate documents relevant to the same defense and produce the responsive documents located in the course of such searches. EMTC conferred in good faith with JPMC in an effort to obtain such discovery without Court action.

As the Court may recall, multiple Essilor affiliates had accounts with the New York branch of JPMC that were linked through a cash sweeping process referred to as Essilor's "cash management program." At the motion to dismiss stage, JPMC argued that its standard account terms in place in 2015 (the "2015 Standard Terms") govern EMTC's New York account rather than the set of non-standard terms that JPMC approved for Essilor and EMTC in late 2016, shortly before the cash management program became operational in 2017 (the "2017 Non-Standard Terms"). JPMC prefers the 2015 Standard Terms because they contain a 2-year limitations period, while the 2017 Non-Standard Terms provide for 3-years. The Court's motion to dismiss order held there were issues of fact relating to what terms were operative in 2019. *See* ECF No. 41 at 14.

Discovery has confirmed that, contrary to JPMC's repeated representations to the Court, the parties intended that one set of terms—the 2017 Non-Standard Terms—would apply to all accounts that were part of Essilor's cash management program, including EMTC's New York account. *See*, *e.g.*, Ex. 1 at '125962 ("we will have one single agreement which will be applicable in the 3 regions").[1] In fact, JPMC agreed to a three-year limitations period in 2015 *before* EMTC opened its account. *See* Ex. 3 at '26370 ("JPM is agreeable to client request [sic] replace two years with three years."). And, although EMTC opened the New York account in late 2015, the account was not used until late December 2016, after the non-standard terms were approved and just before the broader cash management program went online in 2017. Indeed, a JPMC managing director who worked closely with Essilor, Vincent Tanneur, described EMTC's New York account as being "opened" in 2017. Ex. 4 at '103273 (referencing "accounts added to EMTC's Access profile subsequent to the

---

[1] *See also* Ex. 2 at '76946 ("Given Essilor Thai entities require accounts in the US and in Thailand, we had have [sic] to negotiate the docs both in APAC and in the US. . . . [G]iven the ambition we have with Essilor globally . . . we have taken the opportunity of Thai business negotiation, to try negotiating [sic] harmonized docs globally.").

The Honorable Lewis J. Liman                                        November 10, 2023
Page 2

date of the SADF (including the New York account opened in 2017).").

JPMC has produced documents showing that during a meeting on or about November 18, 2016, a committee within JPMC called the "Client Deal Management Committee," or "CDMC," approved the 2017 Non-Standard Terms for all accounts part of the Essilor cash management program, including EMTC's account. Ex. 5 at '7970 ("NA & EMEA CDMC approved the non standard terms for the accounts being opened in London, France and US.").[2] The email states that the terms would apply to multiple entities in the Essilor corporate family, including specified "wholly owned" entities such as EMTC. *Id.* ("The approval only applies to the specific entities (100% wholly owned) *that are listed in the client section of the memo*.") (emphasis added). The email at the bottom of the chain, sent first in time, references a memo and indicates that the "client section of the memo" identifies all entities to which the approval applies. The bottom email also directs the lead JPMC relationship manager for Essilor and EMTC, Illan Benamara, to "modify the attached form to indicate that the scope of the approval is limited to only those entities listed on the form and where those accounts will be opened." *Id.* JPMC did not produce a standalone version of the bottom email included in Ex. 5 that would contain the attachments to that email. When asked about these documents, JPMC stated that it was unable to locate the first email in the chain or independently locate the documents referenced as attachments. JPMC indicated that the email and attachments appear to have been deleted from the limited repositories searched by JPMC.

On November 6, 2023, JPMC produced a standalone version of the second email from the bottom of Ex. 5. *See* Ex. 6. This is an email from Mr. Benamara responding to the direction that he "modify the attached form to indicate that the scope of the approval is limited to only those entities listed on the form and where those accounts will be opened." Ex. 6. Mr. Benamara responded: "As requested, see attached the amended form." *Id.* However, JPMC withheld the attached form entirely as privileged and has refused to remove this designation or produce the document in an appropriately redacted format. The "form" is not privileged. It is a business record evidencing the fact that the committee in question considered and approved the non-standard terms. *See, e.g., Serin v. N. Leasing Sys.*, 2010 U.S. Dist. LEXIS 142714, at *6 (S.D.N.Y. Oct. 6, 2010) (business records are not privileged merely because they are included within attorney client communications or provided to an attorney); *see also United States v. Walker*, 243 Fed. Appx. 621, 623 (2d Cir. 2007) (similar holding); *TIG Ins. Co. v. Swiss Reinsurance Am. Corp.,* 2023 U.S. Dist. LEXIS 165288, at *11 (S.D.N.Y. Sept. 18, 2023) (same). In addition, Mr. Benamara is not an attorney. His amendments clarifying to which entities the approval applied were not legal advice or a request for legal advice. And to the extent that the form happens to contain some legal advice, only the legal advice should be redacted—not information reflecting business action taken by the CDMC or factual details such as the nature of the accounts and the entities involved. *See, e.g., TIG Ins. Co.,* 2023 U.S. Dist. LEXIS 165288, at *11 ("if non-privileged communications are mixed in with the privileged communications, then the documents must be redacted and produced. Defendants cannot withhold an entire document if only one part of it is privileged."); *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 2004 WL 4054842, at *3 (S.D.N.Y. July 22, 2004) (ordering production of a redacted version of a memo because the discussion of "follow up" items in the memo were "purely business objectives").

_____

[2] Another document recently produced by JPMC references a CDMC meeting to discuss "non standard terms for Essilor" was held on November 17, 2016. Ex. 7.

November 10, 2023

        JPMC has also withheld as privilege other crucial documents relating to the CDMC approvals. For example, JPMC has produced an email showing that the Asia Pacific CDMC had a meeting on November 22, 2016 to approve "Non-Standard Terms" for EMTC. Ex. 8 at '76936. The email has an attachment forwarded to CDMC participants. This document likely provides factual background that explains why the approval is being sought, how the EMTC account works, and may include discussions relating to the negotiations with Essilor. None of this would be privileged because the document is being used for the business purpose of approving a set of non-standard terms. Yet JPMC has withheld the document based on a specious privilege claim that it has refused to retract. As another example, in an email dated the same day, Phiroon Hongrattanakulchai wrote to Mr. Benamara: "CDMC has approved the request [for the non-standard EMTC terms], but they are looking for 'credit approval' evidence." Ex. 2. Mr. Benamara attached the "evidence" of credit approval, but JPMC has withheld the document he attached based on purported privilege. But "evidence" of a "credit approval" is not privileged because a credit approval is a business function.

        JPMC's refusal to provide the foregoing discovery is baseless. The Court should compel JPMC to produce Exhibits 2, 6, and 8. with attachments in unredacted form or in a redacted form approved by the Court after an *in-camera* review. The Court also should order JPMC to reconsider its other redaction decisions in light of the Court's guidance as this issue appears to affect many other documents in JPMC's production and Plaintiff did not want to burden the Court by presenting additional documents for an *in-camera* review at this time.

        Plaintiff further submits that the Court should compel JPMC to perform supplemental searches related to the CDMC deliberations in November 2016. To date, JPMC appears to have limited its search to the email files of one employee, Mr. Benamara, and certain centralized files that JPMC has said do not contain the materials provided to the CDMC or relating to the approvals that it issued at the relevant meetings.[3] More searches would be appropriate under the circumstances. It seems likely that materials provided to the CDMC, and approvals provided, are stored in a centralized location at the bank. JPMC has advised us that is not the case. JPMC has refused to attempt to fill in the gaps by searching the ESI of members of the United States and Asia Pacific CDMC who attended the meetings in the latter half of November 2016 to assess whether they have the materials sent to the CDMC and documents evidencing the CDMC approvals or other relevant documents. Because these documents directly relate to, and are likely to rebut, JPMC's purported statute of limitations defense, the Court should compel JPMC to do so.

                                        Respectfully Submitted,

                                        */s/ Steven S. Fitzgerald*

                                        Steven S. Fitzgerald

---

[3] After significant prodding, JPMC agreed to search the emails of others on the chain reflected in Ex. 5, though it only agreed to produce the bottom email if located. This single supplemental search alone would be woefully inadequate for two reasons. First, JPMC has indicated that it is unlikely to have ESI for the other individuals on the chain. Second, JPMC should select custodians from the CDMC whose emails were retained and search their ESI for the brief period in question to identify what materials were considered by the CDMC and what approvals were provided and in what form.

# EXHIBIT 1

| Message | |
| --- | --- |
| **From**: | Benamara, Illan [illan.benamara@jpmorgan.com] |
| **Sent**: | 1/28/2016 10:41:07 AM |
| **To**: | Audrey FELD [felda@essilor.fr] |
| **CC**: | Nicolas MURAT [muratn@essilor.fr]; Arnault GITZINGER [gitzinga@essilor.fr]; Cousin, Bertrand A [bertrand.a.cousin@jpmorgan.com]; Yuen, Olivia E [olivia.e.yuen@jpmorgan.com]; Akkaragumtorn, Naruedol [naruedol.akkaragumtorn@jpmchase.com] |
| **Subject**: | Essilor: legal agreements |
| **Attachments**: | EMEA Account Application - England Addendum (EMEA) (Clean).docx; Global Account Terms - US Addendum.docx; ESSILOR- Thailand Addendum (redline) v1-3.docx; Essilor- 2013 GAT CLIENT v 4-3.docx; ESSILOR-US (Domestic)_Cash_Concentration_Agreement-Multi (EXECUTION).docx; ESSILOR- APAC SWEEP EXECUTION.docx |

Hi Audrey,

Please find attached the revised version of the GAT for your review. This GAT version has been reviewed and agreed by our legal teams in US, APAC and Europe, so that we will have one single agreement which will be applicable in the 3 regions.

The only clause where we cannot agree the same wording for all 3 regions is the clause 17.5. Given Essilor's requested changes can only be accepted in APAC, we have materialized Essilor required changes in the Thailand addendum (and not in the GAT) which supersede the GAT. You will then also find attached the redline version of Thailand. The other terms of the Thailand addendum have not been modified and remain identical to what has been previously agreed with you.

Moreover, you will find attached the clean versions of the other agreements that have already been agreed with Essilor:
- APAC cash concentration
- US cash concentration agreement
- US addendum

I have also attached the UK addendum, for your review in case we need to open accounts in London at some point.

Please let us know if you have any queries and in case needed, we remain available for a call.
Many Thanks
Best regards
illan

---

**illan BENAMARA** | V.P Relationship Manager | Treasury Services
J.P. Morgan | 14, Place Vendôme – 75001 Paris - France | T: +33 (0)1 40 15 44 51 | M: +33 (0)7 78 69 33 82 | illan.benamara@jpmorgan.com

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email

CONFIDENTIAL

# EXHIBIT 2

| From: | Benamara, Illan </O=CORPEXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E633492> |
|---|---|
| To: | Hongrattanakulchai, Phiroon |
| Sent: | 11/22/2016 4:46:47 PM |
| Subject: | RE: 11-18 EMEA/NA CDMC Essilor |
| Attachments: | RE: Essilor: legal agreements |

Hi Phiroon,

Great news and see attached

Many Thanks
Best regards
illan

Illan Benamara | Treasury Services | Head of France, Belgium & Luxembourg Corporate Sales |
J.P. Morgan | 14, Place Vendôme - 75001 Paris - France | T: +33 (0)1 40 15 44 51 | M: +33 (0)7 78 69 33 82 | illan.benamara@jpmorgan.com

(Alternate contact: Dunita Moonshiram | T: +33 1 40 15 42 32 | dunita.moonshiram@jpmorgan.com)

**From:** Hongrattanakulchai, Phiroon
**Sent:** 22 November 2016 04:01
**To:** Benamara, Illan
**Subject:** RE: 11-18 EMEA/NA CDMC Essilor

Hello Illan,

CDMC has approved the request, but they are looking for "credit approval" evidence. I could not find it so would appreciate your help to share with me please. Thank you very much.

Regards,
Phiroon.

**From:** Benamara, Illan
**Sent:** Monday, November 21, 2016 7:11 AM
**To:** Hongrattanakulchai, Phiroon
**Subject:** FW: 11-18 EMEA/NA CDMC Essilor

hi Phiroon,

As you are probably aware, finally we have not been able to find a slot with global CDMC which includes the 4 region.
last Friday we had EMEA and US CDMC that has been approved.

Could you please schedule a CDMC in APAC to get approval of negotiated terms. I believe there is one CDMC this Tuesday.

please let me know if it is ok for you, as Essilor HQ is asking update

Many Thanks
Best regards
illan

JPMC_EMTC_00076941

**Illan Benamara** | Treasury Services | Head of France, Belgium & Luxembourg Corporate Sales |
J.P. Morgan | 14, Place Vendôme - 75001 Paris - France | T: +33 (0)1 40 15 44 51 | M: +33 (0)7 78 69 33 82 | illan.benamara@jpmorgan.com

(Alternate contact: **Dunita Moonshiram** | T: +33 1 40 15 42 32 | dunita.moonshiram@jpmorgan.com)

**From:** Benamara, Illan
**Sent:** 21 November 2016 01:08
**To:** Chang, Janice E; Souza, Joanes; Prasad, Pranav; Riley, Julia A; Yelisova, Kateryna X
**Subject:** RE: 11-18 EMEA/NA CDMC Essilor

Janice,

As requested, see attached the amended form.
let me know if you have any queries.

Many Thanks
Best regards
illan

---

**Illan Benamara** | Treasury Services | Head of France, Belgium & Luxembourg Corporate Sales |
J.P. Morgan | 14, Place Vendôme - 75001 Paris - France | T: +33 (0)1 40 15 44 51 | M: +33 (0)7 78 69 33 82 | illan.benamara@jpmorgan.com

(Alternate contact: **Dunita Moonshiram** | T: +33 1 40 15 42 32 | dunita.moonshiram@jpmorgan.com)

**From:** Chang, Janice E
**Sent:** 19 November 2016 03:47
**To:** Benamara, Illan; Souza, Joanes; Prasad, Pranav; Riley, Julia A; Yelisova, Kateryna X
**Subject:** 11-18 EMEA/NA CDMC Essilor

The attached non standard terms for Essilor were presented at a joint EMEA/NA CDMC today.  NA & EMEA CDMC approved the non standard terms for the accounts being opened in London, France and US.  The approval only applies to the specific entities (100% wholly owned) that are listed in the client section of the memo.  The committee would not approve future entities or other jurisdictions at the meeting.

Illan:  Please modify the attached form to indicate that the scope of approval is limited to only those entities listed on the form and where those accounts will be opened.  If you decide that you want to ask for future approvals for other entities and/or jurisdictions then it has to either come back to the regional CDMC where the accounts will be opened or global CDMC.  Please make sure that you send the revised memo to everyone on this distribution list.

Pranav/Joanes:  Please use the revised form from Illan for presentation at the APAC and LATAM CDMC meetings this week.

Julia:  Please let me know if I missed anything from this morning's meeting

Regards

Janice

Confidential Discovery Material

From:           Holden, Graham
Sent:           Wednesday, November 16, 2016 10:43 AM
To:             Tannour, Vincent; Benameur, Ilias
Subject:        RE: Enidac legal agreements

Michael has now approved this, so you have C4 credit approval confirmed.

Best,
Graham

Graham Holden | Emerging Markets | Credit | J.P. Morgan | T: +44 (0) 207 742 6951 | M: +44 (0) 7929 361 429 | graham.holden@jpmorgan.com

From: Tannour, Vincent
Sent: 16 November 2016 10:06
To: Holden, Graham; Benameur, Ilias
Subject: RE: Enidac legal agreements

Thx Graham. It is well understood.

From: Holden, Graham
Sent: Wednesday 16 November 2016 10:57
To: Benameur, Ilias; Tannour, Vincent
Subject: RE: Enidac legal agreements

Thanks Ilias,

C3/C4/C5/C6 etc are different levels of credit approval authority – the higher the number the more senior the credit officer. So in this instance we need to seek C4 approval (i.e. approval at a credit officer with at least C4 authority, Michael has C5 and so can approve anything at or below this required authority level). Most of the other credit officers on the floor (Jon, Carlos, Christoph, etc.) have C3 authority and so cannot approve.

Michael's approval will be sufficient to sign off.

Regards,
Graham

Graham Holden | Emerging Markets | Credit | J.P. Morgan | T: +44 (0) 207 742 6951 | BB: +44 (0) 7092 451 429 | graham.holden@jpmorgan.com

From: Benameur, Ilias
Sent: 16 November 2016 09:48
To: Holden, Graham; Tannour, Vincent
Subject: RE: Enidac legal agreements

Yes, to risk approved
We attached approvals from EMEA, US and Brazil.
I am unable to find the confirmation from APAC, so will ask to provide the in writing confirmation

Could you please confirm what do you mean by "there is no C4"?

Many Thanks
Best regards
Ilias

From: Tannour, Vincent [Touch Vincent Email   Morgan Brazil-EM settlement counterparty]
Sent: [...]

[Primary contact: Renata Hernandez  T: +55 11 65 54 27 | vincent.tannour@jpmorgan.com]

From: Holden, Graham
Sent: 16 November 2016 10:01
To: Tannour, Vincent; Benameur, Ilias
Subject: RE: Enidac legal agreements

Ilias has now signed off on will be sending onto Michael for approval.

Ilias – guidur can you confirm that product risk has signed off on this? I gather their approval is also required prior to CMAC. Thanks!

Graham Holden | Emerging Markets | Credit | J.P. Morgan | T: +44 (0) 207 742 6951 | BB: +44 (0) 7929 361 429 | graham.holden@jpmorgan.com

From: Tannour, Vincent
Sent: 15 November 2016 18:44
To: Holden, Graham; Benameur, Ilias
Subject: RE: Enidac legal agreements

Tell me if you need me to call Michael at some point.
Rgds
Vincent

From: Holden, Graham
Sent: mardi 15 novembre 2016 19:06

Confidential Discovery Material

To: Tanner, Vincent; Beneman, Ilan
Subject: RE: Easdor legal agreements

I have set an email to confirm afternoon recommending approval and desiring our sign off as required before the CDMC on Thursday. If the approvers it will need sign off from Michael Rutledge (CSI as Jon only) has CI authority. I will keep you both posted – aware the timeline is tight here.

Graham Holden | D: +44 (44) 20 (chans) | Credit | J.P. Morgan | T: +44 (0) 207 742 6951 | M: +44 (0) 7920 242 4291 graham.holden@jpmorgan.com

[Redacted-Privileged]

Graham,

Kgds
Vincent

From: Yuen, Olivia E
Sent: Tuesday, November 15, 2016 12:33 PM
To: Beneman, Ilan; Holden, Graham; Melhac, Aurore
Cc: Bennett, Jonathan R; Cheng, Janez E; Tanner, Vincent
Subject: RE: Easdor legal agreements

Hi Graham.

[Redacted-Privileged]

Best regards,

Olivia

Sent with Good Work (www.blackberry.com)

From: Beneman, Ilan <Ilan.beneman@jpmorgan.com>
Date: Tuesday, 15 Nov 2016, 7:24 PM
To: Holden, Graham <graham.holden@jpmorgan.com>, Yuen, Olivia E <olivia.e.yuen@jpmorgan.com>, Melhac, Aurore <aurore.melhac@jpmorgan.com>
Cc: Bennett, Jonathan R <jonathan.r.bennett@jpmorgan.com>, Cheng, Janez E <janez.e.cheng@jpmorgan.com>, Tanner, Vincent <vincent.tanner@jpmorgan.com>
Subject: RE: Easdor legal agreements

Graham,
I do not have the answer for this specific case but I would that, from a general standpoint, clients regulated it by policy

Olivia,
Are you able to respond to this question?

Many Thanks
Best regards,
Ilan

[Ilan Beneman | D: +44 (44) (chans) | Credit | J.P. Morgan | T: +44 (0) 207 742 6451 | M: +44 (0) 7920 242 4171]

**Redacted-Privileged**

From: Holden, Graham
Sent: 15 November 2016 (11)3
To: Melhac, Aurore; Yuen, Olivia E
Cc: Bennett, Jonathan R; Cheng, Janez E; Beneman, Ilan; Tanner, Vincent
Subject: RE: Easdor legal agreements

Best regards,
Graham

Graham Holden | D: +44 (44) (chans) | Credit | J.P. Morgan | T: +44 (0) 207 742 6951 | M: +44 (0) 7920 242 4291 graham.holden@jpmorgan.com

From: Melhac, Aurore
Sent: 15 November 2016 09:27
To: Yuen, Olivia E; Holden, Graham
Cc: Bennett, Jonathan R; Cheng, Janez E; Beneman, Ilan; Tanner, Vincent
Subject: RE: Easdor legal agreements

Hi Olivia,

[Redacted-Privileged]

Confidential Discovery Material

Many thanks,

Best regards,

Aurore

Aurore Melfreac | Associate Vice President Senior Counsel Legal Transaction | Treasury Services legal | J.P. Morgan | 25 Bank Street, Canary Wharf, London | t +44 (0) 207 742 6430 | aurore.melfreac@jpmorgan.com | jpmorgan.com

From: Yuen, Olivia E.
Sent: 15 November 2016 04:07
To: Holden, Graham
Cc: Bennett, Jonathan E; Melfrac, Aurore; Chang, Janice E; Benjamin, Zlan; Tannery, Vincent
Subject: RE: Esdier legal agreements

Hi Graham,

The client's request to remove the contractual lien language from the set-off clause is quite a common request/negotiation point. Once we have approval from product, risk and legal, then it will be presented to CDAC for approval.

Once approved, we will also add the following language: "All common law and statutory rights of the Bank, and all contractual rights granted under any other agreement with the Bank, in each case whether relying now or in the future, with respect to liens or security interests in the Accounts and/or credit funds therein are expressly preserved.", which will address the concern that the removal of the contractual item will impact other agreements. We will no longer have common law liens and security interests, but JPM will retain the applicable common law and statutory rights of set-off, lien or security interests, if any.

Also, we have proposed for additional language to the client and the client has accepted and not requested other changes to the set-off clause. So hi, in APAC I have not seen request for removal of contractual lien not being approved. Aurore, please let us know if otherwise in EMEA.

Happy to discuss if you have further questions.

Best regards,

Olivia

Olivia E. Yuen | Assistant Vice President, Senior Counsel | GTS Legal APAC | J.P. Morgan | 107 One Space East, 38 Hennessey Road, Wanchai, Hong Kong | T: +852 2800 6303 | F: +852 2921 9438 | olivia.e.yuen@jpmorgan.com |

From: Bennett, Ilan
Sent: Monday, November 14, 2016 02:44 PM
To: Holden, Graham; Yuen, Olivia E; Tannery, Vincent
Cc: Bennett, Jonathan E; Melfrac, Aurore; Chang, Janice E
Subject: RE: Esdier legal agreements

Hi Graham,

As discussed, we have started the GAT negotiation following the wire of the Jacob management business in Thailand, which is our Hpt TS business with Esdier (except one legacy entity in the US), so we have no existing documents that we can leverage.

Esdier HQ is in the negotiation.

Negotiation here are only valid for TS GAT.

Olivia is best place to provide the rationale of Esdier request when it comes to the lien negotiation.

Olivia,

Could you please come back to Graham ASAP, otherwise it will be challenging to get to CDAC this Thursday.

Graham needs this into to ask for C4 approval

Many Thanks
Best regards
Ilan

From: Holden, Graham
Sent: 14 November 2016 20:21
To: Yuen, Olivia E; Benjamin, Zlan; Tannery, Vincent
Cc: Bennett, Jonathan E
Subject: RE: Esdier legal agreements

Olivia,

By way of introduction, I work in the Credit team in London covering Esdier.

A couple of questions I had for you:
1. How will the amendment of the set off in the GAT impact the interaction with the other agreements that we sign into, if at all? (U.S. & APAC cash conc agreements, addendums, etc.?)
2. Have you seen removal of this lien before for agreements of this nature or is this something that is generally not negotiated?

Vincent / Ilan, it would be very helpful to know what is driving this request from Esdier, i.e. at HQ or local level? What is the rationale behind doing so? If we assess, we will be unsecured credit, do we have any sort of MTM / confirmation from Esdier that these entities do not grant security elsewhere? It is important for us to know the materiality of the amount of debts that we are junior to.

Thanks,
Graham

3

Confidential Discovery Material

JPMC_EMTC_0007045

Graham Haddon < D.>;<'nt 1+J H<<i('>nt | < < < | J.K. Morgan T: +44 (0) 207 742 6711 | BB: +44 (0) 7702 211 429 | graham.haddon@jpmorgan.com

**From:** Richards, Jonathan P
**Sent:** 08 November 2016 15:47
**To:** Hoban, Graham
**Subject:** FW: Escaler: legal agreements

Graham - see below. Have you been in the loop on this ?

**From:** Tanneur, Vincent <Vincent.Tanneur@jpmorgan.com>
**Sent:** 04 Nov 2016, 1:43 pm
**To:** Auer, Christoph <Christoph.Auer@jpmorgan.com>; Richards, Jonathan P <jonathan.p.richards@jpmorgan.com>
**Cc:** Borromeo, Illan <illan.borromeo@jpmorgan.com>
**Subject:** RE: Escaler: legal agreements

Christoph, Jon,

You will find here below a summary of legal docs negotiation in the context of the implementation of cash management in Thailand for Escaler. This negotiation has been carried out in APAC to coordination with EMEA and the US, to make sure we cover the future development of cash management with Escaler, in particular expecting an RFP for the US in 2017, and account opening in Lille for Escaler International.

The set of clause has been preserved in the GAT but the firm has been amended and we are seeking for CS approval now that Legal has given its green light. Given the constraining of Escaler and the last we maintain the set off clause, I am rather supportive, it will ultimately go to CDAC.

Please feel free to give us a call.

Rgds

Vincent

**From:** Borromeo, Illan
**Sent:** Mardi 8 novembre 2016 11:43
**To:** Tanneur, Vincent
**Subject:** Escaler: legal agreements

Hi Vincent,

Please find below some background about Legal negotiation with Escaler.
Following the mandate on the cash management business in Thailand, we have started to negotiate the legal docs with Escaler HQ.
Given Escaler Thai entities require accounts in the US and in Thailand, we had have to negotiate the docs both in APAC and in the US.

Finally given the ambition we have with Escaler globally and on-going pipeline (HQ, US, Thailand, Brazil, India...), we have taken the opportunity of that business negotiation, to try negotiating harmonized docs globally, which will avoid to non negotiations later on. I we manage to get standard for cash management business in other countries.
The negotiation was managed by the APAC legal team but in coordination with EMEA and US legal. Legal approval in the 3 regions have been obtained.

The negotiation with the client has been concluded and we have negotiated the below docs:

- GAT
- US addendum
- US cash concentration agreement
- US addendum
- APAC addendum
- APAC cash concentration agreement

Following the negotiation of the above docs, I understand from legal that we need to present the GAT to global CDAC, please find language has been negotiated.
However beyond the CDAC, are also need to collect CS approval.

If it helps, see below and attached the amended set off clause of the GAT, which include the wording on the firm

4.     Set Off.

The Bank may at any time, without putative to any other rights which it may have, and without prior notice or demand for payment, combine, consolidate or merge all or any of the Accounts of the Customer or the Customer with any of its or any of the Accounts maintained by the Customer in the Bank or any of its ... and may, if such Bank set-off or claim as is in such respect for, and whatsoever currency, apply or set-off any or any of the proceeds standing to the Customer in the Bank or any of its ... affiliates. The Bank shall be entitled to access the Majority of any sum standard of the firm for the purposes of the Section the Bank, ... if the sum then is between or in relation in outside as it complete necessary. The Customer grants to the Bank in form and way and over any money held in the Bank, with respect to how ... it any ... such to any other money held or the Bank, and ... all ... if any group account any ... any other agreement with the Bank, in such... in Customer in the Bank, in Customer in the Bank... with respect to how it relates to the Accounts which funds were on express provided.

You will also find attached the draft version of the CDAC memo which indicates the Legal analysis.
Let me know if you need additional information.

Many Thanks
Best regards
Illan

**From:** Tanneur, Vincent
**Sent:** 07 Nov 2016 22:14
**To:** Borromeo, Illan
**Cc:** Richards, Elizabeth X
**Subject:** RE: Escaler: legal agreements

Buddy not sure if at the proposed verbiage and it has has or has not been approved / Discussed. Lets discuss as I'm OOO on client meeting on the west coast. For what entities are they asking it? Ehy do we need US risk approval?

Illan Borromeo < D.>;<'nt 1+J H<<i('>nt | < < < | J.K. Morgan T: +44 (0) 207 742 6711 | BB: +44 (0) 7702 211 429 | illan.borromeo@jpmorgan.com

Sent with Good Work (www.blackberry.com)

Confidential Discovery Material

JPMC_EMTC_0009844

From: Brennan, Eliav <Eliav.brennan@jpmorgan.com>
Date: Monday, Nov 07, 2016, 13:22
To: Tabone, Rodrigo M <rodrigo.m.tabone@jpmorgan.com>
Subject: Re: Esafor legal agreements

Hi Rodrigo,

I did not have time to call you on this.

In the view of global CDMC for Esafor (non standard terms), we would need to obtain TS (sia approval) in the US since we have amended the wording on the lien

Could you help us obtain this?
Global CDMC is planned for thursday and theoretically, we need to complete the form by tuesday end

Juluz [Redacted-Privileged]

Let me know if you need additional information

Thanks
Eliav

From: Riley, Julia A
Sent: Monday, November 07, 2016 08:45 PM
To: Yuen, Olivia E; Benamara, Blanc Nichole, Aurore
Cc: Tabone, Rodrigo M; Tomboc, Vincent; NeoSwin, Eksabee; APAC CCL Contracts; HongratanaluAchai, Phroon
Subject: RE: Esafor legal agreements

(Olivia) [Redacted-Privileged]

# Redacted-Privileged

Julia A. Riley

Senior Counsel | JP Morgan Chase Bank N.A. | 25 S. Dearborn | floor 6.161.0236|Oceago.illinois 60623 3200 |+1-312-3-3 3091 | julia.a.riley@jpmchase.com

From: Yuen, Olivia E
Sent: Saturday, November 05, 2016 5:07 AM
To: Riley, Julia A; Benamara, Blanc, Nichole, Aurore
Cc: Tabone, Rodrigo M; Tomboc, Vincent; NeoSwin, Eksabee; APAC CCL Contracts; HongratanaluAchai, Phroon
Subject: RE: Esafor legal agreements

Hi all,

# Redacted-Privileged

Best regards,

Olivia

Olivia & Yuen | Associate Vice President - Senior Counsel | CCB TS Legal APAC | J.P. Morgan | 33/F One (Land Exc, 18 Westlands East, Limited Exc, Hong Kong | T: +852 2800 6881 | F: +852 2103 9483 | olivia.yuen@jpmorgan.com

From: Riley, Julia A
Sent: Saturday, November 05, 2016 4:09 AM
To: Benamara, Blanc, Yuen, Olivia E; NeoSwin, Aurore; HongratanaluAchai, Phroon
Cc: Tabone, Rodrigo M; Tomboc, Vincent; NeoSwin, Eksabee; APAC CCL Contracts
Subject: RE: Esafor legal agreements

Thanks Blan.

Julia A. Riley

Senior Counsel | JP Morgan Chase Bank N.A. | 25 S. Dearborn | floor 6.161.0236|Oceago.illinois 60623 3200 |+1-312-3-3 3091 | julia.a.riley@jpmchase.com

Confidential Discovery Material

**Redacted-Privileged**

From: Eremenko, Dan
Sent: Friday, November 04, 2016 10:33 AM
To: Riley, Julia A; Yven, Olivia E; Holker, Aurore; Horgoitzandvilchel, Phroon
Cc: Tekion, Rodrigo M; Tanneur, Vincent; Menteseni, Elsabetz; APAC CCL Contracts
Subject: RE: Esskin legal agreements

Many thanks
Best regards
Illian

**Redacted-Privileged**

From: Riley, Julia A
Sent: 04 November 2016 11:48
To: Yven, Olivia E; Holker, Aurore; Horgoitzandvilchel, Phroon
Cc: Tekion, Rodrigo M; Tanneur, Vincent; Menteseni, Elsabetz; APAC CCL Contracts
Subject: RE: Esskin legal agreements

Olivia,

I'll take a look at this my time Friday morning.

**Redacted-Privileged**

Julia A. Riley

From: Yven, Olivia E
Sent: Friday, November 04, 2016 8:43 AM
To: Eremenko, Dan; Holker, Aurore; Riley, Julia A; Horgoitzandvilchel, Phroon
Cc: Tekion, Rodrigo M; Tanneur, Vincent; Menteseni, Elsabetz; APAC CCL Contracts
Subject: RE: Esskin legal agreements

Hi Illan,

I will do this and get it to you by tomorrow.

Olivia

Sent with Good Work (www.blackberry.com)

From: Eremenko, Illan
Sent: Friday, 04 Nov 2016 3:34 PM
To: Yven, Olivia E; Holker, Aurore; Riley, Julia A; Horgoitzandvilchel, Phroon
Cc: Tekion, Rodrigo M; Tanneur, Vincent; Menteseni, Elsabetz; APAC CCL Contracts
Subject: RE: Esskin legal agreements

Thanks Aurore.

**Redacted-Privileged**

Olivia,

**Redacted-Privileged**

From: Holker, Aurore
Sent: 04 November 2016 14:30
To: Yven, Olivia E; Eremenko, Illan; Riley, Julia A; Horgoitzandvilchel, Phroon
Cc: Tekion, Rodrigo M; Tanneur, Vincent; Menteseni, Elsabetz; APAC CCL Contracts
Subject: RE: Esskin legal agreements

Olivia, Illan,

Happy to discuss

Best regards,

Aurore

Confidential Discovery Material

JPMC_EMTC_00078948

Aurore Mathas | Associate Vice President and Senior Counsel | Treasury Services Legal | J.P. Morgan |25 Bank Street, Canary Wharf, London E14 5JP |Tel: +44 (0) 207 742 6630 | aurore.mathas@jpmorgan.com | jpmorgan.com

From: Yum, Olivia E.
Sent: 04 November 2016 12:14
To: Bonamano, Elan; MathAc, Aurore; Riley, Julia A; Hongratanaka'uha, Phiroon
Cc: Telecris, Rodrigo H; Tunnew, Vincent; Marchesin, Elisabete; APAC CCL Contracts; TS Transactions Legal
Subject: RE: Equilar: legal agreements

Hi Elan,

I will review again tomorrow and get back to everyone.

Olivia

Sent with Good Work ([www.blackberry.com](www.blackberry.com))

From: Bonamano, Elan <Elan.bonamano@jpmorgan.com>
Sent: Friday, 04 November 7:45 PM
To: Yum, Olivia E. <olivia.e.yum@jpmorgan.com>; MathAc, Aurore <aurore.mathas@jpmorgan.com>; Riley, Julia A <julia.a.riley@jpmorgan.com>; Hongratanaka'uha, Phiroon <phiroon.hongratanaka'uha@jpmorgan.com>
Cc: Telecris, Rodrigo H <rodrigo.h.telecris@jpmorgan.com>; Tunnew, Vincent <vincent.tunnew@jpmorgan.com>; Marchesin, Elisabete <elisabete.marchesin@jpmorgan.com>; APAC CCL Contracts <apac.ccl.contracts@jpmorgan.com>; TS Transactions Legal <TS_Transactions_Legal@restricted-list.msg>
Subject: RE: Equilar: legal agreements

Olivia,

# Redacted-Privileged

Many thanks
Best regards
Elan

From: Bonamano, Elan <Elan.bonamano@jpmorgan.com>
Sent: 03 November 2016 11:01
To: Yum, Olivia E. <olivia.e.yum@jpmorgan.com>; MathAc, Aurore; Riley, Julia A; Hongratanaka'uha, Phiroon
Cc: Telecris, Rodrigo H; Tunnew, Vincent; Marchesin, Elisabete; APAC CCL Contracts; TS Transactions Legal
Subject: RE: Equilar: legal agreements

Hi Elan and Phiroon,

Hi Julia and Aurore,

# Redacted-Privileged

Thanks,

Best regards,

Olivia

Olivia E Yum | Assistant Vice President, Senior Counsel | GB TS Legal APAC | J.P. Morgan | 3/F Asia Tower, Chater Road, Central, Hong Kong | T: +852 2800 6843 | F: +852 2503 9431 | olivia.e.yum@jpmorgan.com

## Redacted-Privileged

From: Bonamano, Elan
Sent: Thursday, November 03, 2016 5:43 PM
To: Yum, Olivia E.; Cheng, Jeanjy E; Monstpira; Eisabet; Hongratanaka'uha, Phiroon
Cc: Telecris, Rodrigo H; Madhac, Aurore; Tunnew, Vincent
Subject: RE: Equilar: legal agreements

# Redacted-Privileged

Many Thanks
Best regards
Elan

Confidential Discovery Material

JPMC_FinTC_0001649

From: Yum, Olivia E
Sent: 03 November 2016 10:35
To: Benamara, Titan; Chong, Janice E; Marchesini, Elisabete; Hongvitanakula(kia), Phenom
Cc: Talaron, Rodrigo H; Malhie, Aurore; Tameur, Vincent
Subject: RE: Esidor: legal agreements

**Redacted-Privileged**

Best regards,

Olivia

From: Benamara, Titan
Sent: Thursday, November 03, 2016 5:30 PM
To: Yum, Olivia E; Chong, Janice E; Marchesini, Elisabete; Hongvitanakula(kia), Phenom
Cc: Talaron, Rodrigo H; Malhie, Aurore; Tameur, Vincent
Subject: RE: Esidor: legal agreements

Thanks Olivia.

**Redacted-Privileged**

Brice,
When do we stand re Rodri?
At 1:30am approved at CDMC

Many Thanks
Best regards
Titan

From: Yum, Olivia E
Sent: 03 November 2016 10:29
To: Benamara, Titan; Chong, Janice E; Marchesini, Elisabete; Hongvitanakula(kia), Phenom
Cc: Talaron, Rodrigo H; Malhie, Aurore; Tameur, Vincent
Subject: RE: Esidor: legal agreements

Hi Titan,

I will get it out before end of week.

Best regards,

Olivia

Olivia E Yuen | Executive Vice President, Senior Counsel | OB TS Legal AMC | J.P. Morgan | 237 One Bank East, 78 Wandsworth Road, Lyon? East, Hong Kong | T: +852 2800 6803 | F: +852 2115 9438 | olivia.e.yuen@jpmorgan.com

From: Benamara, Titan
Sent: Thursday, November 03, 2016 5:27 PM
To: Yum, Olivia E; Chong, Janice E; Marchesini, Elisabete; Hongvitanakula(kia), Phenom, Yum, Olivia E
Cc: Talaron, Rodrigo H; Malhie, Aurore; Tameur, Vincent
Subject: RE: Esidor: legal agreements

**Redacted-Privileged**

Hi Janice,
Ok for me, depending on the timing.
Phenom, Olivia,

Many Thanks
Best regards
Titan

From: Chong, Janice E
Sent: 03 November 2016 05:40
To: Benamara, Titan; Marchesini, Elisabete; Hongvitanakula(kia), Phenom; Yum, Olivia E
Cc: Talaron, Rodrigo H; Malhie, Aurore; Tameur, Vincent
Subject: RE: Esidor: legal agreements

**Redacted-Privileged**

Regards,

Janice

Confidential Discovery Material

**From:** Beneventi, Illan
**Sent:** Tuesday, October 25, 2016 5:28 PM
**To:** Mathison, Elisabet; Chong, Janice E; Horgos Tanakulabal, Phroson; Yuen, Dixie E
**Cc:** Taledo, Rodrigo H; Meltre, Aurore; Tanner, Vincent
**Subject:** RE: Essler: legal agreements

Thanks Bore.

Such timing is perfect, so we can have the global COMC the week after.
Please keep up posted.

Princess Chiola,

Redacted-Privileged

Many Thanks
Best regards
Illan

**From:** Mathison, Elisabet
**Sent:** 24 October 2016 11:39
**To:** Beneventi, Illan; Chong, Janice E; Horgos Tanakulabal, Phroson; Yuen, Dixie E
**Cc:** Taledo, Rodrigo H; Meltre, Aurore; Tanner, Vincent
**Subject:** RE: Essler: legal agreements

Hi Illan

Redacted-Privileged

Right
Best

**From:** Beneventi, Illan
**Sent:** 24 October 2016 10:33
**To:** Mathison, Elisabet; Chong, Janice E; Horgos Tanakulabal, Phroson; Yuen, Dixie E
**Cc:** Taledo, Rodrigo H; Meltre, Aurore; Tanner, Vincent
**Subject:** RE: Essler: legal agreements

Redacted-Privileged

Many Thanks
Best regards
Illan

**From:** Chong, Janice E
**Sent:** 21 October 2016 15:23
**To:** Beneventi, Illan; Horgos Tanakulabal, Phroson; Yuen, Dixie E
**Cc:** Mathison, Elisabet; Taledo, Rodrigo H; Meltre, Aurore; Tanner, Vincent
**Subject:** RE: FW: Essler: legal agreements

Regards,

Janice

**From:** Beneventi, Illan
**Sent:** Tuesday, October 11, 2016 11:46 AM
**To:** Chong, Janice E; Horgos Tanakulabal, Phroson; Yuen, Dixie E
**Cc:** Mathison, Elisabet; Taledo, Rodrigo H; Meltre, Aurore; Tanner, Vincent
**Subject:** RE: FW: Essler: legal agreements

Hi Janice,

Redacted-Privileged

JPMC_SMTC_0001931

Confidential Discovery Material

# Redacted-Privileged

Re the legal analysis, will defer to Olivia.

Hope this helps.
Regards,
Ilan

From: Chong, Janice E
Sent: Monday, October 10, 2016 05:14 PM
To: Benenson, Ilan; Hongvatanakul/xoa, Phroon; Yuen, Olivia E
Cc: Huchbock, Elodee
Subject: RE: FW: Esskler: legal agreements

Copying Janice, who is responsible for global CDMC.

Janice,
Could you please let us know when the next global CDMC (if the objective is to go shortly.

Olivia,

## Redacted-Privileged

Many thanks.
Best regards,
Ilan

[line of redacted text]

From: Hongvatanakul/xoa, Phroon
Sent: 07 October 2016 09:57
To: Yuen, Olivia E
Cc: Benenson, Ilan
Subject: RE: FW: Esskler: legal agreements

Hello Olivia,

You are welcome Olivia.                                Thank you very much.

Hello Ilan,

## Redacted-Privileged

When shall we bring this to CDMC? Thank you very much.

Regards,
Phiroon.

From: Yuen, Olivia E
Sent: Friday, October 07, 2016 2:53 PM
To: Hongvatanakul/xoa, Phroon
Cc: Benenson, Ilan
Subject: RE: FW: Esskler: legal agreements

Thanks Phiroon.

Ha has it been sent yet for this global CDMC?

Olivia

From: Yuen, Olivia
Sent: Friday, October 07, 2016 3:26 PM
To: Hongvatanakul/xoa, Phroon; Yuen, Olivia E

Confidential Discovery Material

JPMC_EMTC_00076932

18

Cc: Benemans, Elan
Subject: FW: FW: Easler: legal Agreements

for Olivia in Legal.

JPMC Internal Use Only

From: Hooymans@lubuluba, Phroon
Sent: Friday, October 27, 2016 3:13 PM
To: Benemans, Elan; Yuen, Olivia
Subject: RE: FW: FW: Easler: legal agreements

Hello Illan, Olivia,

# Redacted-Privileged

Regards,
Phiroon.

From: Benemans, Elan
Sent: Thursday, October 06, 2016 3:55 PM
To: Yuen, Olivia E; Hooymans@lubuluba, Phiroon
Cc: Songsanian, Tan-Teewin; Heikhac, Aurore; Chodorex, Frederique X; Tanneur, Vincent; Takeiros, Rodrigo M; Hornchorn, Elisabete; Dunq, Janice E; Seforyen, Anna
Subject: RE: FW: FW: Easler: legal Agreements

Hi Olivia, Phiroon,

## Redacted-Privileged

Bete,
Here is the latest redline version of the CsA that has been agreed with Easler.
If you need a clean version, Olivia should be able to provide it.

Janice,
Could you please share the CEMC template to the team in case they do not have it.

Many Thanks
Best regards
Illan

From: Benemans | Studip Senwin | <mailto:Bene.Banemans@jpmorgan.com>
Sent: [redacted]
To: [redacted]

From: Benemans, Elan
Sent: 18 September 2016 12:52
To: Yuen, Olivia E; Hooymans@lubuluba, Phiroon
Cc: Songsanian, Tan-Teewin; Heikhac, Aurore; Chodorex, Frederique X; Tanneur, Vincent; Takeiros, Rodrigo M; Hornchorn, Elisabete; Dunq, Janice E; Seforyen, Anna
Subject: RE: FW: FW: Easler: legal Agreements

All,

We finally completed the legal negotiations with Easler on all the docs globally (APAC, US and EMEA).

Thanks so much for your help on this!

We need now to present this to global CEMC for approval.

Phiroon,
Given the urgency at this stage especially for that estates, could you please start preparing the memo.

Olivia,

## Redacted-Privileged

Bete,
Are CsA's applicable to East or do you have different docs?
Who is the TS legal leads/?

Thanks
Illan

From: Benemans, Elan
Sent: Tuesday, September 27, 2016 06:53 AM
To: 'Bene@easler.ai' <Bene@easler.ai>
Cc: Yuen, Olivia E; Songsanian, Tan-Teewin; Heikhac, Aurore; 'marketh@easler.ai' <marketh@easler.ai>; 'buyer@easler.ai' <buyer@easler.ai>; Chodorex, Frederique X; Hooymans@lubuluba, Phiroon; Tanneur, Vincent

Confidential Discovery Material

JPMC_EMTC_00078955

Subject: Re: FW: Esidor: legal agreements

Thanks Audrey,

This is a great news!
We will know yet formal proposal from our management globally and we'll confirm to you once obtained.

Once done, we will send you clean version of the agreed docs.

Regards
Illan

From: Audrey FELD [mailto:feldefrançke.it]
Sent: Tuesday, September 27, 2016 09:42 AM
To: Benenson, Illan
Cc: Tran, Dinn E; Senguanaut, Tan-Teven; Helhac, Aurore; Nicolas MORAT <nicolas@esidor.fr>; François LAIGLE <laigle@esidor.fr>; Chalonea, Frederique X
Subject: RE: FW: Esidor: legal agreements

Dear Illan,

Apologies for not receiving sooner. I confirm I am fine with the changes and that we can close the documentation.

With kind regards,

Audrey

Audrey FELD
Responsable of the Able Juridique
Head of Legal Division
SG LEGAL DEPARTMENT NATIONAL SA
Tel : +33 (0) 1 57 64 96 73
Fax : +33 (0) 1 49 77 42 05
E-mail : feldefrançke.it

2016-09-AZ 11:56 GMT+02:00 Beneman, Illan <illan.beneman@jpmorgan.com>:

Hello Audrey,

Hope you're well and that you had a good summer break.
Could you please confirm that the about 17.5 below is agreeable to Esidor, so we can close the legal negotiation.

Please let me know should you have any comments.

Best regards
Illan

From: Beneman, Illan
Sent: 27 July 2016 11:58
To: 'Audrey FELD'
Cc: Nicolas MORAT; Chalon, Bertrand A; Tran, Dinn E; Senguanaut, Tan-Teven; Helhac, Aurore
Subject: RE: FW: Esidor: legal agreements

Hi Audrey,

Please see below our comments re the close 17.5 and find attached the draft GAT updated.

17.5    Both the Bank and The Customer represents and warrants that it shall comply with applicable laws and regulations. The Bank is required to act in accordance with Bank policies, the laws and regulations of various jurisdictions relating to the prevention of money laundering and the prevention of sanctions, including but not limited to regulations issued by the U.S. Office of Foreign Assets Control. The Bank is not obligated to execute payment orders or effect any other transaction where the beneficiary or other payer is a person or entity with whom the Bank is prohibited from doing business by any law or regulation applicable to the Bank, or in any case where compliance would, in the Bank's opinion, conflict with applicable law or banking practice or its own policies and procedures. Where the Bank does not execute a payment order or effect a transaction for such reasons, the Bank may take: any action required by any law or regulation applicable to the Bank including, without limitation, freezing or blocking funds. Transaction screening may result in delays in the posting of transactions and/or funds availability. In this context, the Bank may need freeze the Customer to make changes to the activity in the Customer's Accounts, including if necessary to cease and desist from using the Accounts for particular types of transactions or for transactions involving particular parties from time to time. The Customer agrees to comply with such restrictions.

I hope this version will be suitable for Esidor. If not, let's organise a call to draw this out.

Please let us know
Many thanks
Best regards
Illan

From: Audrey FELD [mailto:feldefrançke.it]
Sent: 10 July 2016 10:42
To: Beneman, Illan
Cc: Nicolas MORAT; Chalon, Bertrand A; Tran, Dinn E; Senguanaut, Tan-Teven
Subject: RE: FW: Esidor: legal agreements

Dear Illan,

Confidential Discovery Material

JPMC_ESMT2_0007804

Please find attached my modifications to article 17.5.

I accept the majority of the proposed wording with some slight modifications. In the interest of time, it maybe easier to set up a call to finalize?

With kind regards,

Audrey

**Audrey FELD**
*Responsable de Pôle Juridique*
*Head of Legal Division*
ESSILOR INTERNATIONAL, SA
Tel - +33 (0) 1 72 94 88 72
Fax - +33 (0) 1 49 77 43 05
E-mail: felda@essilor.fr

2016-06-09 6:19 GMT+02:00 Besancon, Illan <illan.besancan@jpmorgan.com>:
Hi Audrey,

Please find attached our revised mark up for the GAT.

Please do not hesitate to contact us should you have any queries

Many Thanks
Best regards
Illan

From: Audrey FELD [mailto:felda@essilor.fr]
Sent: 17 May 2016 12:12
To: Besancon, Illan
Cc: Inoeko HUART; Couds, Bertrand A; Yuen, Olivia E; Siriputsod, Teh-Tawn
Subject: Re: PO: Essilor legal agreements

Dear Illan,

I apologize for not reverting earlier.

I am sorry to revisit regarding clause 17.5 but:

a) we are a large international group and customer has a fairly large definition, I must insist on a wording that provides at least that this guarantee is subject to our best knowledge.

b) would it be possible to specify why we have you indicated in your comments that this right to request access and delete is directly related to global money laundering legislation and for transactions that could trigger JP's liability in the context of such legislation. We want to avoid such an extra huge clause that could also trigger liability or any failure in which by law however you would support no real damages from this default.

With kind regards,

Audrey

**Audrey FELD**
*Responsable de Pôle Juridique*
*Head of Legal Division*
ESSILOR INTERNATIONAL, SA
Tel - +33 (0) 1 72 94 88 72
Fax - +33 (0) 1 49 77 43 05
E-mail: felda@essilor.fr

2016-05-10 11:47 GMT+02:00 Besancon, Illan <illan.besancan@jpmorgan.com>:
Hi Audrey,

I hope you are well.
I trust you have been able to review all the docs attached.
Could you confirm that you are fine with the wording of all documents?

Many Thanks
Best regards
Illan

From: Besancon, Illan
Sent: 29 January 2016 11:41
To: Audrey FELD
Cc: Inoeko HUART; Arnault GETZINGER; Couds, Bertrand A; Yuen, Olivia E; Atkkerputsorn, Navedol
Subject: Essilor legal agreements

Hi Audrey,
Please find attached the revised version of the GAT for your review. This GAT version has been reviewed and agreed by our legal teams in IOS, APAC and Europe, as these will have one single agreement which will be applicable in the 3 regions.
The only clause where we cannot agree the same wording for all 3 regions is the clause 17.5. Given Essilor's expected changes can only be accepted in APAC, we have materialized Essilor required changes in the Thailand addendum (and not in the GAT) which supercede the GAT. You will then also find attached the redline version of Thailand. The other terms of Thailand have not been modified and remain identical to what has been previously agreed with you.

Confidential Discovery Material

Moreover, you will find attached the clean versions of the other agreements that have already been agreed with Earlier.

* APAC cash concentration

* US cash concentration agreement

* US Addendum

I have also attached the UK Addendum, for your review in case we need to open accounts in London at some point.

Please let us know if you have any queries and in case needed, we remain available for a call.
Many Thanks
Best regards
Illan

[signature block — illegible small text]

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email

Confidential Discovery Material

JPMC_EMTC_00078656

Redacted-Privileged

Confidential Discovery Material

JPMC_EMTC_00076957

# EXHIBIT 3

Message

| | |
|---|---|
| **From:** | Benamara, Illan [illan.benamara@jpmorgan.com] |
| **Sent:** | 5/15/2015 3:48:39 PM |
| **To:** | Renato PESTANA [pestanar@essilor.fr] |
| **CC:** | Arnault GITZINGER [gitzinga@essilor.fr] |
| **Subject:** | Essilor: legal doc review |
| **Attachments:** | Essilor- 2013 GAT- CLIENT v1-3.docx; ESSILOR- APAC SWEEP CLIENT v1-2.docx |

Hi Renato, Arnault,

Please find attached the feedback from our legal team, on the GAT and the APAC sweep agreement, for your review.
I will also send you shortly the US addendum for the accounts to be opened at JPM NY, so you can review it as well.

In addition to the above, would you have any legal comments on the other docs provided earlier and that will be part of the implementation project.

Please let me know.
Best regards
illan

---

**illan BENAMARA |**  V.P Relationship Manager | Treasury Services
J.P. Morgan | 14, Place Vendôme · 75001 Paris – France | T: +33 (0)1 40 15 44 51 | M: +33 (0)7 78 69 33 82 | illan.benamara@jpmorgan.com

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email

# Account Terms

## INTRODUCTION

This document (the "Account Terms"), contains the general terms, conditions and other disclosures for the accounts and services selected by the Customer and constitutes an agreement between the Bank and the Customer. References to "the Bank", when used in the Account Terms, shall mean **JPMorgan Chase Bank, N.A.**, and any of its affiliates or subsidiaries. References to the "Customer" in the Account Terms mean the governmental, nonprofit, or business entity to which the Bank, as an independent contractor, provides accounts and services. All accounts subject to the Account Terms are, regardless of their location, referred to in this document as "Accounts". The Account Terms may be supplemented or amended by existing or future agreements, terms, conditions and notices, including, but not limited to any terms contained in an account application, country addendum, signature card or similar document for an Account or arrangements regarding specific types of Accounts or services ("Services") offered by the Bank, as described herein or which by their terms ("Service Terms") are subject to the Account Terms. By signing the signature card, account application or similar document or by using or continuing to use any of the Accounts or Services, the Customer agrees to the Account Documentation (as defined hereinafter) and such supplements, amendments, agreements, terms, conditions, notices or Service Terms, as applicable.

> This provision was revised to make sure customers are aware that they are deemed to accept any changes to the country addenda (in addition to the GAT or Service Terms) by signing the signature card/account application or similar document or by continuing to use any Account/Service.
>
> The proposed amendment was made to enhance clarity and to align with other documents of the Bank.

The Accounts established with the Bank are subject to the Account Terms and relevant Account documentation, which shall include jurisdiction specific provisions set forth in an account application or country-specific addendum for the jurisdiction in which the Accounts are held (collectively, "Account Documentation"). The Customer shall not transfer any of its rights and obligations in an Account or with respect to a Service, or create any form of security interest over such rights and obligations in an Account, without the prior written consent of the Bank.

The Account Terms or Service Terms may vary applicable law or regulation to the maximum extent permitted under any such law or regulation. Any provision of applicable law or regulation that cannot be varied shall supersede any conflicting term of the Account Terms or Service Terms.

## 1.   Authorized Persons.

1.1    The Bank is authorized to rely upon any document submitted by or on behalf of the Customer, subject to the Bank's satisfaction, that indicates the person authorized to act on behalf of the Customer ("Authorized Person") with respect to the Accounts and Services, until the authority for such Authorized Person is withdrawn by the Customer upon written notice to the Bank, and the Bank has had a reasonable opportunity to act on the termination instruction. The Customer will provide specimen signatures of such Authorized Person to the Bank in the manner requested by the Bank.

> - Client request to add "provided by the Customer" after the word "document" in the first sentence is not agreeable. - see counterproposal above.

1.2    Each Authorized Person, subject to any written limitation provided by the Customer and received by the Bank, is authorized on behalf of the Customer to: open, operate and close Accounts; overdraw Accounts as permitted by the Bank; appoint and remove Authorized Persons; execute or otherwise agree to any form of agreement relating to the Accounts or Services, including, without limitation, Account Documentation; execute guarantees, indemnities or other undertakings to the Bank in relation to guarantees, letters of credit or other financial transactions, or in relation to missing documents; draw, accept, endorse or discount checks, drafts, bills of exchange, notes and other financial instruments ("Items"); receive materials related to security procedures; and give instructions ("Instructions"), including, without limitation, requests and payment orders, by means other than the signing of an Item, with respect to any Account transaction. Without limitation, such Instructions may be given singly or otherwise regarding: (i) the payment, transfer or withdrawal of funds by wire, computer or other electronic means, or otherwise; (ii) money, credits, items or property at any time held by the Bank for account of the Customer; or (iii) any other transaction of the Customer with the Bank.

> - Client request to delete "and accepted" in the first sentence is not acceptable. The acceptance on the Bank's part is to review the Bank's ability to comply with the written limitations.

1.3    If the Customer provides the Bank with facsimile signature specimens, or if the Customer issues Items with a facsimile signature on one or more occasions, the Bank is authorized to pay Items signed by facsimile signature (including, but not limited to, computer generated signatures) if the actual or purported facsimile signature, regardless of how or by whom affixed, reasonably resembles the specimens filed with the Bank by the Customer, or reasonably resembles a specimen facsimile signature otherwise employed for the Customer's benefit.

UEY (04 16 2015)v.1-3

> - Client request to add "markedly" before "resembles" in the above clause is not acceptable- see counterproposal above.

1.4  The Customer represents that, prior to submitting any document or information, including through any electronic transmission, which designates the persons authorized to act on the Customer's behalf, including as a user of the Bank's electronic access systems, the Customer shall obtain from each individual referred to in such document all necessary consents to enable the Bank to process the data set out therein for the purposes of providing the Service.

## 2.  Instructions; Security Procedures.

2.1  The Bank and the Customer may from time to time agree upon a security procedure to be followed by the Customer upon the issuance of an Instruction and/or by the Bank upon the receipt of an Instruction, so as to enable the Bank to verify that such Instruction is effective as that of the Customer.  A security procedure may require the use of algorithms or other codes, identifying words or numbers, encryption, call back procedures or similar security devices.  It is understood that such security procedure is designed to verify the authenticity of, and not to detect errors in, Instructions.  The Customer agrees to safeguard such security procedure and to make it available only to persons duly authorized.  Any Instruction, the authenticity of which has been verified through such security procedure, shall be effective as that of the Customer, whether or not authorized.  An authenticated SWIFT or host-to-host (secure communications channel for data transfer) message issued to the Bank in the name of the Customer shall be deemed to have been given by an Authorized Person.  The Customer shall be bound by and adhere to the security procedures for use of the Service advised to it in writing or electronically by the Bank, as may be revised from time to time upon notice to the Customer.

> - Client request to agree on a security procedure now- details to be incorporated into an Appendix is not acceptable.
> - JPM may introduce additional internal controls and new procedures from time to time, therefore we need the language to be flexible.

2.2  If the Customer, other than with respect to security procedures, chooses to confirm an Instruction, any confirmation must be clearly marked as such, and, if there is any discrepancy between an Instruction and a confirmation, the terms of the Instruction shall prevail.  Subject to Section 5.6, the Bank may, at its option, use any means to confirm or clarify any request or Instruction, even if any agreed security procedure appears to have been followed.  The Bank is not obligated to confirm any Instructions.  If the Bank is not satisfied with any confirmation or clarification, it may decline to honor the Instruction.

> - Client request for changes below in 2nd sentence of clause above is not acceptable.
> - "Subject to Section 5.6, the Bank shall use any means to confirm or clarify any request or Instruction, even if any agreed security procedure appears to have been followed.  The Bank is not obligated to confirm any Instructions."
> - JPM needs to retain flexibility in deciding on how or when to confirm an Instruction as JPM is not obligated to confirm any Instructions.  For example, there are situations where JPM may decide from time to time to change the callback limit for manual instructions, or make two callbacks to different persons for the same Instructions or not callback because it is an inter-account transfer.

2.3  This Section 2.3 shall govern arrangements where the Customer authorizes the Bank to allow a third party (a "Third Party") to access and provide Instructions against an Account, including, without limitation, to initiate payments and transfers against an Account.  The Customer may request that the Bank provide access to an Account to a Third Party by submitting an access request in a form acceptable to the Bank (an "Access Request").

(a)  The Customer confirms that the Third Party, as set forth in the Access Request, is authorized by the Customer to issue Instructions to the Bank and to access and receive balance and transaction information (including without limitation account statements, information reporting and transaction advices) in relation to an Account via any method of communication, including but not limited to the Bank's electronic channels, facsimile transmission, in writing, by telephone and SWIFT (each a "Delivery Method").

(b)  Subject to the Third Party's completion of appropriate documentation (as may be required by the Bank), the Third Party may issue Instructions and access the Account as contemplated hereunder.  The Bank is authorized to act upon any Instruction that it receives from the Third Party on behalf of the Customer, regardless of the identity of the individual transmitting the Instruction and without any further authority from or reference to the Customer, provided that the Instruction is verified pursuant to the agreed upon security procedures, and notwithstanding that the Instruction may result in an overdraft of an Account.  The Customer acknowledges that the Bank is authorized to act upon any Instructions purported to be given by any signatory of the Third Party who has been nominated by the Third Party in a form acceptable to the Bank, and such signatory of the Third Party shall be deemed an Authorized Person with respect to the provisions of these Account Terms relating to the use of Accounts and the giving of Instructions with respect to the Accounts.  The Bank is authorized to act upon any Instructions received via any of the SWIFT BIC codes specified in an Access Request whether or not such SWIFT BIC codes are associated with the Customer or the Third Party.

(c)   Instructions given by the Third Party with respect to an Account pursuant to the terms of this Section 2.3 shall be deemed to be Instructions or communications given on behalf of the Customer for all purposes of these Account Terms.

(d)   The Customer may revoke an Access Request at any time by giving the Bank written notice of such revocation.  The notice of revocation shall be sent to the address of the Bank officer or service representative managing the Account or to any other address notified by the Bank to the Customer from time to time. The Bank shall have a reasonable time to act on any notice received.

## 3.    Deposits.

3.1   All Items deposited or cashed are received for collection only, and are received subject to final payment.  The Bank may agree with other banks and clearing houses to vary procedures regarding the collection or return of Items, and deadlines to the extent permitted by applicable law or practice.  The Bank chooses the method of collecting Items and may use other banks in the process.  The Bank will present Items in accordance with the custom and practice of the jurisdiction in which the Items are collected.  The Bank is not responsible for actions taken by other banks, nor for the loss or destruction of any Item in the possession of other banks or in transit.  The Customer agrees to use commercially reasonable efforts to assist the Bank in locating or obtaining replacements of Items lost while in the Bank's possession.

- Client request to insert sentence below after first sentence is not acceptable.

"The Bank shall prior notify the Customer the names of the banks thus selected to assist in the collection. Customer shall be allowed to reject the choice of the banks thus selected subject to reasonable motives."

- JPM has in place existing corresponding relationships with other banks for paper and electronic instruments. It is a commercial decision for JPM and one that is transparent to our clients. JPM's choice of correspondent bank is not subject to client approval.

- JPM is agreeable to client's request to insert "commercially" before reasonable efforts as tracked above.

3.2   Credits and deposits to an Account will be available in accordance with the Bank's availability policy and in accordance with applicable laws.  If the Bank credits an Account: (i)  in contemplation of receiving funds for the Customer's credit and those funds are not actually received by the Bank, or (ii) in reliance on a transaction which is subsequently returned, reversed, set aside or revoked, or if the Bank does not receive funds for the Customer's credit for value on the date advised by or on behalf of the Customer, or if final settlement is not received by the Bank for any reason, then the Bank shall be entitled to debit any Account of the Customer with the amount previously credited and/or with any other charges incurred, even if doing so creates or increases an overdraft.

3.3   If an Item is processed by the Bank on a collection basis, the Bank may defer credit or payment for a reasonable time, in accordance with its practices, without dishonor; and the Bank shall not be obligated thereon until it has remitted final payment.

## 4.    Payment of Items.

4.1   The Bank is authorized to pay any Item drawn on the Account, in accordance with the Bank's usual procedures, including, without limitation, any item that purports to be a substitute check.  The Bank is authorized to debit the Account on which the Item is drawn on the day the Item is presented, certified or accepted, or at such earlier time that the Bank receives notice by electronic or other means that an Item drawn on an Account has been deposited for collection.  The Bank may determine Account balances in order to decide whether to dishonor an Item for insufficient funds at any time between receiving such presentment or notice and the time of the return of the Item, and need make no more than one such determination.

JPM is not agreeable to client's request below:

"The Bank is authorized to pay any Item drawn on the Account, in accordance with the security procedures as agreed upon between the Parties and attached in Appendix [   ], including, without limitation, any item that purports to be a substitute check."

- Client's request is not applicable as there are standard industry-wide clearing procedures that JPM follows when clearing/honouring a check and it is not security procedures per se that are to be agreed with client.

4.2   The Bank is authorized to pay all Items presented to it or cashed at the Bank, regardless of amount and without inquiry as to the circumstances of issue, negotiation or endorsement or as to the disposition of proceeds, even if drawn, endorsed or payable to cash, bearer or the order of the signer or any Authorized Person or to a lender in payment of that individual's obligations.

4.3   The Customer shall immediately notify the Bank if it becomes aware that any Items (whether completed or blank) are lost or stolen. The Customer shall not use its Account to allow any third party to issue checks or otherwise use the Account unless specifically agreed to in writing by the Bank. The Customer shall not issue Items that are post-dated, and the Bank shall not be liable for any damages caused by premature payment or certification of a post-dated Item.  Further, the Customer shall not put any condition, restriction or legend on any Item, and the Bank is not required to comply with any such condition, restriction or legend.

4.4     The Bank may process any Item by electronic means. All Items the Customer draws against any Account must comply with the Bank's check specifications and image standards, published from time to time, and industry standards and security procedures as described in Appendix [ ] of the Agreement. The Bank shall not be liable for damages or losses due to any delay or failure in procuring, collecting or paying Items not conforming to such specifications or standards, except to the extent such losses or damages are the direct result of the Bank's gross negligence or willful misconduct.

> JPM is not agreeable to client's request below:
>
> "All Items the Customer draws against any Account must comply with the Bank's check specifications and image standards, published from time to time, and industry standards and security procedures as described in Appendix [ ] of the Agreement."
>
> • As stated in 4.1 above, client's request is not applicable as there are standard industry-wide clearing procedures and internal procedures that JPM follows when clearing/honouring a check and it is not security procedures per se that are to be agreed with client.

## 5.    Funds Transfer Instructions.

5.1     The Customer may issue funds transfer Instructions against Accounts, subject to the Bank's acceptance. Funds transfer Instructions will be received, processed and transmitted only on the Bank's funds transfer business day, and within the Bank's established cut-off hours on such days. Communications requesting cancellation or amendment of payment orders must be received at a time and in a manner affording the Bank a reasonable opportunity to act on the communication. The Customer may reverse, amend, cancel or revoke any Instructions only with the consent of the Bank and the beneficiary's bank. The Bank will debit the Account for the amount of each funds transfer Instruction accepted by the Bank, and the Customer authorizes the Bank to debit the Account for all fees associated with any funds transfer Instruction, including debit and credit processing charges, or to otherwise deduct such fees from the amount of the payment order. In processing the funds transfer, other banks may deduct fees from the payment order issued to them. No restrictions upon the acceptance of funds transfer Instructions by the Bank or upon the Accounts that the Bank may debit shall be binding unless agreed to by the Bank in writing. The Bank shall not be required to inquire into the circumstances of any transaction.

5.2     Notwithstanding any Instructions by the Customer to the contrary, the Bank reserves the right to use any funds transfer system and any intermediary bank in the execution of any funds transfer Instruction and may otherwise use any means of executing the funds transfer Instruction which the Bank deems reasonable in the circumstances.

5.3     In connection with any funds transfer, the Bank and other financial institutions may rely upon the identifying number of the beneficiary, the beneficiary's bank or any intermediary bank included in the funds transfer Instruction. Also, the beneficiary's bank in the funds transfer Instruction may make payment on the basis of the identifying number even though it identifies a person different from the named beneficiary. Accordingly, the Customer shall be responsible for the consequences of any inconsistency between the name and identifying number, as instructed, of any party in such a funds transfer Instruction.

5.4     If the Bank accepts a funds transfer Instruction issued in (i) the Customer's name for payment in a currency (the "Non-Account Currency") other than the currency (the "Account Currency") of the Account or (ii) a Non-Account Currency where the Customer is the beneficiary, the Bank is authorized (unless otherwise agreed in writing and subject to any restrictions under applicable law or regulations) to enter into a foreign exchange transaction with the Customer to convert the relevant amount of Non-Account Currency into an amount of Account Currency at a foreign exchange rate and spread, and at such date and time, as the Bank determines in its discretion. In the case of an Instruction for payment in a Non Account Currency, the Bank is authorized to debit the Account for the converted amount of Account Currency. The applicable foreign exchange rate may differ from rates at which comparable transactions are entered into with other customers or the range of foreign exchange rates at which the Bank otherwise enters into foreign exchange transactions on the relevant date. Any such foreign exchange transaction will be between the Bank and the Customer as principals, and the Bank will not be acting as agent or fiduciary for the Customer.

Notwithstanding any prior action or course of dealing, subject to applicable law and regulations, the Bank has no obligation to cancel, reverse or otherwise buy back foreign currencies purchased by the Customer under a Service and the Bank makes no commitment to buy back currencies. The Customer acknowledges that it may not be able to sell back certain foreign currencies once purchased.

5.5     If the Customer elects to settle foreign exchange transactions by draft, the Customer acknowledges and agrees that in the event the draft is not presented for payment within one hundred eighty (180) calendar days from the date of issuance, the Bank, subject to any restrictions under applicable law or regulations, shall have the right to cancel the draft, and the Customer authorizes the Bank to reconvert the funds and re-credit the Customer's Account in- the Account Currency at a foreign exchange rate and spread, and at such date and time, as the Bank determines in its discretion. If the remitter is no longer a customer of the Bank, the Bank may, in its discretion, transfer balances to an unclaimed moneys account, or issue a cashier's check, sending it to the address of the Customer on the books and records of the Bank. In the event that the payee, holder or other third party claims against the Bank on a cancelled draft, the Customer agrees that it shall be responsible for any losses in connection with such cancellation, including any amount recredited or otherwise paid to the Customer. The Customer acknowledges and agrees that applicable service charges and expenses, including stop payment and periodic maintenance fees, may be charged to the Customer's Account or otherwise deducted from the amount to be paid to the Customer.

5.6     Unless the Customer and the Bank have agreed in writing to an alternate security procedure, the authenticity of oral or written (including those transmitted by facsimile) funds transfer Instructions may, at the Bank's discretion, be verified by telephonic call-back confirmation with an

Authorized Person. The Customer agrees that this security procedure is commercially reasonable for such Instructions. The Customer further agrees to be bound by such funds transfer Instructions, whether or not authorized, if issued in the name of the Customer using such security procedure.

Client request the following changes:

"Unless the Customer and the Bank have agreed in writing to an alternate security procedure, the authenticity of oral or written (including those transmitted by facsimile) funds transfer Instructions shall be verified by telephonic call-back confirmation with an Authorized Person whose authority has been evidenced by remittance of a corporate document and to any other security procedure as detailed in Appendix [ ] ."

- JPM is not agreeable to client's request to change "may, at the Bank's discretion" to "shall". JPM verifies Instructions through a number of security procedures. Telephonic call back confirmation is only one method.

- JPM is not agreeable to client's request to add "whose authority has been evidenced by remittance of a corporate document and to any other security procedure as detailed in Appendix [ ]" at the end of the clause. In APAC, the authorized person is listed in the account opening form (submitted by client during on-boarding).

## 6.   Interest; Fees; Taxes.

6.1   The Bank may pay interest on certain balances in interest-bearing Accounts at a rate determined by the Bank. The Bank may adjust interest paid (or principal, if permitted by law) and/or impose any charges on time deposit Accounts or fixed term Accounts from which withdrawals are made prior to maturity. Early withdrawal charges may require a reduction in the principal amount if the amount of accrued and unpaid interest on the deposit is less than the charge. Where the Bank makes a payment of interest to the Customer, the Bank is authorized to deduct or withhold any sum on account of any tax required, or which in its view is required, to be so deducted or withheld or for which it is in its view liable or accountable by law or practice of any relevant revenue authority of any jurisdiction and in each case in accordance with the Bank's usual and customary business practice and the Bank shall pay the net amount of the interest to the Customer. To the extent market interest rates are negative, the rate applied by the Bank to interest-bearing Accounts may be negative, in which case the Customer may be required to make a negative rate payment, which the Bank shall also be entitled to collect by debiting the Account.

Client request to add language below:

"The Bank may pay interest on certain balances in interest-bearing Accounts at a rate determined by the Bank and prior agreed with the Customer."

- JPM is not able to agree to interest rate with client prior to paying interest. It is based on market conditions and we notify client through one way communication of the rates.

In light of recent developments in market interest rates (For e.g. the EUR market interest rates have fallen below zero), this provision needed to be revised (see above tracked language).

6.2

(a)   The Bank may impose, charge, pass-through and modify fees and/or charges for Accounts and Services provided by the Bank, including, but not limited to, transaction, maintenance, balance-deficiency, and service fees and other charges, including those levied by any governmental authority and taxes (collectively "Fees"). The Customer will pay all Fees. The Bank may from time to time receive commission, rebate or similar payments from other banks or third parties which may derive from a portion of the Fees ultimately borne by the Customer. The Bank may debit any Account for Fees, whether or not such debit may result in an overdraft of the Account.

Client request to add language below.

"The Bank may impose, charge, pass-through and modify fees and/or charges for Accounts and Services provided by the Bank, including, but not limited to, transaction, maintenance, balance-deficiency, and service fees and other charges, including those levied by any governmental authority and taxes (collectively "Fees") provided that the Fees are prior validated with the Customer."

- JPM is not able to validate the Fees with client prior to charging the Accounts. For examples, there are government stipulated prices /taxes or correspondent bank fees which we would not be getting prior validation from the client. The Fees would most likely be made known to the client through a communication.

(b)   All payments (inclusive of, but not limited to, Fees and interest on overdrafts) from the Customer to the Bank shall be in full, without set-off or counterclaim, and free of any deduction or withholdings related to any tax or other claim, unless a deduction or withholding is required by law. If any deduction or withholding is required by law in respect of any payment due to the Bank, the Customer shall:

(i)  ensure that the deduction or withholding is made;

(ii)  pay the full amount deducted or withheld applicable authority in accordance with the applicable law;

(iii)  if the payment is to be made by the Customer, increase the payment in respect of which the deduction or withholding is required so that the net amount received by the Bank after the deduction or withholding shall be equal to the amount which the Bank would have been entitled to receive in the absence of any requirement to make any deduction or withholding; and

(iv)  deliver to the Bank, within thirty days after it has made the payment to the applicable authority, a certified copy of the original receipt issued by the authority, evidencing the payment to the authority of all amounts required to be deducted or withheld.

6.3  In addition to any Fees or other amounts due, the Customer will pay or reimburse the Bank for any taxes (including, but not limited to, value added taxes, sales taxes and similar taxes), levies, imposts, deductions, charges, stamp, transaction and other duties and withholdings (together with any related interest, penalties, fines, and expenses) in connection with the Account or Services (including payments or receipts to an Account) except if imposed on the overall net income of the Bank. The Customer will provide the Bank such documentation, declarations, certifications and information as the Bank may require in connection with taxation and warrants that such information is true and correct in every respect and shall immediately notify the Bank if any information requires updating or correction.

## 7.  Account Statements.

The Bank will issue Account statements, confirmations, or advices ("Account Statements") at the frequency and in the manner advised to the Customer from time to time. The Customer is responsible for ensuring that an Authorized Person promptly examines each Account Statement and any accompanying Items which it receives or is made available to it by the Bank, and reporting any irregularities to the Bank in writing, including any claim of improper or unauthorized funds transfer activity. The Bank shall not be responsible for the Customer's reliance on balance, transaction or related information that is subsequently updated or corrected or for the accuracy or timeliness of information supplied by any third party to the Bank. Internet Account Statements or electronic Account Statements, if applicable, shall be deemed by the Customer and the Bank to be available to the Customer when the Account Statements are posted on the Internet and the Bank sends an electronic mail notification of availability to the Customer, or when the Bank sends the electronic Account Statement to the Customer. For purposes of determining when an Item is sent to the Customer, an image of an Item or information identifying the Item (i.e. Item number, amount and date of payment) is a sufficient substitute for the actual Item.

## 8.  Overdrafts.

8.1  The Bank may debit the Account even though the debit may bring about or increase an overdraft. Unless otherwise agreed in writing, any overdraft shall be immediately due and payable by the Customer to the Bank. If the Bank permits an overdraft, the Bank is authorized to charge interest on the amount of the overdraft (as per agreed rates) as long as the overdraft is outstanding, at the rate determined by the Bank, up to the maximum rate permitted by law at the time of the overdraft or at the specific rate agreed in writing between the Customer and the Bank. Subject to applicable laws and regulations, interest shall remain applicable to any negative balance in the Account notwithstanding closure of the Account and/or termination of these Account Terms. Whether or not the Bank pays an Item that brings about or increases an overdraft, the Bank may deduct the applicable fees and expenses from the Account without notice. Unless agreed in writing, the Bank is under no obligation to permit any overdraft or to continue to permit overdrafts after having permitted an overdraft, notwithstanding any prior action or course of dealing.

- • JPM is agreeable to client request to add language above.
- • JPM will negotiate a specific rate with client.

8.2  When Items and other debits to the Account are presented to the Bank for payment on the same day and there are insufficient available funds in the Account to pay all of these transactions, the Bank may choose the order in which it pays transactions, including, without limitation, the largest transaction first or any other order determined by the Bank, in its sole discretion.

## 9.  Set Off.

The Bank may at any time, without prejudice to any other rights which it may have, and without prior notice or demand for payment, combine, consolidate or merge all or any of the Accounts of the Customer or may retain, apply or set off any money, deposits or balances held in, or standing to the credit of, any Account in any currency towards payment of any amount owing by the Customer to the Bank or any of its affiliates. The Bank shall be entitled to accelerate the maturity of any time deposit or fixed term deposit. For the purposes of this Section the Bank may effect currency conversions at such times or rates as it may think reasonable and may effect such transfers between any Accounts as it considers necessary. . All common law and statutory rights of the Bank, and all contractual rights granted under any other agreement with the Bank, in each casewhther existing now or in the future, with respect to liens or security interests in the Accounts and/or funds therin are expressly preserved.

- • Client request for addition of mutual set-off rights language below is not acceptable to JPM:

"Respectively, Customer may at any time and without prejudice to any other rights which it may have, and without prior notice or demand for payment, combine, consolidate or merge all or any of its Accounts, may retain, apply or set off any money, deposits or balances held in, or standing to the debit of any Account in any currency towards payment of any amount owing by the Bank or its

UEY (04 16 2015)v.1-3

> affiliates to the Customer. Customer shall be entitled to accelerate the maturity of any time deposit or fixed term deposit. For the purposes of this Section, Customer may discharge its obligations to the Bank in the currencies of the credit balances in the Accounts."
>
> - Client to provide us with rationale for requesting mutual right to set-off.
>
> - Client request for deletion of contractual lien/security interest language is acceptable (subject to internal approval), if replaced with highlighted language above.
>
> - **SUBJECT TO INTERNAL APPROVAL**

## 10. Agents; Information.

**10.1  Confidential Information.**  The Bank agrees to take customary and reasonable measures to maintain the confidentiality of Customer confidential information.  The Customer authorizes the Bank and its affiliates to disclose Account opening documentation, information with respect to any Account or Service, any banking transaction, and the Customer itself, including Customer confidential information, in order to provide the services under the Account Terms, Account Documentation and Service Terms, for compliance with legal and regulatory requirements, and for the Bank's operational purposes, risk management and compliance with internal policies: (i) to unaffiliated third parties, including the transmission of information to other banks and clearing houses and through channels and networks operated by third parties, and to agents of the Bank, (ii) to a proposed assignee of the rights of the Bank; (iii) to branches and affiliates of the Bank; (iv) to the auditors, legal advisers and consultants of the Bank, its branches and affiliates; (iv) to the auditors of the Customer; (v) to the Bank's or its affiliates' or the Customer's examiners or other regulators, including tax authorities, law enforcement agencies, courts of competent jurisdiction or other official bodies, anywhere in the world, and (vi) pursuant to subpoena or other court process, or to establish, exercise or defend the legal rights of the Bank and its affiliates.

**10.2  Agents.**  The Bank may retain agents to perform data processing, collection and other services in connection with the Accounts and Services.

**10.3  Offshoring.** Subject to applicable laws, processing of Customer confidential information may be performed by any Bank affiliate, including affiliates, branches and units located in any country in which we conduct business or have a service provider. The Customer authorizes the Bank to transfer Customer Information to such affiliates, branches and units at such locations as the Bank deems appropriate.

**10.4  Consents.**  The Customer represents and warrants that prior to submitting to the Bank information about natural persons related to the Customer (including Authorized Persons, users of the Bank's electronic access systems, officers and directors, employees, beneficial owners, customers or other personnel), the Customer shall have obtained such consents as may be required by applicable law or agreement, for the Bank to process and use the information for purposes of providing the Services.

> Client request to replace entire "Agents; Information" clause with the following "Confidentiality Obligations" clause:
>
> "Confidential Information means, any and all information, data, know-how, concepts and ideas, whether oral or written, recorded, stored or held by any electronic, mechanical, photographic or computerized process or by any other means (i) concerning the business or operations of any Party or (ii) relating to the existence, negotiations on, or the contents of this Agreement.
>
> Each Party undertakes to the other Party:
>
> a) at all times to keep and treat as strictly confidential the Confidential Information;
>
> b) not to communicate or disclose at any time to any person any Confidential Information without the prior written consent to do so from the other Party;
>
> c) not to use any of the Confidential Information for any purpose other than the intended purpose this Agreement; and
>
> d) to procure that any person to whom any Confidential Information is disclosed by it, complies with the restrictions and confidentiality obligations contained in this Article 10, as if such person were a party to this Agreement.
>
> For the purposes of this Article, information will not be deemed to be Confidential Information if such information (i) becomes generally ascertainable from public or published information other than by reason of a default of the relevant Party (or its directors or its employees) or (ii) is independently developed by the relevant Party or (iii) proves to have been known to the receiving Party or any of its affiliates prior to disclosure by the disclosing Party under this Agreement.
>
> Moreover, either Party may disclose any Confidential Information:

a) if and to the extent disclosure of that Confidential Information is required by mandatory law, pursuant to a court order, or for the purposes of enforcing this Agreement. It being agreed that the relevant Party shall notify the other in advance of such occurrence and shall take all available measures to protect the Confidential Information;

b) if and to the extent disclosure is required by any securities exchange or regulatory or governmental body to which that Party is subject. It being agreed that the relevant Party shall notify the other in advance of such occurrence and shall take all available measures to protect the Confidential Information;

c) to its directors and employees to the extent required in order to perform and discharge on behalf of that Party the provisions of this Agreement provided that any such person is duly informed of the confidentiality undertakings, set out in this article;

d) to its professional advisers, auditors, and bankers provided they have a duty to keep such information confidential; or

Notwithstanding a termination of this Agreement the provisions of this article will continue to bind each Party indefinitely from the date of termination.

- JPM is not agreeable to insert confidentiality provision above. JPM is a highly regulated financial institution that has restrictions on how it can disclose information by law and/or regulation depending on the jurisdiction. Additionally, JPM has obligations to disclose certain information to governmental authorities. Please see Section 1.4 of the Bank's Code of Conduct: www.jpmorganchase.com/corporate/About-JPMC/code-of-conduct.htm which addresses how employees are to protect the client's confidential information.

- JPM to counter-propose insertion of new 2015 GAT clause 10 above which has a confidentiality provision.

- Client to provide rationale for their concern- to see if we can address their concern by proposing alternative language to our standard provision.

## 11. Liability Limitation; Force Majeure.

11.1    The Bank, its agents, employees, officers and directors, shall not be liable for any damage, loss, expense or liability of any nature which the Customer may suffer or incur, except to the extent of direct losses or expenses attributable to the gross negligence or willful misconduct of the Bank, its agents, employees, officers or directors.  The Bank, its agents, employees, officers and directors shall not, in any event, be liable for indirect, special, consequential or punitive loss or damage of any kind (including, but not limited to lost profits), whether or not foreseeable, even if the Bank, its agents, employees, officers or directors have been advised of the likelihood of such loss or damage, and regardless of whether the claim for loss or damage is made in negligence, gross negligence, for breach of contract or otherwise; provided, however, that the foregoing shall not apply to the extent such loss or damage is caused by fraud on the part of the Bank, its agents, employees, officers or directors.

Client request for the following modifications to clause above:

"The Bank, its agents, employees, officers and directors, shall not be liable for any direct or indirect (capped at [ ]) damages, loss, expense or liability of any nature which the Customer may suffer or incur, except to the extent of direct losses or expenses attributable to the gross negligence or willful misconduct of the Bank, its agents, employees, officers or directors.  The Bank, its agents, employees, officers and directors shall not, in any event, be liable for consequential or punitive loss (including, but not limited to lost profits),  and regardless of whether the claim for loss or damage is made in negligence, gross negligence, for breach of contract or otherwise; provided, however, that the foregoing shall not apply to the extent such loss or damage is caused by fraud on the part of the Bank or its agents, employees, officers or directors."

- JPM is not agreeable to client requested changes above. JPM will not be liable for any indirect losses and JPM does not agree to setting a cap above which JPM will be liable for direct and indirect losses.

11.2    Neither the Bank nor the Customer shall be liable for any loss or damage to the other for its failure to perform or delay in the performance of its obligation resulting from an act of God, act of governmental authority, de jure or de facto, legal constraint, war, terrorism, catastrophe, fire, flood or electrical, computer, mechanical or telecommunications failure, or failure of any agent or correspondent, or unavailability of a payment system, or any cause beyond its reasonable control.

Client request changes below:

"Neither the Bank nor the Customer shall be liable for any loss or damage to the other for its failure to perform or delay in the performance of its obligation resulting from an act of God as such term is usually understood under the governing law."

- JPM is unable to accept client's requested changes. In the context of this section, JPM will not be able to perform due to force majeure reasons and due to force majeure matters its agents or correspondents will not be able to perform and should not be liable.

**12. Indemnity.**

The Customer agrees to indemnify and hold the Bank, and its agents, employees, officers and directors, harmless from and against any and all claims, damages, demands, judgments, liabilities, losses, reasonable costs and expenses (including attorneys' fees) resulting directly or indirectly from: (i) the Bank's acceptance or execution of any request or direction, including, without limitation, Items and Instructions (a) issued in the name of an Authorized Person, (b) issued in accordance with the agreed upon security procedures or (c) on which the Bank is otherwise permitted to rely; (ii) the Bank's payment of any taxes, interest or penalty otherwise due from the Customer paid on the Customer's behalf, or for which the Bank has no responsibility under the Account Terms; or (iii) any action taken by the Bank in accordance with or as contemplated by Section 2.3 of these Account Terms. Notwithstanding the foregoing, the Bank shall not be indemnified for any damages resulting directly from its own gross negligence, willfull misconduct, or fraud.

---

The client requested changes below:

"The Customer agrees to indemnify and hold the Bank, and its agents, employees, officers and directors, harmless from and against any and all damages, liabilities, losses, reasonable costs and expenses (including attorneys' fees), save cases of fraud, willful misconduct or gross negligence; resulting directly or indirectly from: (i) the Bank's acceptance or execution of any request or direction, including, without limitation, Items and Instructions (a) issued in the name of an Authorized Person, (b) issued in accordance with the agreed upon security procedures or (c) on which the Bank is otherwise permitted to rely; (ii) the Bank's payment of any taxes, interest or penalty otherwise due from the Customer paid on the Customer's behalf, or for which the Bank has no responsibility under the Account Terms; or (iii) any action taken by the Bank in accordance with or as contemplated by Section 2.3 of these Account Terms.

- JPM is not agreeable to deletions of claims, demands and judgements.
- JPM is agreeable to insertion of "reasonable" before costs.
- JPM proposes alternate language above.

---

**13. Notices.**

All Account Statements and notices may be sent to the Customer by ordinary mail, courier, facsimile transmission, electronic transmission (including but not limited to SWIFT communication), through internet sites, or by such other means as the Customer and the Bank agree upon from time to time, at the address of the Customer on the books and records of the Bank. Unless otherwise arranged, all notices to the Bank must be sent to the Bank officer or service representative managing the Account, and must be sent by ordinary mail, by courier, by facsimile transmission, by electronic transmission or by such other means as the Customer and the Bank agree upon from time to time. The Bank shall have a reasonable time to act on any notices received.

**14. Termination.**

Unless otherwise agreed, either the Bank or the Customer may close an Account or terminate a Service by giving the other party not less than sixty (60) calendar days' prior written notice of intent to close or terminate. Notwithstanding the foregoing, either party may terminate an Account or a Service upon written notice to the other party in the event of: (i) a breach of the Account Terms or Service Terms by the other party; (ii) the other party's inability to meet its debts as they become due, receivership, administration, liquidation, or voluntary or involuntary bankruptcy; or the institution of any proceeding therefore, any assignment for the benefit of the other party's creditors, or anything analogous to the foregoing in any applicable jurisdiction, or a determination in good faith by the terminating party that the financial or business condition of the other party has become impaired; (iii) a determination by the terminating party, in its sole opinion, that termination is necessary or required by law or regulation, or as a result of a court or regulatory agency order or proceeding; or (iv) a good faith belief by the terminating party that the other party is engaged in activities that are inconsistent with the terminating party's policies. The Bank shall have a reasonable opportunity to act upon any termination request. The Bank may (but shall not be obliged to) complete all requests and Instructions received by it prior to receipt of the termination request, in addition to any request or Instruction accepted on the day termination is to become effective. Notwithstanding anything to the contrary in any Service Terms, upon the closing of an Account, all Services linked to such Account are simultaneously terminated (unless otherwise specifically agreed to by the parties) and the Bank's obligations in respect of such Account or Services will terminate. However, any such closing or termination shall not affect the Customer's liabilities to the Bank arising prior to, or on, such closing or termination, all of which shall continue in full force and effect. Interest on overdrafts as provided for in Section 8.1 of the Account Terms shall remain applicable to any negative balances on the Account after termination hereof. In the absence of Instructions from the Customer, the Bank may transfer balances to an unclaimed moneys account, or issue a cashier's check, sending it to the address of the Customer on the books and records of the Bank.

---

- JPM is not agreeable to client's request for 90 days termination notice period instead of 30 days. JPM counter-proposes 60 days.

- JPM is not agreeable to deletion of subclauses (iii) and (iv) as JPM must retain the flexibility to terminate immediately an Account or Service without giving prior written notice to the client in accordance with the number of days agreed, especially if necessary or required by law or regulation or if we have good faith belief that the client is engaged in activities against our own policies.

---

UEY (04 16 2015)v.1-3

## 15. Account Disclosures.

15.1 The Bank may return or refuse to accept all or any part of a deposit or credit to an Account, at any time, and will not be liable to the Customer for doing so, even if such action causes outstanding Items to be dishonored and returned, or payment orders to be rejected. Refused deposits will be returned to the Customer.

15.2 The Bank may refuse to allow a withdrawal from any Account in certain cases including, but not limited to, cases where: (i) there is a dispute about the Account (unless an enforceable court decision or other competent authority has ordered the Bank to allow the withdrawal); (ii) a legal garnishment or attachment is served, including, but not limited to, a levy, restraining notice or court order; (iii) the Account is being used as collateral to secure a debt; (iv) Account Documentation has not been presented; or (v) the Customer fails to pay a Bank loan or other debt or obligation to the Bank on time.

> • Client's requested change is acceptable to JPM.

15.3 Any amount standing to the credit of any Account with the Bank is payable exclusively at a branch in the country at which the Account is held; however, payment may be suspended from time to time in order to comply with any law, regulation, governmental decree or similar order, in any jurisdiction, for the time period affecting the Bank, its officers, employees, affiliates, subsidiaries, agents or correspondents. The Customer acknowledges that deposits held in a branch of the Bank located outside the United States are not payable in the United States and: (i) are not insured by the Federal Deposit Insurance Corporation or any other United States governmental agency; (ii) are subject to cross-border risks; and (iii) have a lesser preference as compared to deposits held in the United States in the event of a liquidation of the Bank.

## 16. Governing Law.

16.1 The Account Terms, the relevant Account Documentation and the rights and obligations of the Customer and the Bank in respect of each Account shall be governed by and construed in accordance with the laws of the country in which the branch holding the relevant Account is located.

16.2 The Customer and the Bank hereby irrevocably waive all right to, and will not seek, trial by jury in any action, proceeding or counterclaim, of whatever type or nature, arising out of these Account Terms or the relationship established hereby. Any claim in connection with Accounts which are the subject of these Account Terms or any Services, unless a shorter period of time is expressly provided, must be brought against the Bank within three (3) years of the occurrence of the cause of action, except as prohibited by applicable law.

> • JPM is agreeable to client request replace two years with three years.
>
> • JPM is not agreeable to add "or discovery" after occurrence because any claim in connection with accounts which are subject to the Account Terms must be brought against the Bank within a defined period of time in order to maximize the availability of documentation and witnesses to assist in the resolution of any dispute. Proposed revision of proposing a time frame of three years from the *discovery* of a cause of action does not create a sufficiently defined period of time.

16.3 In relation to each Account, the courts of the country or state in which the branch of the Bank at which the relevant Account is held shall have exclusive jurisdiction to settle any disputes that arise out of or are connected with the Account Terms, the relevant Account Documentation and/or the relevant Account. This section is for the benefit of the Bank only and does not prevent the Bank from taking proceedings in the courts of any other country or state with jurisdiction including, to the extent allowed by law, concurrently in any number of countries or states.

## 17. Miscellaneous.

17.1 If the Account Terms, Account Documentation, including, without limitation, Service Terms, are translated into, or appear in a language other than English, the English language version shall control.

17.2 The term Bank shall include any successors of the Bank including, without limitation, an assignee or successors of JPMorgan Chase Bank, N.A. or any affiliate or subsidiary of such bank or any person who, under the laws of the jurisdiction of incorporation or domicile, has assumed the rights and obligations of the Bank, affiliate or subsidiary hereunder or to which under such laws the same have been transferred.

> • JPM is not agreeable to client request to add the following sentence at the end of clause above:
> "Such assumption will be prior notified in writing three months in advance to the Customer."
>
> • JPM will not be notifying the client three months prior to transferring of the Bank's rights and obligations.

UEY (04 16 2015)v.1-3

17.3   Any terms of any supplement, amendment, agreement, Service Terms or notice that are inconsistent with a provision of the Account Terms shall supersede the Account Terms' provision for purposes of the particular account or Service which is the subject thereof. The Account Terms supersede and replace any other account conditions previously sent to the Customer.

17.4   Section headings are for convenience only and shall not affect the meaning of the Account Terms. If any provision of the Account Terms shall be held to be illegal, invalid, or unenforceable the validity of the remaining portions of the Account Terms shall not be affected.

17.5   The Customer represents and warrants that it shall comply with all applicable laws and regulations. The Bank is required to act in accordance with Bank policies, the laws and regulations of various jurisdictions relating to the prevention of money laundering and the implementation of sanctions, including but not limited to regulations issued by the U.S. Office of Foreign Assets Control. The Bank is not obligated to execute payment orders or effect any other transaction where the beneficiary or other payee is a person or entity with whom the Bank is prohibited from doing business by any law or regulation applicable to the Bank, or in any case where compliance would, in the Bank's opinion, conflict with applicable law or banking practice or its own policies and procedures. Where the Bank does not execute a payment order or effect a transaction for such reasons, the Bank may take any action required by any law or regulation applicable to the Bank including, without limitation, freezing or blocking funds. Transaction screening may result in delays in the posting of transactions and/or funds availability. The Bank may direct the Customer to make changes to the activity in the Customer's Accounts, including to cease and desist from using the Accounts for particular types of transactions or for transactions involving particular parties from time to time. The Customer agrees to comply with such directions.

> - JPM is not agreeable to client's request to add "material" before laws in the first sentence since any type of qualification would limit our ability to make a claim for misrepresentation or breach of contract for a loss or damage incurred by JPM as a result of the client's misrepresentation.

> Due to the evolving global regulatory environment and changes in regulators' expectations on Financial Institutions to take measures to identify and combat money laundering and terrorist financing, from time to time the Bank may have to require the Customer to cease and desist from using the Accounts for particular types of transactions or for transactions involving particular parties.

17.6   The Bank may change or update these Account Terms, and/or Service Terms or impose other restrictions on the Accounts or Services, as the Bank deems necessary in the course of its business, at any time, by the sending of notice by means of ordinary mail or through electronic channels. Changes to the Account Terms which are required by law may be implemented immediately or as required by law. The Bank may waive any of these Account Terms, but such waiver shall apply only on that occasion. Such waiver shall not constitute a waiver of any other provision of the Account Terms or Account Documentation. Any such waiver shall not affect the Bank's right to enforce any of its rights with respect to other customers or to enforce any of its rights with respect to later transactions with Customer and is not sufficient to modify the terms and conditions of this Agreement. Any amendments to these Account Terms or Service Terms which would increase the Customer's liability or would require any change which would have a material adverse affect on the Customer shall be required to be signed by both parties hereto in order to be effective.

> - Client request to add the following sentence at the end of clause above:
>
> "The Bank may change or update these Account Terms or impose other restrictions on the Accounts or Services, as required, pursuant to legal or market standards, in the course of its business, at any time, by the sending of notice by means of ordinary mail or through electronic channels."
>
> - JPM is not agreeable to the above requested changes but counterproposes highlighted tracked language above.

> In an effort to streamline the Bank's terms and forms, certain general terms applicable to all Accounts and Services are concentrated in the main Account Terms, but applicable to all Accounts and Services (see tracked language above).

17.7   To the extent that the Customer has or hereafter may acquire any immunity (including sovereign, crown or similar immunity) from jurisdiction of any court, suit or legal process (whether from service of notice, injunction, attachment, execution or enforcement of any judgment or otherwise), the Customer irrevocably waives and agrees not to claim such immunity.

> - Client request to delete entire clause 17.7 clause above is unacceptable.
>
> - JPM does not expect that any Customer would seek to utilize a grant of immunity to shield itself from responsibilities under a commercial contract which it has voluntarily entered into with the Bank.

17.8   The Customer agrees at its sole expense: (i) to advise each of its employees, officers, agents or other persons accessing any Service by or on behalf of Customer ("Users") of their obligations under the Account Terms or under any Service Terms or ancillary Service material, including,

but not limited to, the obligation to refrain from using the Service via the Internet in the countries identified by the Bank; and (ii) to provide the Bank with all information reasonably necessary to setup and provide Services for the Customer, including, but not limited to, advising the Bank of the countries from which Users will access any Service via the Internet.  Customer shall promptly provide the Bank with a notice of any claims it receives regarding a Service.

17.9    The Bank or the Customer, at its sole discretion, may make recordings and retain such recordings of telephone conversations between the Customer and the Bank.

17.10   All payment Instructions, whether Items, payment orders or otherwise, are subject to applicable law and payment system rules.

17.11   Subject to provisions in Clause 10, the Bank may retain copies (paper, electronic or otherwise) of any documents or Items relating to the Accounts and Services in a form preserving an image of any such documents or Items, including signatures, or a regular business record and discard the original documents or Items.  The Customer hereby waives any objection to the use of such records in lieu of their paper equivalents for any purpose and in any forum, venue or jurisdiction, including, without limitation, objections arising from the Bank's role or acquiescence in the destruction of the originals.

> - Client request to add the following at the beginning of the clause above:"Subject to confidentiality requirements as set out in Article 10."
> - JPM counterproposes tracked language above.

17.12   All intellectual property rights in or relating to a Service, including any trademarks, service marks, logos, and trade names used in conjunction with a Service are the property of the Bank or its licensors and are protected by applicable copyright, patent, trademark and other intellectual property law.  Except as provided herein, the Customer shall not reproduce, transmit, sell, display, distribute, establish any hyperlink to, provide access to, modify, or commercially exploit in whole or in part any part of a Service, without the prior written consent of the Bank.

> - JPM is not agreeable to client's request to add the following sentence at the end of the clause above:"The same will apply to all intellectual property rights relating to the Client."
> - JPM is not using the client's services and do not see how this may apply.

17.13   To assist in the fight against the funding of terrorism and money laundering activities, applicable law or regulations may require financial institutions to obtain, verify, and record information that identifies each person who opens an account.  What this means for the Customer: When the Customer opens an account, the Bank may ask for the Customer's name, address, date of birth (for individuals), and/or other information and documents that will allow the Bank to identify the Customer.  The Customer agrees that the Bank also may request and obtain certain information from third parties regarding the Customer.  For purposes of this provision, the Customer, to the extent required by law or regulation, shall include any signatory on an Account.  If the Customer fails to provide or consent to the provision of any such information, the Bank may close any Account or discontinue providing any Service without further notice.

17.14   The Customer agrees that the Bank may deliver, make available and/or make accessible terms and conditions applicable to Accounts and Services to the Customer via electronic means and channels (including but not limited to by posting such terms on a Bank website).  The Bank may request that the Customer "click" its approval of such terms.  Subject to applicable law and regulations, the Customer agrees that the act of "clicking" its approval (or any similar act which has the same effect) with respect to any such terms will be evidence of Customer's acceptance of the applicable terms and conditions, to the same extent, and with the same force and effect, as if Customer had manually executed a written version of such terms and conditions.

17.15   To fulfill the Bank's "know your customer" responsibilities, the Bank will request information from the Customer from time to time regarding the Customer's organization, business and, to the extent applicable, persons or entities maintaining bank accounts with the Customer.  The Bank may also request further information and/or documentation in connection with the provision of the Services. Any information and/or documentation furnished by the Customer is the sole responsibility of the Customer and the Bank is entitled to rely on the information and/or documentation without making any verification whatsoever (except for the authentication under the security procedures, as applicable). The Customer represents and warrants that all such information and/or documentation is true, correct and not misleading and shall advise the Bank promptly of any changes and, except as prohibited by applicable law, the Customer agrees to provide complete responses to the Bank's requests within the timeframes specified. Unless prohibited by applicable law, the Customer agrees to promptly disclose to the Bank activity in the Customer's Accounts that is suspicious or violates applicable laws or sanctions.

> The Bank requires additional KYC information from customers as part of its effort to combat money laundering/terrorist financing in view of the latest changes in global regulatory requirements and regulators' expectations.

18. **Disputes over Account Funds.**

The Bank may refuse to pay out any money from an Account until any dispute over the deposits or funds (including, without limitation, any dispute over what persons are authorized to represent or act for the Customer) has been resolved by a court, or by agreement of the parties that is documented to the Bank's satisfaction.  The Bank may file an action in interpleader with respect to any money where the Bank has been notified of disputed claims to that money. If any person asserts that a dispute exists, the Bank is not required to determine whether that dispute has merit in order to refuse to pay funds or interplead the funds.  The Customer agrees to reimburse the Bank for any expenses, including legal and attorneys' fees that the Bank incurs because of any such dispute.

19. **Provisional Recredit.**

In connection with any dispute regarding an Account, the Bank may choose to credit the Account pending completion of the Bank's investigation of the dispute. If the Bank determines that the Customer is not entitled to such credit, then, the Bank may reverse the provisional recredit to the Account, even if that reversal results in an overdraft.



**CASH MANAGEMENT SWEEP AND INTERCOMPANY REPORT SERVICE TERMS (Negotiated)**

The Customer(s) maintain(s) certain account(s) with JPMorgan Chase Bank, N.A., its affiliates and/or any of its subsidiaries, as applicable (the "**Bank**"), listed as either Master Account(s) or Participating Account(s) in the forms relating to the Service.

Under these Service Terms, the Master Account(s) and/or the Participating Account(s) shall be generally/collectively referred to as Accounts, each an "**Account**".

## 1. Sweep Service.

(i) Prior to the effective date of the Sweep Service, the Customer(s) and the Bank shall agree on features of the Sweep Service (the "**Sweep Options**") by way of completion of the implementation form set out in Exhibit A (the "**Implementation Form**"). The finalized copy of the Sweep Implementation Form shall be sent by the Bank to the Customer or the Agent (as defined below, in case of a multiple entity sweep arrangement) for its records.

(ii) Pursuant to the Sweep Service, as of the cut-off times and at the frequency agreed on a day which is a Banking Day (as defined below), the Bank will transfer funds between the Participating Account(s) and the Master Account in accordance with the Sweep Options.

(iii) If the Bank is pre-advised of a credit or debit to an Account, regardless of whether such pre-advice ultimately proves correct, the Bank will not anticipate the pre-advised transaction in calculating the funds to be transferred pursuant to this Sweep Service. A debit to an Account received subsequent to the corresponding cut-off time may result in an end-of-day overdraft in such Account, and Customer(s) shall be liable for the repayment of such overdraft together with interest thereon. A credit to an Account received subsequent to the corresponding cut-off time may result in funds being left in the Account at the end-of-day.

(iv) If, by reason of time zone differences or any other reason, a transfer to an Account is credited before the offsetting debit is made to the corresponding Account, and the Bank is unable to lawfully complete the transfer, the Bank is entitled to reverse such credit by debiting the Account so credited.

(v) No transfer will be made under these Service Terms on, or as of, any day which is not a Banking Day. "Banking Day" means either (a) in relation to cross-border sweeps (i.e. sweeps between Accounts in different locations), the Bank's funds transfer business day in the location of the relevant Master Account and the Participating Account and a day on which funds transfers denominated in the currency subject to the transfer under this Sweep Service may be cleared and settled, or (b) in relation to domestic sweeps (i.e. sweeps between Accounts in the same location), the Bank's funds transfer business day in that location.

(vi) Each Customer appoints the Agent to act on behalf of such Customer for the purpose of: (i) amending or terminating this Sweep Service or the Sweep Options; (ii) adding or removing any Customer from the Sweep Service; (iii) adding or deleting any Accounts hereunder; (iv) receiving or sending notices; and (v) accepting receipt of service of legal process upon any Customer for issues arising under this Sweep Service.

(vii) The Sweep Options may be amended by prior agreement between the Customer and the Bank. The Bank may allow the Customer(s) to request for amendments to the Sweep Options by way of an electronic channel made available by the Bank, and any such requests may be accepted by the Bank in its sole discretion which the Bank may communicate via such electronic channel.

## 2. Overdrafts.

If the Bank permits an overdraft in the Master Account(s) or any Participating Account(s), the Bank is authorized to charge interest (as per agreed rates) on the amount of the overdraft as long as the overdraft is outstanding, at a rate determined by the Bank, up to the maximum rate permitted by law at the time of the overdraft.

> - JPM is agreeable to client request to add language above.
> - JPM will negotiate a specific rate with client.

## 3. Fees.

The Bank may impose, charge, and adjust fees associated with the Service as applicable from time to time. The Customer will pay all fees and charges applicable to the Service. All payments to the Bank shall be in full, without set-off or counterclaim and free of any deduction or withholdings related to any tax or other claim.

## 4. Term; Termination.

The Service may be terminated by a Customer with respect to itself, by the Agent with respect to any one Customer or by the Agent on behalf of all Customers, by sending written notice to the Bank. Any notice of termination sent to the Bank shall only be effective when actually received by the Bank and after the Bank has had a reasonable time to act on such notice. The Service may be terminated by the Bank with respect to any one Customer, or with respect to all Customers, effective immediately upon the sending of written notice to the affected Customer or the Agent (in



case of a multiple entity sweeping arrangement). Notwithstanding the foregoing, the Bank may terminate a Service with immediate effect where it becomes aware of any of the following events : (i) upon control of any one Customer's business being assumed by a trustee, conservator or the like; or (ii) upon the filing of an action by or against any one Customer in the nature of bankruptcy or reorganization; or (iii) upon being directed to do so by a competent regulatory authority or court in any jurisdiction. Termination of the Service shall not affect accrued obligations or limit the right of set-off provided to the Bank hereunder.

> JPM is not agreeable to client's following request:
>
> The Service may be terminated by any Party subject to prior written notice sent ninety (90) days in advance.
>
> - Client to provide rationale for requesting that service may be terminated by any party subject to written notice sent 90 days in advance. JPM does not require such advance notice to terminate this Service. In any case, if client wishes to align with GAT, then JPM counter-proposes 60 days prior written notice by the Client.
> - JPM requires the language that provides for the the client to  terminate by written notice to the Bank (to be effective when received by JPM and allows for JPM to have reasonable time to act on the notice); and
> - JPM needs the flexibility to terminate with immediate effect by sending a written notice to the client.

## 5. Set-off.

The Customers agree that the Bank shall have the unrestricted right, at any time, without notice, to (i) set-off, in whole or in part, any funds in any Account, against any overdraft in any other Account; and (ii) transfer or otherwise apply, in whole or in part, any overdraft in any Account, to any other Account, even if so doing places such other Account into or further into an overdraft. For the avoidance of doubt, any rights of set-off of the Bank under the Bank's Account Terms or under any law or statute are in addition to the rights contained in this provision.

> JPM is not agreeable to client's request to have right to set-off against its others accounts by adding the following paragraph:
>
> "The Bank agrees that Customers shall have the unrestricted right, at any time, without notice, to (i) set-off, in whole or in part, any funds in any Account, against any overdraft in any other Account; and (ii) transfer or otherwise apply, in whole or in part, any overdraft in any Account; to any other Account, even if so doing places such other Account into or further into an overdraft. For the avoidance of doubt, any rights of set-off of the Customer under the Account Terms or under any law or statute are in addition to the rights contained in this provision."
>
> - Client to provide us with rationale for request to have right to set-off unilaterally across its other accounts.
> - ALL CHANGES TO THIS CLAUSE IS SUBJECT TO INTERNAL APPROVAL

## 6. Indemnity.

The Customers shall, jointly and severally, indemnify and hold the Bank harmless from and against any and all claims, damages, demands, liabilities, losses, reasonable costs and expenses (including attorneys' fees and claims caused by overdrafts in any Account) arising under or in relation to the Service, including but not limited to claims resulting from any breach or alleged breach of any representation or warranty hereunder, except, and to the extent, any such claims, damages, demands, liabilities, losses, costs and expenses are directly caused by fraud, gross negligence or willful misconduct of the Bank. This Section 6 shall survive termination of the Service.

> Client requested the following changes:
>
> The Customers shall, jointly and severally, indemnify and hold the Bank harmless from and against any and all damages, liabilities, losses, reasonable costs and expenses (including attorneys' fees and claims caused by overdrafts in any Account) arising under or in relation to the Service, including but not limited to claims resulting from any breach or alleged breach of any representation or warranty hereunder, except, and to the extent, any such claims, damages, demands, liabilities, losses, costs and expenses are directly caused by fraud, gross negligence or willful misconduct of the Bank. This Section 6 shall survive termination of the Service.
>
> In line with our response to client's requested changes to the GAT:
>
> - JPM is not agreeable to deletions of claims and demands
> - JPM is agreeable to insertion of "reasonable" before costs
> - JPM is agreeable to insertion of "fraud" before gross negligence

## 7. Limitation of Liability.

The Bank's liability under these Service Terms and in relation to the Service shall be limited to direct damages resulting from the Bank's gross negligence or willful misconduct in the provision of the Service hereunder. The Bank shall not, in any event, be liable for indirect, special, consequential or punitive losses or damages of any kind (including, but not limited to loss of profits), whether or not foreseeable, even if the Bank has been advised of the likelihood of such loss or damage, and regardless of whether the claim for loss or damage is made on account of negligence, gross negligence, for breach of contract or otherwise; provided, however, the foregoing shall not apply to the extent such loss or damage is caused by fraud on the part of the Bank. This Section 7 shall survive termination of the Service.



Client request for the following modifications to clause above:

"The Bank's liability under these Service Terms and in relation to the Service shall be limited to direct damages or indirect damages [capped at  ] resulting from the Bank's gross negligence or willful misconduct in the provision of the Service hereunder. The Bank shall not, in any event, be liable for consequential or punitive losses (including, but not limited to loss of profits),; provided, however, the foregoing shall not apply to the extent such loss or damage is caused by fraud on the part of the Bank. This Section 7 shall survive termination of the Service."

In line with our response to client's requested changes to the GAT:

• JPM is not agreeable to client requested changes above.
• JPM will not be liable for any indirect losses and JPM does not agree to setting a cap above which JPM will be liable for direct and indirect losses.

## 8. Acknowledgements.

Each Customer acknowledges that, notwithstanding anything to the contrary herein, if the Bank becomes aware of any regulatory or legal action which, in the Bank's sole opinion affects the propriety of the Service or any Account, and/or on any day when a Customer's funds are not permitted to be transferred, the Bank may suspend all transfers under the Service until: (i) the basis for the inability to transfer funds is removed or satisfied and/or the Bank's concerns regarding any regulatory or legal action are resolved to its satisfaction; and (ii) the Customer or the Agent (in case of a multiple entity sweeping arrangement) and the Bank mutually agree to reinstate the Service.

## 9. Taxes – Liability of the Customer.

(i) Each Customer shall pay or reimburse the Bank for any taxes, levies, imposts, deductions, charges, stamp, transaction and other duties and withholdings (together with any related interest, penalties, fines, and expenses) in connection with the Service (including payments or receipts to an Account) charged, assessed, collected from or paid by the Bank in any jurisdiction.

(ii) Each Customer is expected to and herein confirms that: (a) it has fully satisfied itself, having obtained independent professional advice, as to any tax impact of the Service before agreeing to the terms herein; (b) it has not relied on any representations from the Bank as to the interpretation or characterization or implication of the transactions herein undertaken under a tax (including withholding tax and/or dividend tax), transfer pricing or any other regulation or purpose, in any jurisdiction; (c) it is solely responsible for monitoring any change in tax regulations (including any local withholding tax, dividend tax and / or tax transfer pricing requirements or implications) or interest rate change, and for notifying the Bank of the same and requesting an amendment to the Sweep Options or Report Options, as applicable; (d) the Bank shall not, in any manner, be liable to make transfer to the appropriate authority of Taxes deducted by it on interest payable to any Customer as a result of these Sweep Options; (e) where relevant in connection with the Intercompany Report Service, it has taken independent tax advice and it has fully satisfied itself that the inter-company lending rates are at all times provided on an arms' length basis; and (f) it is solely responsible for the validity, accuracy and completeness of any tax (inclusive of, but not limited to, withholding tax) and interest rates provided to the Bank.

(iii) The Customer(s) shall, jointly and severally (in case of a multiple entity sweep arrangement), indemnify and otherwise hold the Bank harmless for (i) withholding tax imposed by any jurisdiction on overdraft interest charged to any Account, and any interest, penalties or additions to tax for failure to properly remit such tax, and/or (ii) the Bank's payment of any taxes, interest, penalties and or additions to tax otherwise due from, or paid on behalf of, any Customer.  If a tax deduction is required by law on any payment made from the Customer to the Bank, the amount of the payment due from the Customer will be increased to an amount which (after making the tax deduction) leaves an amount equal to the payment which would have been due if no tax deduction had been required.

(iv) Each Customer shall provide the Bank such documentation, declarations, certifications and information as it may require in connection with taxation, and warrants that such information, including the information contained in the Sweep Implementation Form and/or Intercompany Report Implementation Form, as applicable, is true and correct in every respect, not misleading or inaccurate in any way, and contains all material information.  The Customer understands that the Bank has relied upon and assumed the validity, accuracy and completeness of all information made available to the Bank by it, and each Customer undertakes to notify the Bank immediately if any information requires updating or revision.

## 10. Taxes – Liability of the Bank.

Each Customer hereby acknowledges that:

(i) the Bank makes no representations as to the interpretation or characterization or implication of the transactions herein undertaken under a tax or any other regulation or purpose, in any jurisdiction;

(ii) the Bank will not be acting as the Customer's tax agent to file any documents with the local tax authorities or determination or payment of any applicable taxes (including but not limited to withholding, value-added, sales, business, transaction, stamp duties or other similar taxes, penalties and charges) in relation to any of the Customer's arrangements;

(iii) the Bank by performance of its obligations hereunder or by any of its actions or omissions in connection with these Service Terms shall not be deemed or construed to be (a) providing tax advice or (b) making any representation (in particular, such representation that the



transactions contemplated hereunder are compliant with applicable regulation, tax or otherwise) or recommendation to the Customer in any respect whatsoever;

**(iv)** the Bank is providing an administrative service for an agreed fee and that in providing the Service shall not be required to provide any fiduciary responsibilities towards the Customer. It will be the Customer's responsibility to ensure that any calculations, assessments or reports that are generated by the Bank is verified to its own satisfaction. The Bank shall not be responsible for and will not be providing any checks on the validity, accuracy of the interest rates or tax (inclusive of, but not limited to, withholding tax) rates, whether implied or actual; and

**(v)** the Bank shall not be responsible for monitoring tax regulations or any amendments thereto on the Customer's behalf.

## 11. Representations and Warranties.

Each of the Customers represents, warrants and undertakes that:

**(i)** the execution and delivery by it of these Service Terms, (including but not limited to the appointment of the Agent, in case of multiple entity Sweep Service) and the documents provided for herein, and the consummation of every transaction contemplated under the Sweep Service, have been (and will continue to be) duly authorized by requisite corporate actions (including, any board or shareholder consents, as applicable) as may be required by applicable law and constitutional documents of each Customer and each Customer has full legal power, capacity and authority to enter into these Service Terms.

**(ii)** the Accounts are and will be maintained in accordance with all applicable laws and that the Customer(s) shall at all times avail itself of the Services only in accordance with the terms of all applicable law (including but not limited to any exchange control restrictions which may apply to the operations of the Accounts).

> Client request for the following modifications to clause above:
>
> "Each Party represents, warrants and undertakes that:
>
> (i) the execution and delivery by it of these Service Terms, (including but not limited to the appointment of the Agent, in case of multiple entity Sweep Service) and the documents provided for herein, and the consummation of every transaction contemplated under the Sweep Service, have been (and will continue to be) duly authorized by requisite corporate actions (including, any board or shareholder consents, as applicable) as may be required by applicable law and constitutional documents of each Customer and each Customer has full legal power, capacity and authority to enter into these Service Terms.
>
> Customers represent, warrant and undertake that:
>
> **(iii)** (ii) the Accounts are and will be maintained in accordance with all relevant Governing laws and that the Customer(s) shall at all times avail itself of the Services only in accordance with the terms of relevant Governing law (including but not limited to any exchange control restrictions which may apply to the operations of the Accounts)."
>
> • JPM is not agreeable to provide representation and warranty on sub-clause (i).
> • JPM is not agreeable for "applicable laws" in sub-clause (ii) to be replaced with "relevant Governing laws"-since applicable laws is broader and would cover more than just governing laws (which limits to the participant account location).

## 12. Addition or Removal of Accounts from the Service.

The Customer or the Agent (in case of a multiple entity sweep arrangement) may apply for addition or removal of Accounts under the Service by providing a letter in the form attached hereto as Exhibit B or through a request sent through an electronic channel made available by the Bank. The Bank shall have a reasonable period to review such application and may agree to the addition/removal in its sole discretion, and may advise the Customer/Agent of acceptance or otherwise through any means acceptable to the Bank including but not limited to via the electronic channel.

## 13. Acceptance of Intercompany Reporting Terms.

In selecting the Intercompany Report Service, the Customer hereby agrees that the terms and conditions set out in Exhibit E shall apply accordingly.

## 14. Miscellaneous.

**(i)** All Accounts subject to the Service are subject to the Bank's Account Terms (including but not limited to any provisions on set-off), as the same may be amended from time to time, subject to any conflicting terms in these Service Terms.

**(ii)** Reference to "**these Service Terms**" shall include the local jurisdictional terms scheduled hereto (the "**Jurisdictional Terms Addendum**"). Notwithstanding any other term to the contrary, in the event of any inconsistency between the terms contained in the main body of this document and the terms set out in the Jurisdictional Terms Addendum, the terms of the Jurisdictional Terms Addendum shall prevail.



**(iii)** In case of a multiple entity sweep arrangement, the acceptance of these Service Terms may be confirmed by way of completion by each Customer of a set of the Application Form (all of which together shall constitute one legally binding agreement) or Exhibit C or by any other means acceptable to the Bank.

**(iv)** The Bank may, at its discretion, and subject to completion of applicable documentation by the Customer(s), allow the Customer(s) an option to submit certain requests/instructions through an electronic channel provided by the Bank. Where such electronic channel is used, it is agreed that all actions taken and instructions provided by the Customer(s) shall bind the Customer(s) and, as applicable, be subject to acceptance by the Bank (and the Bank may confirm such acceptance electronically or by other means acceptable to it).

## 15. Governing Law and Jurisdiction.

These Service Terms shall be governed by and construed in accordance with the laws of the jurisdiction where the Participating Account(s) are held.  The parties hereto consent to the non-exclusive jurisdiction of the courts of such jurisdiction.

## 16. Expansion of Service Terms to Other Jurisdictions.

The Customer(s) agrees to apply these Service Terms to additional jurisdictions not covered by these Service Terms (at the date hereof), and the Bank shall provide the applicable jurisdiction specific terms (if any) for such jurisdictions which the Customer will be deemed to have accepted on receipt of such terms.

# EXHIBIT 4

Message

| From: | Tanneur, Vincent [Vincent.Tanneur@jpmorgan.com] |
|---|---|
| on behalf of | Tanneur, Vincent <Vincent.Tanneur@jpmorgan.com> [Vincent.Tanneur@jpmorgan.com] |
| Sent: | 2/24/2020 11:46:33 AM |
| To: | Marco PASSANTE [marco.passante@essilor.com] |
| CC: | Benamara, Illan [illan.benamara@jpmorgan.com]; Hilary HALPER [halperh@essilor.fr] |
| Subject: | RE: requests |
| Attachments: | Cash Con 100317.pdf; Access Service Terms - EMTC.PDF; 1600222 EMTC.DOCX |

Dear Marco,

Plse find answers below and docs attached :

## 1-regarding the SADF dated 15 Oct 2015, could we please:

- **be provided with a copy of the whole agreement (this SADF being pages 4-5 of 11)?**

The copy of the SADF provided was complete. Its pages were numbered 4-5 of 11 because it would have been part of a larger document packet that included the SADF. The other pages included in the packet would include a cover page listing the following documents, the SADF Waiver referenced below, the Service Terms (also referenced below and attached at your request) and certain other documentation distributed as part of the standard Access onboarding. Our document management team is searching its records to locate a copy of the complete packet with cover page. We will provide it if and when it is found. But, to be clear, the copy of the 2015 SADF provided was complete.

- **understand which of EMTC's bank account is concerned?**

SADFs apply at the entity level, so it would apply to all accounts managed via an EMTC Access profile, which could include accounts at more than one branch of JPMorgan and accounts added to EMTC's Access profile subsequent to the date of the SADF (including the New York account opened in 2017).

- **be confirmed that this is applicable in the context of the cash pooling structure and to EMTC's account in NYC, especially as the box « web (ach) cash concentration » is not ticked?**

The checkboxes, including for "Web (ACH) Cash Concentration," indicate the products and services to which the initial Access set-up or changes by the Security Administrator apply. EMTC did not have the Web (ACH) Cash Concentration product, which is no longer offered, on its profile and thus did not appoint any Security Administrators with authority to manage it. The Web (ACH) Cash Concentration product was a tool for reporting and consolidating decentralized deposits. It did not relate to whether the accounts managed within the EMTC profile were part of a cash pooling structure. Such cash pooling structure was set up via the attached US Cash Concentration Service Terms (Multi Entity) completed and executed by the various Essilor entities involved, including EMTC.

## 2-regarding the SADF waiver dated 15 Oct 2015, might we please:

- **understand which of EMTC's bank account is concerned by this waiver?**

SADF Waivers (similar to SADFs) apply at the entity level, so it would apply to all accounts managed via an Access profile owned by EMTC, which could include accounts at more than one branch of JPMorgan and accounts added to EMTC's Access profile subsequent to the date of the SADF Waiver (including the New York account opened in 2017), until the waiver has been expressly revoked.

- **be confirmed what are the Service Terms (referred to in the waiver) that have been modified further to the signing of this waiver (and be provided with a copy of those Service Terms)?**

A copy of the Access Service Terms provided to EMTC is attached.

- **be sent a copy of the whole agreement (this waiver being page 6 of 11)?**

The SADF Waiver on page 6 is the entirety of the waiver form. As noted in response to the first question above, the other pages included a cover page, the SADF and the Access Service Terms.

EMTC-000103273

- know if this 2015 waiver does apply to EMTC's account in NYC (which we understand was opened only in 2017)?

As noted, SADF Waivers (similar to SADFs) apply at the entity level, so it applied to all accounts managed via an Access profile owned by EMTC, which could include accounts at more than one branch of JPMorgan and accounts added to EMTC's Access profile subsequent to the date of the SADF Waiver, including the New York account opened in 2017.

3-regarding the SADF dated 30 October 2018, could we please:

- be provided with page 1 (as it is indicated that this SADF is page 2 of 2)?

The copy of the SADF provided is the entire document.  Page 1 would have been a cover page listing the attached document.  Our document management team has successfully located a Word version of the complete 2018 packet, a copy of which is attached.

- be confirmed that this document did not cancel and supersede the waiver dated 15 oct 2015?

The SADF dated 30 October 2018 did not cancel or supersede the SADF and SADF Waiver dated 15 October 2015.  The 2018 SADF added and removed certain Security Administrators.  The 2015 SADF Waiver remained in effect, and the 2015 SADF remained effective with respect to SADFs who were not removed by the 2018 SADF.

Regards

---

**Vincent Tanneur** | Managing Director | Head of Global Corporate Bank - France | **J.P. Morgan** | 14, Place Vendome, 75001 Paris, France | T: +33140154128 | M: +33778871824 | vincent.tanneur@jpmorgan.com

**Executive assistant:** Sonia Domingues | T: +33140154321 | sonia.domingues@jpmorgan.com


**From:** Marco PASSANTE [mailto:marco.passante@essilor.com]
**Sent:** Monday, February 10, 2020 12:13 PM
**To:** Tanneur, Vincent (CIB, FRA) <Vincent.Tanneur@jpmorgan.com>
**Cc:** Benamara, Illan (CIB, FRA) <illan.benamara@jpmorgan.com>; Hilary HALPER <halperh@essilor.fr>
**Subject:** Re: requests

dear Vincent thanks for the info provided I have few questions to better understand the documents


1-regarding the SADF dated 15 Oct 2015, could we please:

- be provided with a copy of the whole agreement (this SADF being pages 4-5 of 11)?
- understand which of EMTC's bank account is concerned?
- be confirmed that this is applicable in the context of the cash pooling structure and to EMTC's account in NYC, especially as the box « web (ach) cash concentration » is not ticked?

2-regarding the SADF waiver dated 15 Oct 2015, might we please:

- understand which of EMTC's bank account is concerned by this waiver?
- be confirmed what are the Service Terms (referred to in the waiver) that have been modified further to the signing of this waiver (and be provided with a copy of those Service Terms)?
- be sent a copy of the whole agreement (this waiver being page 6 of 11)?
- know if this 2015 waiver does apply to EMTC's account in NYC (which we understand was opened only in 2017)?

CONFIDENTIAL

EMTC-000103274

3-regarding the SADF dated 30 October 2018, could we please:

- be provided with page 1 (as it is indicated that this SADF is page 2 of 2)?
- be confirmed that this document did not cancel and supersede the waiver dated 15 oct 2015?

let me know


regards
m

**Marco Passante**
Vice President Internal Audit
ACS Audit & Consulting Services

No. 201 Kallang Bahru Essilor Building I, #03-00 Singapore 339338
Direct line : (+65) 67134737 Mobile: (+65) 81277044

Visit the ACS web site

This e-mail and its attachments are confidential and intended for use by the above named recipient(s) only. If you are not the intended recipient, please note that any use, modification, dissemination, edition or reproduction (either in whole or partially) of this e-mail and/or its attachments, or of the information contained herein, is strictly prohibited. If you have received this e-mail by mistake, please notify the sender immediately, and immediately delete this e-mail with its attachments and any copy of it from your computer system. We do not ensure the security of electronically transmitted information. Therefore, we take no responsibility in the event this email and/or its attachments may have been for example modified, altered and/or in the case of transmission of a virus. Your communication with us through such means shall signify your acceptance of such risks. We kindly advise you to check whether this email or its attach


On Fri, Jan 31, 2020 at 6:30 PM Tanneur, Vincent <Vincent.Tanneur@jpmorgan.com> wrote:

Dear Marco,

Plse find attached JPMAccess forms we have on file for EMTC to answer #1.

Regards

Vincent


**From:** Marco PASSANTE [mailto:marco.passante@essilor.com]
**Sent:** Saturday, January 25, 2020 3:08 PM
**To:** Tanneur, Vincent (CIB, FRA) <Vincent.Tanneur@jpmorgan.com>
**Subject:** requests


hi Vincent
thank you for the info already provided.
I have 2 additional requests:

1.      would be possible to receive the " JP Access online Form" for EMTC  (attached the one for EDT as a reference )

2.      the list of all the beneficiries created on the EMTC accounts with the function "maker" possibly since the account activation with the creation date

thanks in advance

mrco

**Marco Passante**
Vice President Internal Audit
**ACS** Audit & Consulting Services

No. 201 Kallang Bahru Essilor Building I, #03-00 Singapore 339338
Direct line : (+65) 67134737 Mobile: (+65) 81277044

Visit the ACS web site

This e-mail and its attachments are confidential and intended for use by the above named recipient(s) only. If you are not the intended recipient, please note that any use, modification, dissemination, edition or reproduction (either in whole or partially) of this e-mail and/or its attachments, or of the information contained herein, is strictly prohibited. If you have received this e-mail by mistake, please notify the sender immediately, and immediately delete this e-mail with its attachments and any copy of it from your computer system. We do not ensure the security of electronically transmitted information. Therefore, we take no responsibility in the event this email and/or its attachments may have been for example modified, altered and/or in the case of transmission of a virus. Your communication with us through such means shall signify your acceptance of such risks. We kindly advise you to check whether this email or its attach



This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, viruses and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.



This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, viruses and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

CONFIDENTIAL

EMTC-000103276

# EXHIBIT 5

| From: | Benamara, Illan </O=CORPEXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E633492> |
|---|---|
| To: | Souza, Joanes |
| CC: | Chang, Janice E; Prasad, Pranav; Riley, Julia A; Yelisova, Kateryna X; Zeppelini, Glauce S |
| Sent: | 11/21/2016 10:13:05 PM |
| Subject: | RE: 11-18 EMEA/NA CDMC Essilor |

Thanks,
this Friday is fine

Best regards
illan

**Illan Benamara** | Treasury Services | Head of France, Belgium & Luxembourg Corporate Sales |
J.P. Morgan | 14, Place Vendôme - 75001 Paris - France | T: +33 (0)1 40 15 44 51 | M: +33 (0)7 78 69 33 82 | illan.benamara@jpmorgan.com

(Alternate contact: **Dunita Moonshiram** | T: +33 1 40 15 42 32 | dunita.moonshiram@jpmorgan.com)

**From:** Souza, Joanes
**Sent:** 21 November 2016 17:21
**To:** Benamara, Illan
**Cc:** Chang, Janice E; Prasad, Pranav; Riley, Julia A; Yelisova, Kateryna X; Zeppelini, Glauce S
**Subject:** RE: 11-18 EMEA/NA CDMC Essilor

Hi Illan,

I will follow up with Legal and local TSM [ Redacted-Privileged ] this
Friday.

Please let me know if this timeframe is not good for you.

Regards,
Joanes.

**From:** Benamara, Illan
**Sent:** domingo, 20 de novembro de 2016 22:08
**To:** Chang, Janice E; Souza, Joanes; Prasad, Pranav; Riley, Julia A; Yelisova, Kateryna X
**Subject:** RE: 11-18 EMEA/NA CDMC Essilor

Janice,

As requested, see attached the amended form.
let me know if you have any queries.

Many Thanks
Best regards
illan

**Illan Benamara** | Treasury Services | Head of France, Belgium & Luxembourg Corporate Sales |
J.P. Morgan | 14, Place Vendôme - 75001 Paris - France | T: +33 (0)1 40 15 44 51 | M: +33 (0)7 78 69 33 82 | illan.benamara@jpmorgan.com

(Alternate contact: **Dunita Moonshiram** | T: +33 1 40 15 42 32 | dunita.moonshiram@jpmorgan.com)

**From:** Chang, Janice E

**Sent:** 19 November 2016 03:47
**To:** Benamara, Illan; Souza, Joanes; Prasad, Pranav; Riley, Julia A; Yelisova, Kateryna X
**Subject:** 11-18 EMEA/NA CDMC Essilor

The attached non standard terms for Essilor were presented at a joint EMEA/NA CDMC today.  NA & EMEA CDMC approved the non standard terms for the accounts being opened in London, France and US.  The approval only applies to the specific entities (100% wholly owned) that are listed in the client section of the memo.  The committee would not approve future entities or other jurisdictions at the meeting.

Illan:  Please modify the attached form to indicate that the scope of approval is limited to only those entities listed on the form and where those accounts will be opened.  If you decide that you want to ask for future approvals for other entities and/or jurisdictions then it has to either come back to the regional CDMC where the accounts will be opened or global CDMC.  Please make sure that you send the revised memo to everyone on this distribution list.

Pranav/Joanes:  Please use the revised form from Illan for presentation at the APAC and LATAM CDMC meetings this week.

Julia:  Please let me know if I missed anything from this morning's meeting

Regards

Janice

# EXHIBIT 6

| | |
|---|---|
| **From:** | Benamara, Illan </O=CORPEXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E633492> |
| **To:** | Chang, Janice E; Souza, Joanes; Prasad, Pranav; Riley, Julia A; Yelisova, Kateryna X |
| **Sent:** | 11/21/2016 12:07:52 AM |
| **Subject:** | RE: 11-18 EMEA/NA CDMC Essilor |
| **Attachments:** | Essilor Global CDMC Non-Standard Terms FINAL (redline) (2) (3) (2).docx |

Janice,

As requested, see attached the amended form.
let me know if you have any queries.

Many Thanks
Best regards
illan

---

**Illan Benamara** | Treasury Services | Head of France, Belgium & Luxembourg Corporate Sales |
J.P. Morgan | 14, Place Vendôme - 75001 Paris - France | T: +33 (0)1 40 15 44 51 | M: +33 (0)7 78 69 33 82 | illan.benamara@jpmorgan.com


(**Alternate contact: Dunita Moonshiram** | T: +33 1 40 15 42 32 | dunita.moonshiram@jpmorgan.com)

---

**From:** Chang, Janice E
**Sent:** 19 November 2016 03:47
**To:** Benamara, Illan; Souza, Joanes; Prasad, Pranav; Riley, Julia A; Yelisova, Kateryna X
**Subject:** 11-18 EMEA/NA CDMC Essilor

The attached non standard terms for Essilor were presented at a joint EMEA/NA CDMC today.  NA & EMEA CDMC approved the non standard terms for the accounts being opened in London, France and US.  The approval only applies to the specific entities (100% wholly owned) that are listed in the client section of the memo.  The committee would not approve future entities or other jurisdictions at the meeting.

Illan:  Please modify the attached form to indicate that the scope of approval is limited to only those entities listed on the form and where those accounts will be opened.  If you decide that you want to ask for future approvals for other entities and/or jurisdictions then it has to either come back to the regional CDMC where the accounts will be opened or global CDMC.  Please make sure that you send the revised memo to everyone on this distribution list.

Pranav/Joanes:  Please use the revised form from Illan for presentation at the APAC and LATAM CDMC meetings this week.

Julia:  Please let me know if I missed anything from this morning's meeting

Regards

Janice

JPMC_EMTC_00089062

DOCUMENT WITHHELD FOR PRIVILEGE

Confidential Discovery Material

# EXHIBIT 7

| From: | Benamara, Illan </O=CORPEXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E633492> |
| --- | --- |
| To: | Marchesini, Elisabete; Souza, Joanes |
| CC: | Oliveira, Amanda; Michels, Roberto |
| Sent: | 11/22/2016 4:55:14 PM |
| Subject: | RE: Global CDMC Agenda 11-17 - Essilor/ Brazil |

Hello,
CDMC approval has been obtained in EMEA, US and APAC.

I am still waiting for the minutes

Best regards
illan

**Illan Benamara** | Treasury Services | Head of France, Belgium & Luxembourg Corporate Sales |
J.P. Morgan | 14, Place Vendôme - 75001 Paris - France | T: +33 (0)1 40 15 44 51 | M: +33 (0)7 78 69 33 82 | illan.benamara@jpmorgan.com

**From:** Marchesini, Elisabete
**Sent:** 22 November 2016 02:20
**To:** Souza, Joanes
**Cc:** Benamara, Illan; Oliveira, Amanda; Michels, Roberto
**Subject:** FW: Global CDMC Agenda 11-17 - Essilor/ Brazil

**Hi Joanes**

Illor told me he already obtained the approval for Essilor from EMEA and NA CDMCs. Tomorrow he expects to also obtain the approval for APAC.

So, I'd like to suggest using the minutes of other regions to leverage our request for Latam. Could we request an ad rock approval for Essilor tomorrow?

Tks
Bete

**Elisabete Marchesini** | J.P. Morgan | Corporate & Investment Bank - Treasury Services | T: (55) 11 4950 3610 | M: (55) 11 99479-0096 | elisabete.marchesini@jpmchase.com
Av. Brigadeiro Faria Lima, 3729 - 14th floor | São Paulo - SP | 04538-905

**Ouvidoria J.P. Morgan: 0800-7700847 / ouvidoria.jp.morgan@jpmorgan.com**

**From:** Chang, Janice E
**Sent:** quarta-feira, 16 de novembro de 2016 21:24
**To:** Benamara, Illan; Yuen, Olivia E; Riley, Julia A; Tanneur, Vincent; Talarico, Rodrigo M; Marchesini, Elisabete; Hongrattanakulchai, Phiroon; Cheah, Su-Ann; Oliveira, Amanda
**Cc:** CDMC EMEA; APAC CDMC Submissions; Zeppelini, Glauce S; Souza, Joanes; Muniz-Garcia, Daniel
**Subject:** Global CDMC Agenda 11-17 - Essilor

Attached is the meeting document for Thursday's off cycle Global CDMC meeting. The Global CDMC members have received a separate email with the meeting documents. We will discuss the final bid for ▮▮▮▮ first followed by the non standard terms for Essilor. The dial in numbers are listed below:

**Call Details**
- **Date:** 11-17-16
- **Time:** 7:30am – 8:00am EST

Confidential Discovery Material

**Dial In:** Domestic: 1-(888) 575-5762; International: 1-(857) 318-0900; Passcode: 26464997#

**Additional dial in numbers listed below:**

| Country | Local toll-free | Local dial-in | International dial-in |
|---|---|---|---|
| **Australia** | 1800388152 | 0289166593 | +61 289166593 |
| **China** | 108004400488 | | |
| **China** | 108007440505 | 4008866802 | +86 4008866802 |
| **Hong Kong** | | 30126200 | +852 30126200 |
| **India** | 0008004402039 | | |
| **Japan** | 0120369600 | 0367439237 | +81 367439237 |
| **Malaysia** | 1800220025 | 0362074596 | +60 362074596 |
| **Singapore** | 18006221986 | 66221985 | +65 66221985 |
| **South Korea** | 0804710880 | 0234831485 | +82 234831485 |
| **Taiwan** | 0800666950 | 0226567291 | +886 226567291 |
| **Thailand** | 0018004412348 | | |
| **United Kingdom** | 08007836960 | 03301230612 | +44 3301230612 |

**Other countries:**

Global access numbers for local dial-in numbers for international participants

Regards

Janice

Confidential Discovery Material     JPMC_EMTC_00076959

# EXHIBIT 8

| From: | Hongrattanakulchai, Phiroon </O=CORPEXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F597571B00> |
|---|---|
| To: | Cheah, Su-Ann; Nguyen, Darren |
| CC: | Benamara, Illan |
| Sent: | 11/21/2016 7:42:50 AM |
| Subject: | FW: 11-18 EMEA/NA CDMC Essilor |
| Attachments: | CDMC Essilor & ▮▮▮▮▮; Essilor Global CDMC Non-Standard Terms FINAL (redline) (2) (3) (2).docx |

Dear Darren, Su-Ann,

This case will go to CDMC tomorrow morning 10:30 SG/HK time. Thank you very much.

Regards,
Phiroon.

JPMC_EMTC_00076935

| From: | McGraw, James </O=CORPEXCHANGE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JAMES.MCGRAW> |
|---|---|
| Sent: | 11/21/2016 6:53:36 AM |
| To: | Hongrattanakulchai, Phiroon <phiroon.hongrattanakulchai@jpmorgan.com>; Pon, Patrique BC <patrique.bc.pon@jpmorgan.com>; Pintusopon, Jarin <jarin.pintusopon@jpmchase.com>; Siriyaphan, Pitcha <pitcha.siriyaphan@jpmchase.com>; Godara, Rohit <rohit.godara@jpmorgan.com>; Jun, Hyesi <hyesi.jun@jpmorgan.com>; APAC CDMC Submissions <apac.cdmc.submissions@jpmorgan.com>; Prasad, Pranav <pranav.prasad@jpmorgan.com> |
| Subject: | CDMC Essilor & ▮▮▮▮▮ |
| Start: | 11/22/2016 2:25:00 AM |
| End: | 11/22/2016 2:55:00 AM |
| Show Time As: | Free |
| | |
| Recurrence: | (none) |
| Required Attendees: | Hongrattanakulchai, Phiroon; Pon, Patrique BC; Pintusopon, Jarin; Siriyaphan, Pitcha; Godara, Rohit; Jun, Hyesi; APAC CDMC Submissions; Prasad, Pranav |
| Attachments: | Essilor CDMC 11.22.16 .docx; ▮▮▮▮▮▮▮▮▮▮▮▮ |

When: Tuesday, November 22, 2016 10:25 AM-10:55 AM (UTC+08:00) Beijing, Chongqing, Hong Kong, Urumqi.
Where: Pls see dial in no as below. Passcode: 40655290#

Note: The GMT offset above does not reflect daylight saving time adjustments.

\*~\*~\*~\*~\*~\*~\*~\*~\*

**Item Number 3 (provide this number to operator & wait on the line for your item # to be called; you will be placed on hold and will be notified by operator when the committee members have joined)**

| Time Slot | Item # | Date of Review | Client Entity | Client Name - Ultimate Parent | TMO Name /Presenter | Reason for CDMC | Reason for CDMC 2 |
|---|---|---|---|---|---|---|---|
| 10:30 | 3 | 11/22/2016 | Essilor Manufacturing (Thailand) Co., Ltd | Essilor International Group | Phiroon Hongrattanakulchai | Non-Standard Terms | Essilor 11.22.16 CDMC |
| 10:40 | 3 | 11/22/2016 | Redacted: Client Information | ▮▮▮▮▮▮▮▮ | Phiroon Hongrattanakulchai | Sig Deal | Redacted: Client Information |

## PASSCODE FOR PARTICIPANTS: 40655290#

### PARTICIPANT Dial-In Number(s)

*The below Dial-In numbers should be provided to Dial-In **PARTICIPANTS ONLY**.*

| Country | Toll-free number | International/Local |
|---|---|---|
| Hong Kong | | +852 3011 4660 |
| Singapore | | +65 6622 1295 |
| United Kingdom | 080 0085 5072 | +44 (0) 20 3027 1109 |
| United States | 877 605 3379 | +1 212 444 0512 (New York) |
| United States | | +1 408 916 0678 (San Jose) |



Highly Confidential Discovery Material

Essilor CDMC 11.22.16 .docx



JPMC_EMTC_00076937

DOCUMENT WITHHELD FOR PRIVILEGE

JPMC_EMTC_00076938

DOCUMENT WITHHELD FOR PRIVILEGE

Confidential Discovery Material                                                    JPMC_EMTC_00076939

DOCUMENT WITHHELD FOR PRIVILEGE

Confidential Discovery Material

JPMC_EMTC_00076940